IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EBURY STREET CAPITAL, LLC, EB
1EMIALA, LLC, EB 2EMIALA, LLC,
EBURY FUND 1 NJ LLC, and EBURY
FUND 2 NJ, LLC,

                  Plaintiffs,

    v.

THOMAS R. MCOSKER, ANDREW
KERNAN, BADEL HERNANDEZ,
LIENCLEAR – 0001, LLC, LIENCLEAR –
0002, LLC, LIENCLEAR, LLC,
BLOXTRADE, LLC, BCMG SERVICES,
LLC, BCMG INTERNATIONAL, LLC, and
SITONA VENTURES LLC,

                  Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:21-cv-00203-MN

## **AMENDED COMPLAINT**[1]

Plaintiffs Ebury Street Capital, LLC ("**ESC**"); Ebury Fund 1 NJ, LLC ("**EF 1**"); Ebury

Fund 2 NJ, LLC ("**EF 2**"); EB 1EMIALA, LLC ("**EB 1**"); and EB 2EMIALA, LLC ("**EB 2**" and

collectively, "**Plaintiffs**"), by and through their undersigned counsel, for their Amended

Complaint against Defendants Thomas R. McOsker; Andrew Kernan; LienClear – 0001, LLC

("**LC Purchaser**"); LienClear – 0002, LLC ("**LC Escrow**"); LienClear, LLC ("**LC Servicer**");

BloxTrade, LLC ("**Bloxtrade**"); BCMG Services, Inc. ("**BCMG Services**"); BCMG

International, LLC ("**BCMG International**"); and Sitona Ventures LLC ("**Sitona**" and

collectively, "**Defendants**"), allege the following based upon personal knowledge as to Plaintiffs

---

[1] A redline against the original complaint is attached as Exhibit A.

and their own acts, and upon information and belief as to all matters based on the investigation conducted by and through Plaintiffs and/or Plaintiffs' attorneys.

## NATURE OF ACTION

1. This action is brought under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et. seq.* and Delaware state law for treble, actual and punitive damages and for the recovery of attorneys' fees and costs incurred in this action.

2. Plaintiffs are in the tax lien investment business.

3. Plaintiff ESC is the managing member of Plaintiffs EF 1 and EF 2, which own New Jersey tax lien certificates, and Plaintiffs EB 1 and EB 2, which own Alabama tax lien certificates.

4. Defendants LC Purchaser, LC Escrow, LC Servicer, and BloxTrade (collectively, the "**Tax Lien Defendants**") advertise themselves as market-makers in and brokers of tax lien certificates ("**Certificates**").

5. The Tax Lien Defendants purport to facilitate transactions by (1) purchasing Certificates and then selling the Certificates at a mark-up (2) after providing escrow, clearing, and transfer services to Certificates' sellers and buyers.

6. Defendant Thomas R. McOsker ("**McOsker**") owns and manages a panoply of Delaware and Puerto Rico LLCs that purport to engage in legitimate financial services, including the Tax Lien Defendants and Defendants BCMG Services, BCMG International, and Sitona (collectively, the "**Corporate Defendants**").

7. Defendants Andrew Kernan, and Badel Hernandez (with McOsker, the "**Individual Defendants**") help McOsker manage the Tax Lien Defendants and the Corporate Defendants.

8. Defendants comprise the "**McOsker Enterprise**," an association-in-fact which defrauds the Tax Lien Defendants' clients into depositing escrow funds with Defendant LC Escrow, which Defendants then steal and use for their own purposes.

2

9.     Defendants work in tandem to "offer" unsuspecting clients an efficient, closed-loop tax lien brokerage service.

10.     In reality, Defendants defraud the public and their own clients by presenting the Corporate Defendants as legitimate financial services companies, then spending their clients' money to line their own pockets.

11.     In several separate transactions throughout 2018, ESC and the Tax Lien Defendants executed a series of contracts (the "**Transaction Agreements**") to facilitate Plaintiffs' sale of nearly one thousand Certificates to Defendant LC Purchaser.

12.     Plaintiffs assigned to, and the Tax Lien Defendants gained title of, all Certificates promised in the Transaction Agreements.

13.     In exchange for Plaintiffs' Certificates, the Tax Lien Defendants promised to lawfully perform all transaction services and pay Plaintiffs over $3.5 million in supposedly-escrowed funds.

14.     But unbeknownst to Plaintiffs, the Tax Lien Defendants did not even maintain a proper escrow account.

15.     Instead, the Tax Lien Defendants simply deposited the funds into a JPMorgan Chase checking account held by LC Escrow in New York (the "**Chase Account**").

16.     Furthermore, instead of disbursing Plaintiffs' money as required by the Transaction Agreements, and as repeatedly requested by Plaintiffs, Defendants McOsker, Kernan, and Hernandez repeatedly transferred cash from the New York Chase Account into Puerto Rico bank accounts held by Defendants BCMG Services and LC Servicer (the "**Puerto Rico Accounts**").

3

17.     Once the Individual Defendants moved Plaintiffs' millions into the Puerto Rico Accounts, the McOsker Enterprise misappropriated the money, lining their own pockets and otherwise using Plaintiffs' $3.5 million for anything other than what they had promised Plaintiffs.

18.     The McOsker Enterprise misappropriated Plaintiffs' money for a variety of unlawful purposes that comprise violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et. seq.,* (RICO) through their predicate acts of wire fraud, violations of the National Stolen Property Act, and money laundering.

19.     Defendants' conduct also violates Delaware common law, including breaches of contract, fraud, unjust enrichment, and conversion.

20.     For example, Defendants perpetrated what amounted be essentially a Ponzi Scheme by using new clients' money to pay off the Tax Lien Defendants' existing clients.

21.     Defendants also used Plaintiffs' $3.5 million of supposedly-escrowed funds to (1) finance Defendants BCMG Services's fraudulent scheme to qualify for tax credits issued by the Commonwealth of Puerto Rico; (2) fund Defendant BCMG Services's routine business expenses; (3) bankroll Defendant McOsker's personal whims, including buying a volleyball team and coffee farm; and (4) pay off Defendants Kernan and Hernandez for their help in committing these crimes.

22.     As Plaintiffs became aware that Defendants stole the money, Plaintiffs learned that Defendants had perpetrated similar frauds on other clients of the Tax Lien Defendants since at least 2016.

23.     Plaintiffs believe that the McOsker Enterprise is using the Tax Lien Defendants to lure other innocent victims to this day.

24.     Plaintiffs seek to recover damages caused by the McOsker Enterprise and Defendants to the fullest extent permitted under the law, including treble, actual, and/or punitive damages, together with interest, costs and fees; and all other relief this Court deems just and proper.

## THE PARTIES

25.     Plaintiff ESC is a New York limited liability company and the managing member of the other Plaintiffs.

26.     Plaintiff EB 1EMIALA, LLC is an Alabama limited liability company that purchases, owns, and sells Alabama tax lien certificates.

27.     Plaintiff EB 2EMIALA, LLC is an Alabama limited liability company that purchases, owns, and sells Alabama tax lien certificates.

28.     Plaintiff Ebury Fund 1 NJ, LLC is a New Jersey limited liability company that purchases, owns, and sells New Jersey tax lien certificates.

29.     Plaintiff Ebury Fund 2 NJ, LLC is a New Jersey limited liability company that purchases, owns, and sells New Jersey tax lien certificates.

30.     Each Plaintiff's principal place of business is 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907.

31.     Defendant Thomas R. McOsker is a resident of Puerto Rico.  McOsker owns all of the Corporate Defendants and manages the other Individual Defendants.

32.     Defendant LienClear, LLC (defined above as "**LC Servicer**") is a Puerto Rico limited liability company.  Defendant McOsker owns LC Servicer.

33.     Defendant LienClear – 0001, LLC (defined above as "**LC Purchaser**") is a Delaware limited liability company. Defendant McOsker owns LC Purchaser.

34.     Defendant LienClear 0002, LLC (defined above as "**LC Escrow**") is a Delaware limited liability company.  Defendant McOsker owns LC Escrow.

35.     Defendant BloxTrade, LLC ("**BloxTrade**") is a Puerto Rico limited liability company. Defendant McOsker owns BloxTrade, which purports to be a tax lien broker.

36.     Defendant BCMG Services, LLC (defined above as "**BCMG Services**") is a Puerto Rico limited liability company.  Defendant McOsker owns BCMG Services.

37.     Defendant BCMG International, LLC (defined above as "**BCMG International**") is a Puerto Rico limited liability company wholly owned by BCMG Services.  The Tax Lien Defendants, BCMG Services, and BCMG International all have the same principal place of business: 53 Palmeras Street, Suite 901 San Juan, Puerto Rico 00901.

38.     Defendant Sitona Ventures, LLC (defined above as "**Sitona**") is a Delaware limited liability company whose principal place of business is 401 Park Avenue South, 10th Floor, New York, NY 10016.  Defendant McOsker owns Sitona.

39.     The application for authority of Sitona filed with the New York State Department of State, Division of Corporations dated July 29, 2015 is signed by McOsker, as "member" with an address of 401 Park Avenue South, 10th Floor, New York, NY 10016.

40.     Non-party Cactus Ventures LLC ("**Cactus**") was a Delaware limited liability company whose principal place of business was 401 Park Avenue South, 10th Floor, New York, NY 10016.  Defendant McOsker owned Cactus.

41.     The application for authority of Cactus filed with the New York State Department of State, Division of Corporations dated November 7, 2014 and is signed by McOsker, as "member" with an address of 401 Park Avenue South, 10th Floor, New York, NY 10016.

42.     Cactus identified its principal place of business at 1 Little West 12th Street, New York, New York, 10014, which is the same business address as Defendants LC Purchaser and LC Escrow.

6

43.     Plaintiffs do not sue Cactus because its limited liability company certificate was canceled in 2018.

44.     Defendant Andrew Kernan is a resident of New York and personally profited at least $85,000 from the McOsker Enterprise's wrongdoing against Plaintiffs.

45.     Defendant Kernan is an independent contractor and Chief Financial Officer ("**CFO**") of Defendant BCMG Services and the Tax Lien Defendants.

46.     Defendant Badel Hernandez is a resident of Puerto Rico and personally profited at least $62,000 from McOsker Enterprise's wrongdoing against Plaintiffs.

47.     Defendant Hernandez is the in-house counsel and business manager of Defendants LC Servicer, BloxTrade, and BCMG Services.

48.     Each Tax Lien Defendant is undercapitalized and lacks corporate formalities.

49.     The Tax Lien Defendants did not engage in arm's-length transactions with each other, but instead freely exchanged assets that they had stolen from their clients.

50.     The McOsker Enterprise used the Tax Lien Defendants to commit federal felonies, from which the Individual Defendants personally profited.

51.     The Individual Defendants planned, organized, and directed the wrongful events alleged herein primarily through the Corporate Defendants, including by wrongfully converting the supposedly-escrowed funds due to Plaintiffs for the Corporate Defendants' own business expenses and the Individual Defendants' personal profits.

52.     For example, the McOsker Enterprise used the Tax Lien Defendants to gain control of, and steal, Escrow Funds belonging to Plaintiffs.

53.     There is substantial overlap in ownership, officers, directors and personnel among Defendants.

7

54.     For example, the Individual and Tax Lien Defendants share common office spaces, addresses, and phone numbers in Puerto Rico.

55.     As part of the sale of Plaintiffs' tax liens, the Tax Lien Defendants did not act at arm's-length with each other, despite contractual obligations to do so, but rather engaged in conflicted, interested transactions with one another.

## JURISDICTION AND VENUE

56.     Pursuant to 28 U.S.C. § 1331, this Court has subject-matter jurisdiction because Plaintiffs allege RICO violations in violation of 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. § 1964(c).

57.     Pursuant to 28 U.S.C. § 1367, the Court may exercise supplemental jurisdiction over Plaintiffs' state law claims.

58.     This Court has personal jurisdiction over Defendants LC Purchaser, LC Escrow, and Sitona, each of which is a Delaware limited liability company and may be served by serving its registered agent in Delaware.

59.     The Court has personal jurisdiction over the Tax Lien Defendants because each entered into agreements with Plaintiff in which they consented to the jurisdiction of Delaware Courts.

60.     The Court has personal jurisdiction over the Individual Defendants because they are citizens of the United States, reside in Puerto Rico and New York, and upon information and belief, manage Delaware limited liability companies LC Purchaser, LC Escrow, and Sitona thus have consented to personal jurisdiction in Delaware pursuant to 6 *Del. C.* § 18-109(a).

61.     The Court has personal jurisdiction over all of the Defendants pursuant to 18 U.S.C. § 1965 because this action may be brought in this jurisdiction against Defendants LC Purchaser, LC Escrow, and Sitona.

62.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because Defendants LC Purchaser, LC Escrow, and Sitona are Delaware entities and the Tax Lien Defendants executed agreements with Plaintiff ESC in which the parties consented to Delaware as the venue for any and all disputes that arise out of the agreements.

63.     Moreover, in a related Puerto Rico proceeding, Defendants moved to dismiss on the basis of, inter alia, forum non conveniens, claiming that Delaware court was the proper jurisdiction for this dispute.

## FACTUAL BACKGROUND

### Tax Lien Investments

64.     Plaintiffs invest in tax lien Certificates, which are certificates of claims against properties that have liens against them due to unpaid property taxes.

65.     Investors like Plaintiffs can buy Certificates in jurisdictions that levy property taxes, which typically are counties and municipalities.

66.     The investor pays the property's outstanding taxes to the municipality.

67.     In exchange, the municipality issues the Certificate to the investor, which gives the investor the right to collect the unpaid taxes and interest from the property owner.

68.     Certificates can be valuable investments because they not only provide stable cash flow, but also have superiority to the vast majority of other liens that can be imposed upon real property.

9

69.     Because there is no central exchange for the secondary trading of Certificates, when investors like Plaintiffs want to sell their Certificates, they often engage the services of brokers and market-makers.

70.     The Tax Lien Defendants purport to offer such brokerage and market-making services for Certificates.

### The Transactions

71.     Between 2015 and 2017, Plaintiffs acquired approximately one thousand Certificates on properties located across the United States.

72.     In 2018, Plaintiffs began working with Defendant BloxTrade to sell Plaintiffs' Certificates.

73.     In 2018, Plaintiffs sold thousands of Certificates in eight separate transactions with Defendant BloxTrade, understanding that BloxTrade would, in turn, sell the Certificates to third parties unaffiliated with Plaintiffs or Defendants (the "**Transactions**").

74.     Defendant BloxTrade and the Tax Lien Defendants purported to structure the transactions so that Plaintiffs would sell the Certificates directly to Defendant LC Purchaser, while Defendant LC Escrow would act as a "third-party escrow agent" and Defendant LC Servicer would perform the transfer and assignment of the Certificates in connection with each Transaction.

75.     The Tax Lien Defendants told Plaintiffs that as the Transactions were pending, the money that Defendant LC Purchaser was providing to purchase Plaintiffs' Certificates would be held in an escrow account maintained by Defendant LC Escrow.

76.     The Tax Lien Defendants claimed that LC Escrow would release the purchase money to Plaintiffs once the third-party sellers purchased the Certificates from Defendant LC Purchaser via Defendant BloxTrade.

77.     A functionally-identical set of three contracts governed each Transaction: (1) a Tax Lien Purchase and Sale Agreement, (2) an Escrow Agreement, and (3) a Service Agreement, which each have Delaware choice-of-law and venue provisions (together, the "**Transaction Agreements**").

78.     The Tax Lien Purchase and Sale Agreements ("**P/S Agreements**") memorialize the terms on which Defendant LC Purchaser bought the Certificates from Plaintiffs.

79.     The Transaction Agreements established the terms on and process with which Defendant LC Escrow would conduct escrow services for Plaintiffs and the ultimate third-party purchasers.

80.     The Service Agreements require Defendant LC Servicer to perform all acts necessary to effect each Transaction, including delivering the Certificates from Plaintiffs to Defendant LC Purchaser, certifying those deliveries, and sending the relevant county clerk Plaintiffs' assignments of the Certificates.

81.     Each Transaction Agreement was executed by Plaintiff ESC, on the one hand, and one or more of the Tax Lien Defendants, on the other hand.

82.     Plaintiff ESC executed each Transaction Agreement as the Managing Member of the Plaintiffs selling their respective Certificates.

83.     Annexed to this Complaint as Exhibit 1 are true and correct copies of the Transaction Agreements for the October 1, 2018 Transaction and related transaction documents, including the Certificate of Servicer Evidencing Transfer of Tax Liens executed by Defendant LC Servicer.

84.     To induce Plaintiffs to engage in the Transactions and execute the Transaction Agreements, the Tax Lien Defendants represented that they would ensure that Plaintiffs received the ultimate purchasers' money in exchange for Plaintiffs' Certificates.

85.     In every single one of the eight Transactions, Plaintiffs delivered all relevant Certificates to the Tax Lien Defendants.

86.     The Tax Lien Defendants, meanwhile, were supposed to make two payments to Plaintiffs per Transaction: (a) 60% of the Transaction price when Plaintiffs provided satisfactory assignment forms, and (b) the remaining 40% once LC Servicer actually transferred and assigned the Certificates.

87.     The Tax Lien Defendants repeatedly acknowledged that Plaintiffs had fulfilled all of their contractual duties for each Transaction.

88.     The Tax Lien Defendants, however, did not fulfill their own—and, as discussed below, planned to steal Plaintiffs' money before the parties ever executed the Transaction or P/S Agreements.

89.     In four of the eight Transactions, the Tax Lien Defendants dragged their feet for weeks and months after re-selling Plaintiffs' Certificates, continually manufacturing new excuses for their failure to pay Plaintiffs money that Defendants supposedly had escrowed.

90.     In the remaining four Transactions, the Tax Lien Defendants never paid Plaintiffs at all (the "**Unpaid Transactions**").

91.     In June 2018, Plaintiffs EB 1 and EB 2 sought to sell 41 Certificates on Alabama properties.

12

92.     On June 27, 2018, Plaintiff ESC contracted with Defendant BloxTrade to sell EB 1's and EB 2's 41 Alabama Certificates to LC Purchaser for $413,635.99 (the "**June 2018 Transaction**").

93.     Defendant LC Purchaser was not the ultimate buyer of the June 2018 Transaction's 41 Certificates, but instead a pass-through entity that conveyed the titles to the ultimate buyer.

94.     Defendant BloxTrade confirmed that the June 2018 Transaction became effective on June 28, 2018.

95.     On June 27, 2018, Defendant McOsker confirmed that LC Purchaser had re-sold the 41 Certificates. See Exhibit 2, the trade confirmation for the June 2018 Transaction.

96.     In other words, on June 27, 2018, Defendant McOsker certified that Plaintiffs should receive all of the supposedly-escrowed funds for these 41 Certificates.

97.     But Defendants never paid, and Plaintiffs never received, the $431,635.99 due from the June 2018 Transaction.

98.     In late September 2018, EB1 and EB2 decided to sell 242 more Certificates on Alabama properties.

99.      On October 1, 2018, ESC agreed to sell the 242 Certificates to LC Purchaser for $834,291.64 (the "**October 2018 Transaction**").

100.    LC Purchaser sold the tax liens for more than the $834,291.64 it had contracted to pay Plaintiffs.

101.    LC Servicer certified that all conditions necessary to pay Plaintiffs pursuant to the October 2018 Transaction had been met. See Exhibit 3, the trade confirmation for the October 2018 Transaction.

102.    As they had in June, the Tax Lien Defendants again claimed that they had escrowed Plaintiffs' $834,291.64, yet refused to disburse the proceeds to Plaintiffs.

103.    In November 2018, ESC, sought to sell 18 New Jersey Certificates owned by Plaintiff EF 1.

104.    On November 21, 2018, ESC agreed to sell EF 1's 18 Certificates to LC Purchaser for $450,384.95 (the "**November 2018 Transaction**").

105.    Again, LC Purchaser claimed that the Tax Lien Defendants had escrowed Plaintiffs' proceeds and that LC Purchaser had re-sold the Certificates for more than Plaintiffs' price.

106.    Again, the Tax Lien Defendants confirmed that all conditions precedent had been met to release Plaintiffs' proceeds from escrow to Plaintiffs. See Exhibit 4, the trade confirmation for the November 2018 Transaction.

107.    And again, the Tax Lien Defendants never conveyed, and Plaintiffs have never received, the $450,384.95 that the Tax Lien Defendants supposedly had held in escrow for Plaintiffs.

108.    The last Unpaid Transaction occurred in December 2018, when ESC agreed to sell 666 New Jersey Certificates owned by EF 1 and EF 2 to LC Purchaser for $1,828,267.72 (the "**December 2018 Transaction**").

109.    LC Purchaser again sold those Certificates at a profit, after which the Tax Lien Defendants certified that all conditions precedent had been met to release the "escrowed" proceeds to Plaintiffs. See Exhibit 5, the trade confirmation for the December 2018 Transaction.

110.    Despite acknowledging that Plaintiffs met all conditions precedent to receiving their December 2018 Transaction fees, the Tax Lien Defendants refused to pay the $1,828,267.72 that they had supposedly been holding in escrow for Plaintiffs.

111.    The four Unpaid Transactions should have resulted in the Tax Lien Defendants' release of approximately $3,500,229 in escrowed funds to Plaintiffs (the "**Escrowed Funds**").

112.    To this day, the Tax Lien Defendants continue to owe Plaintiffs the Escrowed Funds.

113.    Yet the Tax Lien Defendants still refuse payment, providing no lawful excuse or justification.

**In a Ponzi-Like Scheme, Defendants Stole Over $3.5 Million of Supposedly-"Escrowed" Funds from Plaintiffs**

114.    After the Transactions, Plaintiffs learned the McOsker Enterprise has a practice and pattern of diverting "escrow" funds from clients like Plaintiffs.

115.    In fact, the Tax Lien Defendants never really "escrow" client funds at all.

116.    Instead, the Individual Defendants move the client money from account to account, jurisdiction to jurisdiction, in order to steal the client money for the McOsker Enterprise's own unlawful purposes.

117.    First, instead of placing the client money into a segregated escrow accounts, the Tax Lien Defendants simply deposit their clients' "escrow" funds into the Chase Account: a New York checking account held by Defendant LC Escrow.

118.    The Chase Account is not a true, segregated escrow account; the McOsker Enterprise uses the Chase Account as a piggy bank.

15

119.    The McOsker Enterprise opened and uses the Chase Account to trick its clients and law enforcement into thinking that the Tax Lien Defendants are legitimate, lawful entities that actually segregate client money.

120.    However, once client money hits the Chase Account, the Individual Defendants transfer the client money to the Puerto Rico Accounts held by Defendants BCMG Services and LC Servicer.

121.    After the client money clears in the Puerto Rico Accounts, the McOsker Enterprise allows Defendants to withdraw the money at will to suit their own whims.

122.    For example, the McOsker Enterprise uses existing clients' money to induce new, unsuspecting clients to give the Tax Lien Defendants even more money, in what amounts to a simple Ponzi scheme.

123.    The McOsker Enterprise uses misappropriated client funds to partly repay existing clients with new clients' supposedly-escrowed funds, as it did with four of Plaintiffs' Transactions.

124.    For example, in or about March 2018, the Tax Lien Defendants began diverting Plaintiffs' funds from the alleged Escrow Account.

125.    On four of the Parties' eight Transactions, the Tax Lien Defendants only paid Plaintiffs after an extreme delay and constant inquiry and concern from Plaintiffs.

126.    Upon information and belief, the Tax Lien Defendants chose to pay Plaintiffs for four of the Transactions in an attempt to string Plaintiffs along as long as possible, in order to steal hundreds more valuable Certificates, which the Tax Lien Defendants liquidated for millions of dollars.

127.    Eventually, the Tax Lien Defendants no longer bothered trying to placate their existing clients and stopped paying them altogether, moving on to new victims.

16

128.    As described below, the methods with which the McOsker Enterprise perpetrates this Ponzi-like scheme comprise wire fraud, violations of the NSPA, and money laundering.

129.    At all relevant times, Defendant LC Escrow told Plaintiffs that it was a legitimate escrow agent that would act independently of the other Defendants.

130.    This was a lie.

131.    Defendant LC Escrow did not hold the Escrow Funds in any escrow account, but rather the Chase Account, which was a mere checking account at a JP Morgan Chase branch in New York.

132.    Defendants McOsker and Kernan controlled the Chase and Puerto Rico Accounts.

133.    Contrary to Defendants McOsker's and LC Escrow's representations, on at least four separate occasions, Defendant McOsker directed Defendant Kernan to wire the Escrowed Funds from LC Escrow's Chase Account to BCMG Services's and LC Servicer's Puerto Rico Accounts.

134.    Contrary to Defendants McOsker and LC Escrow's representations, without Plaintiffs' knowledge or permission, and without fulfillment of any of the conditions specified in the Transaction Agreements for the release of Escrow Funds and in violation of the Wire Fraud Act and the National Stolen Property Act ("**NSPA**"), McOsker directed the Tax Lien Defendants to knowingly and falsely represent in the Transaction Agreements that the Escrow Funds would only be released in the manner agreed to in the schedules of the Transaction Agreements.

135.    The Tax Lien Defendants made these false representations to induce Plaintiffs into agreeing to allow LC Escrow to act as the escrow agent for the Escrow Funds.

17

136.    At the time they induced Plaintiffs into the Transactions and providing their Certificates, McOsker and the Tax Lien Defendants knew that they would convert Plaintiffs' Certificates and the Escrowed Funds for McOsker and the McOsker Enterprise's benefit.

**Defendants Repeatedly Lied About Their Failures to Pay Plaintiffs**

137.    Plaintiffs made several requests to Defendants, including all three Individual Defendants, to close out the transactions and distribute the Escrow Funds due to Plaintiffs.

138.    In response, Defendants repeatedly lied about why the Escrowed Funds were late.

139.    For example, in connection with the December 2018 Transaction, in an email dated March 21, 2019, Defendant McOsker informed Plaintiffs' representative, John Hanratty, and others that:

> [Third-party Buyer A] deposited $1,835,767.72 ($1,828,267.72 plus $7,500 in fees) for NJ_0584_B with Ebury.  Due to the overfunding error that has been previously discussed with the parties, [Buyer A] was refunded $379,000 of that purchase price on Feb. 15. As to Process, yes we can confirm that Ebury/MTAG first releases physical certs on or before tomorrow (Fri.) TLOAX processes assignments, John signs and then the funds are netted and released.

140.    Defendant McOsker's representations were false: despite satisfaction of the pre-conditions needed to release the $1,828,767.72 of Escrow Funds to Plaintiffs, Defendants never released the December 2018 Transaction Escrowed Funds to Plaintiffs.

141.    On August 30, 2018, Plaintiffs' representative requested from the Tax Lien Defendants an updated proof of the Escrow Funds from the June 2018 Transaction.

142.    In response, on August 30, 2018, a representative of the Tax Lien Defendants, identified various entities, including BCMG International (a wholly owned subsidiary of BCMG Services) as entities allegedly holding the Escrow Funds.

143.    To prove that BCMG International held some of Plaintiffs' Escrowed Funds, the LC Escrow representative emailed Plaintiffs a purported screenshot of a Scotia Bank account that held approximately $300,000 (the "**Scotia Screenshot**").

144.    Defendant McOsker informed John Hanratty that a portion of the Escrow Funds was transferred into the BCMG International bank account because the bank had net capital requirements that required a minimum balance of $1 million and upon the approval of BCMG International as an International Financial Entity or upon receipt of a Puerto Rico Industrial Development Laws Act 73 of May 28, 2008 ("**Act 73**") Tax Credit from the government of Puerto Rico, the Escrow Funds would be transferred to Plaintiffs.

145.    Defendant McOsker's excuse was irrelevant: Plaintiffs never allowed Defendants to divert the Escrowed Funds away from the Escrow Account for any reason, let alone to BCMG International, another LLC owned by Defendant McOsker.

146.    BCMG International's supposed net capital requirements simply could never have justified Defendants' unilateral diversion of Plaintiffs' Escrowed Funds.

147.    Nor could a Puerto Rico Tax Credit for BCMG justified the McOsker Enterprise's theft of the Escrowed Funds from Plaintiffs.

148.    Moreover, Defendant McOsker's excuse was also a lie: Defendants never did transfer these supposed Scotia Bank funds to Plaintiffs.

149.    In fact, the Scotia Screenshot did not even represent an actual bank balance: as described below, it was just an image file that the McOsker Enterprise used to repeatedly trick its various clients.

**Defendants Have Perpetrated the Same Racketeering
Scheme Against Other Victims**

150.    In addition to the four separate Unpaid Transactions, the McOsker Enterprise has routinely converted escrow funds from the Tax Lien Defendants' other clients for the McOsker Enterprise's own wrongful ends, including paying previous clients, funding its Tax Fraud Scheme, bankrolling Defendant McOsker's personal projects, paying off Defendants Kernan and Hernandez, and laundering funds.

151.    From 2016 through at least 2019, the McOsker Enterprise repeatedly converted funds from clients' escrow accounts in transactions, including funds of Tax Lien Defendant clients Tang Capital Management LLC, INA Group LLC, Millennium Trust Company, LLC, HGM Holdings LLC, Kite Capital Partners, LLC, and Laveer Capital Management, LLC.

152.    The McOsker Enterprise stole those clients' money in the same manner and for the same reasons that it stole Plaintiffs' money: by pretending that the Tax Lien Defendants would properly escrow proceeds from the sale of clients' Certificates, but instead transferring clients' revenues across jurisdictions and bank accounts so Defendants could profit from those thefts.

153.    In 2017, the McOsker Enterprise routinely breached other clients' Transaction Agreements, diverting at least, $790,000 from client escrow accounts established and managed by the Tax Lien Defendants.

154.    As Defendants did with Plaintiffs' assets, the McOsker Enterprise diverted some of these client assets to cover the shortfalls in the escrow accounts of other clients of the Tax Lien Defendants.

155.    In May 2019, BloxTrade brokered a transaction in which non-party HGM sold real estate located in Indiana to non-party Laveer Capital Management, LLC ("**Laveer**").

156.   Laveer deposited funds for the purchase with LC Escrow (the "**Laveer Transaction**").

157.   Defendant McOsker directed the Tax Lien Defendants to convert the escrow funds deposited by Laveer and instructed Defendant Hernandez to create fictitious reasons to delay the closing of the Laveer Transaction in order to conceal the conversion of the escrow funds deposited by Laveer.

158.   On or about June 11, 2019, HGM informed Defendants Hernandez and McOsker that due to the delays in the closing, the Laveer Transaction was cancelled.

159.   Throughout June and July 2019, Laveer repeatedly demanded that the Tax Lien Defendants refund Laveer's money, which LC Escrow purported to be holding in an escrow account.

160.   On July 8, 2019, Defendant Kernan, at the instruction of Defendant McOsker and in order to conceal the misuse of the escrow funds, sent Laveer's representative the exact same Scotia Screenshot that Defendants had sent to Plaintiffs in August 2018, now claiming that it showed Laveer's own escrowed funds. *See* ¶ 141 *supra.*

161.   Defendant Kernan knew that this representation to Laveer was false: he knew that it was the same Scotia Screenshot the Tax Lien Defendants had used almost a full year earlier to play the same trick on Plaintiffs.

162.   Upon information and belief, the Individual Defendants repeatedly used that exact Scotia Screenshot to defraud multiple clients, assuming that their clients would never communicate with each other and learn the truth.

**Defendants Used Plaintiffs' Escrowed Funds to Commit Tax Fraud Against Puerto Rico**

163.    Under Act 73, certain corporate expenses, including capital expenditures to acquire intellectual property, are eligible for a 50% tax credit.

164.    From 2017 through 2019, the McOsker Enterprise converted Plaintiffs' and other clients' escrow funds to further a tax fraud scheme where BCMG Services would seemingly purchase millions of dollars of intellectual property in order to obtain millions of dollars of freely-transferable tax credits under Act 73.

165.    BCMG Services—another Puerto Rican entity owned by McOsker—engaged in sham transactions designed to look like eligible intellectual property expenditures entitled to Article 73 tax credits.

166.    In reality, these transactions were simply circular payments made at vastly inflated prices among Defendants BCMG Services, Sitona, and non-party Cactus—all of which were owned by Defendant McOsker and operated by all three Individual Defendants.

167.    To further the tax fraud, Defendant McOsker directed Defendant Kernan to divert LC Escrow client funds, including Plaintiffs' assets, to BCMG Services's Puerto Rico Accounts.

168.    Defendant McOsker would then direct BCMG Services to wire the client funds back to New York to reflect BCMG Services's purported "purchases" of the intellectual property from Cactus and Sitona—again, two entities under common control with BCMG Services.

**Cactus Purchases LienLog Intellectual Property for
$160,000 and Purports to Sell it to BCMG Services For Over $2,000,000**

169.    Defendant McOsker owned Cactus, which he operated with Defendants Kernan and Hernandez.

170.     According to United States Patent and Trademark Office ("**USPTO**"), in November 2014, Cactus purchased the trademarks "Lienlog.com" and "Lienlog" from non-parties LienLog LLC and LienMarket LLC (the "**LienLog IP**").

171.     Cactus paid $160,000 for the Lienlog IP.

172.     USPTO records identify the Lienlog IP as goods and services providing an Internet webpage for the management and technical support of various tax lien portfolios.

173.     In 2016, Defendants McOsker and Kernan cooked up a fraudulent valuation of the Lienlog IP to be used in connection with Defendant BCMG Services' purported purchase of the Lienlog IP from Cactus for the purpose of acquiring intellectual property that could be used to obtain an Act 73 Tax Credit.

174.     Pursuant to Defendant Kernan's supposedly-independent valuation, BCMG Services purchased from Cactus Lienlog IP for $2,044,250—almost 13 times what Cactus had paid in the arm's-length transaction just three years earlier.

175.     The $2,044,250 purchase price was to be paid in installments in 2016 and 2017 from BCMG Services to Cactus.

176.     Despite the fact that Defendants, themselves, came up with this purchase price, BCMG Services did not even have $2,044,250 to make the installment payments to Cactus.

177.     Defendant BCMG Services could not obtain the Article 73 Tax Credit unless it showed that it had actually paid Cactus the $2,044,250 purchase price.

178.     To close the fictitious installment sale acquisition of the Lienlog IP, the Individual Defendants diverted Tax Lien Defendants' escrowed client funds to BCMG Services.

179.     The McOsker Enterprise then used these converted client assets to create a fictitious arm's-length transaction for BCMG Services to purchase the LienLog IP from  Cactus.

23

180.    In 2017 and 2018, non-party law firm Pietrantoni Mendez & Alvarez LLC submitted tax credit applications that represented to the Puerto Rican tax authorities that $2,044,250 was paid by BCMG Services for the LienLog IP.

181.    Defendants McOsker and Kernan intentionally grossly overvalued the acquisition value and cost of LienLog IP and converted client escrow funds so that they could create fraudulent Article 73 tax refund applications to submit to the Puerto Rician tax authorities.

182.    Defendants knew that there was no conceivable justification for the LienLog IP's 1300% increase: by September 30, 2017, Lienlog.com was not even an active website.

183.    USPTO records reflect that the LienLog trademarks were cancelled in March 2019.

184.    In other words, the McOsker Enterprise structured its purchase and sale of the LienLog IP to create an economically circular transactions, using money diverted from the Tax Lien Defendants' clients, to defraud the Commonwealth of Puerto Rico.

185.    To make matters worse, even after stealing $1 million from Puerto Rico, the Individual Defendants did not deposit money back into the Chase Account to cover the escrow funds they had stolen from their clients.

186.    By the end of 2017, the client escrow accounts had deficits of over $790,000.

**The McOsker Enterprise Rebrands the LienLog IP as LienCloud IP and Purports to Resell it to BCMG Services for Over $13 million**

187.    Defendant McOsker also owned Defendant Sitona.

188.    In 2018, Defendant BCMG Services purchased purported intellectual property called "Liencloud" for $13,189,500 from Sitona (the "**LienCloud IP**").

189.    Defendant BCMG Services asserts that the LienCloud IP is a web-based portfolio management system for the tax lien industry.

190.    In fact, LienCloud IP is merely a rebranding by the McOsker Enterprise of the purported LienLog IP purchased by Cactus in 2014 for $160,000 and resold to BCMG Services via installments in 2016 and 2017 for $2,044,250.

191.    The McOsker Enterprise rebranded LienLog IP into LienCloud IP in furtherance of a scheme to obtain on behalf of BCMG Services an additional Act 73 tax credit in the amount of $6,594,750—for the very same IP on which BCMG Services fraudulently obtained tax credits in 2017 and 2018.

192.    Defendant BCMG Services made two payments to Defendant Sitona in connection with this purported purchase: $7 million in 2018, and another $6.189 million in 2019.

193.    In order to obtain the Act 73 Tax Credit for the purchase of LienCloud IP, BCMG Services was required to demonstrate to the Puerto Rican tax authorities that it paid Sitona $7 million in 2018.

194.    On March 26, 2019, Pietrantoni Mendez & Alvarez LLC, on behalf of BCMG Services, represented to the Puerto Rican tax authorities that Defendant BCMG Services paid $7 million for the LienCloud IP in 2018 and it would pay the remaining $6,189,500 in 2019.

195.    Defendant BCMG Services again lacked the funds to pay for the IP, and did not have the $7 million it purportedly owed Sitona.

196.    The Individual Defendants again stole Tax Lien Defendant clients' funds from the Chase Account, depositing them into BCMG Services's Puerto Rico Accounts.

197.    The Individual Defendants then directed Defendant BCMG Services to divert the same funds to back to New York, into Sitona's bank account, to pay Sitona for the "LienCloud" IP.

198.    The McOsker Enterprise converted client escrow funds, including escrow funds due and owing Plaintiffs to allow BCMG Services to receive an Act 73 Tax Credit in excess of $6.5 million.

199.    At this time, Plaintiffs are not aware whether BCMG Services actually received that Act 73 Tax Credit of over $6.5 million from Puerto Rico.

**The McOsker Enterprise's Frauds, Thefts, and Money Laundering Comprise Racketeering Activity in Violation of 18 U.S.C. § 1962**

**The McOsker Enterprise**

200.    Defendants are a group of persons and entities associated together in fact as the McOsker Enterprise for the common purpose of carrying out an ongoing enterprise, as described in the foregoing paragraphs of this Amended Complaint.

201.    Through the years of individual acts of theft and fraud to coverup that theft, Defendants stole money from Plaintiffs and the Tax Lien Defendants' other clients, as well as the Commonwealth of Puerto Rico.

202.    As described above, the McOsker Enterprise is an organization that has existed for several years and functions as a continuing unit with an informal command structure that uses seemingly-legitimate business and investment entities to conduct illegal activity.

203.    At all times relevant to this Amended Complaint, the Individual Defendants engaged in the operation or management of the McOsker Enterprise.

204.    While Defendant McOsker acted as the head of the McOsker Enterprise, Defendants Hernandez and Kernan acted closely with him, knowing that they were engaging in illegal conduct and stealing from others.

205.    The predicate acts described herein constitute a pattern of racketeering activities and are part of a common scheme to enrich the McOsker Enterprise at the expense of Plaintiffs

through acts constituting: (i) wire fraud, in violation of 18 U.S.C. § 1343; (ii) violations of the
NSPA, 18 U.S.C. §§ 2314-15; and (iii) money laundering, in violation of 18 U.S.C. §§ 1956 and
1957.

206.     The McOsker Enterprise's violations of § 1962(c) injured Plaintiffs.

207.     Under the provisions of 18 U.S.C. § 1964(c), Plaintiffs are entitled to bring this
action and recover treble damages, the cost of bringing this suit, prejudgment interest and
attorneys' fees.

**The McOsker Enterprise Committed Wire Fraud in Violation of 18 U.S.C. § 1343**

208.     By the acts described herein, the members of the McOsker Enterprise knowingly
executed and/or intentionally participated in a scheme that defrauded, and that was intended to
defraud, the Plaintiffs, and in furtherance of this scheme, Defendants transmitted or caused to be
transmitted, by means of wire communication in interstate or foreign commerce, writings, signs,
signals, pictures and/or sounds, but not limited to the following predicate acts:

(i)      numerous email and telephone communications between Plaintiffs'
representatives, including, John Hanratty, the Individual Defendants, and other
representatives of the McOsker Enterprise between March 2018 and April 2019 in
furtherance of the scheme to fraudulently induce Plaintiffs to enter into agreements and
proceed with the transactions set forth herein above so that the McOsker Enterprise could
divert the Escrow Funds for its own purposes;

(ii)     numerous emails and telephone calls throughout all of 2018 between
Plaintiffs' representatives, including John Hanratty, and the Individual Defendants and
other representatives of the McOsker Enterprise in which the McOsker Enterprise, through
Defendants LC Purchaser and LC Escrow, in furtherance of a scheme to fraudulently

induce Plaintiffs to execute the Transaction Agreements, repeatedly and falsely represented to Plaintiffs that the proceeds from the sales of Plaintiffs' tax liens would be held in an escrow account and only distributed to Plaintiffs upon the occurrence of certain events;

(iii)   numerous emails and telephone communications between Plaintiffs' representatives, including, John Hanratty and the Individual Defendants and other representatives of the McOsker Enterprise between June 2018 and April 2019 that contained numerous false representations and omissions concerning the location and use of the Escrow Funds; and

(iv) Defendant McOsker's instructions to Defendants Kernan and Hernandez throughout 2018 to transfer the Escrow Funds from the Chase Account to the Puerto Rico Accounts are instances of wire communications in furtherance of the McOsker Enterprise that constitute violations of 18 U.S.C. 1343.

209.   The repeated diversions of the Escrow Funds reflect and constitute instances of wire communications in furtherance of the McOsker Enterprise that constitute violations of 18 U.S.C. §1343 occurred on, or shortly after Plaintiffs received trade confirmations from BloxTrade in June 2018, October 2018, November 2018, and December 2018.

210.   All transfers of the Escrow Funds are alleged to have been made by, or at the direction of, Defendant McOsker.

211.   The specific details of the monetary transactions in which LC Escrow wired Plaintiffs' Escrow Funds to BCMG Services and LC Services are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

**The McOsker Enterprise Committed Theft in Violation of The National Stolen Property Act, 18 U.S.C. §§ 2314–2315**

212.     By the acts described herein, the members of the McOsker Enterprise transmitted, transferred, and received money with a value of more than $5,000, knowing that the money had been converted and/or taken by fraud.

213.     The money was transmitted or transferred in interstate commerce among bank accounts in New York and Puerto Rico.

214.     By the acts described herein, the members of the McOsker Enterprise devised or intended to devise a scheme or artifice to defraud, or for obtaining money with a value of $5,000 or more by means of false or fraudulent pretenses, representations, or promises, transported or caused to be transported in interstate or foreign commerce in the execution or concealment of the scheme or artifice to defraud.

215.     The acts include, but are not limited to the unauthorized transfers of Escrow Funds from the LC Escrow account(s) in New York to accounts held by BCMG Services and LC Services in Puerto Rico, and from those accounts, to various other accounts controlled by the McOsker Enterprise, as well as the Puerto Rico Tax Credit fraud described above.

216.     The transfers reflecting and constituting instances of violations of 18 U.S.C. 2314-2135, are set forth in paragraphs 13, 117-125, 208(iv), 209 and 215, which occurred on, or shortly after Plaintiffs received trade confirmations from BloxTrade, and are believed to have occurred on or about June 27, 2018, October 1, 2018, November 21, 2018, and December 6, 2018.

217.     All transfers of the Escrow Funds are alleged to have been made at the direction of Defendant McOsker to Defendant Kernan.

218.    The specific details of the monetary transactions in which LC Escrow wired Plaintiffs' Escrow Funds to BCMG Services and LC Servicer are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

**Money Laundering in Violation of 18 U.S.C. §§ 2314–2315**

219.    Defendant McOsker committed, and aided and abetted, acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957 in connection with a scheme in which he used the McOsker Enterprise to divert escrow funds from Plaintiffs to BCMG Services, for various reasons, including to purchase LienLog IP and LienCloud IP while concealing the true relationships among BCMG Services and Cactus and Sitona.

220.    Defendant McOsker's violations of the other predicate acts (Wire Fraud and the NSPA) are specified unlawful activity within the meaning of 18 U.S.C. §§ 1956 and 1957.

221.    Defendant McOsker concealed the source of the funding for, and his ownership of, entities involved in the racketeering scheme. For example:

(i)      in 2016 and 2017, McOsker concealed that BCMG Services' purported purchase of the LienLog IP was from Cactus, an entity wholly owned by McOsker;

(ii)     in 2017, McOsker concealed that LC Escrow was diverting clients' escrow funds from an LC Escrow account located in New York to a BCMG Services' account in Puerto Rico and then wired to back to New York for the purported arms'-length purchase of LienLog IP from Cactus (an entity McOsker owns);

(iii)    in 2018, McOsker concealed that BCMG's purported purchase of the LienCloud IP was from an entity (Sitona) that was wholly owned by McOsker; and

(iv)     in 2018, McOsker concealed that Plaintiffs' Escrow Funds were diverted from an LC Escrow account located in New York to a BCMG Services' account in Puerto

Rico and then wire back to New York for the purported arms'-length purchase of LienCloud IP from Sitona (an entity that McOsker owns).

222.    McOsker directing the aforementioned wiring of the Escrow Funds between LC Escrow, BCMG Services, and their subsequent transfers of such monies constituted violations of (i) 18 U.S.C. § 1956 in that McOsker knew that the aforementioned financial transactions were intended to promote further predicate offenses, avoid tax reporting requirements, or otherwise conceal laundering funds; and (ii) 18 U.S.C. § 1957 in that McOsker knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity.

223.    Further evidence in support of this Court, including whether McOsker and the McOsker Enterprise is continuing one or more of the predicate acts set forth above, is peculiarly within the knowledge and control of McOsker and other Defendants.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### RICO 18 U.S.C. § 1962(c)
### (AGAINST TOM MCOSKER)

224.    Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

225.    At all relevant times, Plaintiffs were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

226.    At all relevant times, all Defendants were/are/remain "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

227.    At all relevant times, the McOsker Enterprise (i) has been an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii)

has had associated members with a common purpose that function as a continuing unit, including all Defendants.

228.    At all relevant times, the McOsker Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

229.    At all relevant times, Defendants were employed by, or associated with, the McOsker Enterprise and conducted and participated in the conduct of the McOsker Enterprise through a pattern of racketeering activity described in this Complaint.

230.    Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused Plaintiffs' injuries.

231.    Pursuant to 18 U.S.C. § 1964(c), the Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing the suit, prejudgment interest, and attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**RICO 18 U.S.C. § 1962(d)**
**(AGAINST ALL DEFENDANTS)**

232.    Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

233.    At all relevant times, Plaintiffs were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

234.    At all relevant times, each of the Defendants was a "person" within the meeting of 18 U.S.C. §§ 1961(3) and 1962(d).

235.    At all relevant times, the McOsker Enterprise (i) was and is an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that function as a continuing unit.

236.    The Defendants entered into a series of agreements between and among each other to knowingly and willfully engage in a conspiracy to violate 18 U.S.C. 1962(c).  Each Defendant entered into at least one agreement with at least one other Defendant to join the conspiracy, took acts in furtherance of that conspiracy, and knowingly participated in that conspiracy.

237.    The Defendants agreed and conspired to violate 18 U.S.C. 1962(c) by participating, directly or indirectly, in the conduct of the affairs of the McOsker Enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

238.    Each Defendant agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d) to engage in illegal predicate acts that formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. §1962(c), as demonstrated by, among other things the following facts:

(a)    Kernan, as chief financial officer of the Tax Lien Defendants and BCMG Services, actively and knowingly participated in multiple predicate acts to further the scheme, including, but not limited to, working with McOsker to divert client escrow funds belonging to Plaintiffs and other clients of LC Escrow from accounts in New York to BCMG Services' and LC Servicer's accounts in Puerto Rico; and preparing an appraisal of the LienLog IP at a vastly inflated amount in order to further McOsker's scheme to obtain an Act 73 Tax Credit;

(b)    Hernandez, as in-house counsel and business manager for the Tax Lien Defendants and BCMG Services, actively and knowingly participated in multiple predicate acts to further the scheme, including, but not limited to, working with McOsker to knowingly misrepresent to Plaintiffs and other clients the reasons why their escrow funds were not

paid despite knowing that the McOsker Enterprise had stolen and was holding the escrow in the Puerto Rico Accounts and was using the client funds for impermissible purposes, including, but not limited to, furthering the McOsker Enterprise's Act 73 tax scheme;

(c)     As described above, LC Purchaser, LC Escrow, LC Services, BloxTrade, BCMG Services, BCMG International, and Sitona were the principal co-conspirators and directly participated in multiple predicate acts to further the scheme.

239.     Further evidence of an agreement among Defendants is peculiarly within the knowledge and control of Defendants.

240.     Each Defendant is a member of the McOsker Enterprise and as co-conspirators, Defendants are liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by the Plaintiffs that were caused by any members of the conspiracy, regardless of whether Defendants themselves were directly involved in a particular aspect of the McOsker Enterprise.

241.     As a direct and proximate result of the violations set forth above, the Plaintiffs have been injured.  Defendants' violations of 1962(d) are the proximate cause of this injury.  Under the provisions of 18 U.S.C. § 1964(c), the Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing the suit, prejudgment interest and attorneys' fees.

### THIRD CLAIM FOR RELIEF

### FRAUDULENT INDUCEMENT TO CONTRACT
### (AGAINST TOM MCOSKER, LC PURCHASER AND LC ESCROW)

242.     Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

243.     As described herein, McOsker caused LC Purchaser and LC Escrow to make numerous misrepresentations in the P/S Agreements and Transaction Agreements that Plaintiffs

would receive the Escrow Funds, *i.e.,* the proceeds from Plaintiffs' sales of the Certificates to LC Purchaser.

244.    McOsker also personally lied to Plaintiffs in order to get them to execute the Agreements and give up their Certificates.

245.    McOsker, LC Purchaser, and LC Escrow were aware at the time the P/S Agreements and Transaction Agreements were executed that contrary to the representations they made in the agreements that the Escrow Funds would not be held in an escrow account, that that the Escrow Funds would be diverted from the escrow account without Plaintiffs' knowledge or consent, that the Escrow Funds would be used for the benefit of Defendants, and that Plaintiffs would not receive some or all of the Escrow Funds

246.    McOsker, LC Purchaser, and LC Escrow made these false representations in the P/S Agreements and Transaction Agreements to induce Plaintiffs to sell their Certificates to LC Purchaser, to induce Plaintiffs to agree to use LC Escrow as the escrow agent, and thereby, to be able to divert the Escrow Funds for the benefit of Defendants.

247.    At the time McOsker made or caused LC Purchaser and LC Escrow to make these numerous misrepresentations and omissions, McOsker, LC Purchaser, and LC Escrow knew they had no intention of honoring their commitments, rather they intended to divert Plaintiffs' Escrow Funds.

248.    Plaintiffs justifiably relied on McOsker, LC Purchaser, and LC Escrow's false representations in the P/S Agreements and the Transaction Agreements, and thereby, sold the Certificates to LC Purchaser.

249.    As a result of Plaintiffs' reliance, they were injured in an amount to be determined at trial, but not less than $3,500,229.

## FOURTH CLAIM FOR RELIEF

### BREACH OF CONTRACT
### (AGAINST LIENCLEAR 002, LLC)

250.    Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

251.    Plaintiffs' forth claim for breach of contract is plead in the alternative to Plaintiffs' third claim for fraudulent inducement to contract.

252.    The Transaction Agreements were valid and binding contracts between Plaintiff and LC Escrow.

253.    Under the Transaction Agreements, LC Escrow was required to hold the Escrow Funds in an escrow account unless and until a condition for disbursement under the Transaction Agreements occurred – *e.g.*, (i) an instruction from the Servicer; (ii) an event on the agreed upon schedule; or, (iii) a joint written direction from the representatives of both LC Purchaser and Plaintiffs.

254.    Events on the agreed upon schedule for disbursement of funds set forth in the Transaction Agreements occurred – namely, titles to the tax lien Certificates at issue were successfully transferred to LC Purchaser.

255.    Nevertheless, LC Escrow willfully failed and refused to disburse the Escrow Funds to Plaintiffs, despite the formal transfer of title for all tax liens to LC Purchaser, in breach of the Transaction Agreements.

256.    As a result, Plaintiffs have been damaged in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### CONVERSION
### (AGAINST ALL DEFENDANTS)

257.    Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

258.    At all relevant times, Plaintiffs had an immediate and superior right of possession to the Escrow Funds.

259.    By the wrongful actions described herein, Defendants intentionally stole and converted the Escrow Funds to the exclusion and detriment of the Plaintiffs' rights.

260.    As a direct and proximate result of Defendants' actions, the Plaintiffs have been damaged and are entitled to compensatory damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

261.    Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

262.    Defendants are a combination of two or more persons.

263.    As set forth herein, each Defendant engaged in at least one unlawful act in furtherance of a conspiracy against Plaintiffs.

264.    Defendants' conspiracy is the direct and proximate cause of the damage to Plaintiffs in an amount to be determined at trial.

265.    Each Defendant is jointly and severally liable for the acts of its co-conspirators committed in furtherance of the conspiracy.

## EIGHTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT

## (AGAINST ALL DEFENDANTS)

266.    Plaintiffs incorporate and reallege the previously paragraphs as though fully set forth herein.

267.    Plaintiffs plead the eighth claim in the alternative to its fourth claim for breach of contract claim as to those Defendants.

268.    By their wrongful conduct as described herein, Defendants have been unjustly enriched at the Plaintiffs' expense.

269.    It is against equity and good conscience to permit the Defendants to retain the benefits of their wrongful conduct.

270.    Defendants' wrongful conduct was the direct and proximate cause of damage to the Plaintiffs in an amount to be determined at trial.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs pray for entry of a judgment in favor of Plaintiffs against Defendants, jointly and severally, in an amount to be proven at trial, including an award of:

1.    actual, compensatory, and consequential damages;

2.    trebled actual damages;

3.    restitution and a constructive trust over Defendants' assets;

4.    costs and expenses of this action, including reasonable attorneys' fees;

5.    Punitive damages;

6.    Pre- and post-judgment interest at the maximum legal rate; and

7.    Other and further relief as the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand trial by jury on issues so triable.

Dated:  Wilmington, Delaware
         June 25, 2021

Respectfully submitted,

SMITH KATZENSTEIN & JENKINS LLP

/s/ *Kathleen M. Miller*
Kathleen M. Miller (No. 2898)
Julie M. O'Dell (No. 6919)
Brandywine Building
1000 N. West Street, Suite 1501
Wilmington, Delaware 19801
(302) 652-8400
kmiller@skjlaw.com
jodell@skjlaw.com

GUSRAE KAPLAN NUSBAUM PLLC
Ryan J. Whalen (*pro hac vice*)
Kari Parks (*pro hac vice*)
120 Wall Street
New York, New York 10005
(212) 269-1400
rwhalen@gusraekaplan.com
kparks@gusraekaplan.com

*Attorneys for Plaintiffs*