**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| EBURY STREET CAPITAL, LLC, EB 1EMIALA, LLC, EB 2EMIALA, LLC, EBURY FUND 1 NJ LLC, and EBURY FUND 2 NJ, LLC,<br><br>         Plaintiffs,<br><br>   v.<br><br>THOMAS R. MCOSKER, ANDREW KERNAN, BADEL HERNANDEZ, LIENCLEAR – 0001, LLC, LIENCLEAR – 0002, LLC, LIENCLEAR, LLC, BLOXTRADE, LLC, BCMG SERVICES, LLC, BCMG INTERNATIONAL, LLC, and SITONA VENUTRES LLC,<br><br>         Defendants. | No. 1:21-cv-00203-RTD |

## PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT

SMITH KATZENSTEIN & JENKINS LLP

Kathleen M. Miller (No. 2898)
Julie M. O'Dell (No. 6919)
Brandywine Building
1000 N. West Street, Suite 1501
Wilmington, Delaware 19801
(302) 652-8400
kmiller@skjlaw.com
jodell@skujlaw.com

October 12, 2021

GUSRAE KAPLAN NUSBAUM PLLC

Ryan J. Whalen (*pro hac vice*)
Kari Parks (*pro hac vice*)
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
rwhalen@gusraekaplan.com
kparks@gusraekaplan.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ......................................................................................................... 2

I.   The Individual and Tax Lien Defendants Tricked Plaintiffs Into Handing Over Millions of Dollars' Worth of Tax Lien Certificates ................................................................ 2

II.  Defendants Did Not Just Fail to Pay; They Always Intended to Steal Plaintiffs' Property ................................................................................................................ 5

III. The McOsker Enterprise Perpetrated the Same Ponzi Scheme Against Third Parties Both Before and After It Victimized Plaintiffs ...................................................... 7

IV.  Defendants Have Repeatedly Argued that This Dispute Belongs Here in Delaware ......... 8

LEGAL STANDARD .................................................................................................. 9

ARGUMENT .............................................................................................................. 10

I.   Defendants' Factual Attack is Irrelevant at This 12(b)(6) Pleading Stage ...................... 10

II.  Defendants' Ponzi Scheme and Tax Fraud Demonstrate Both the Requisite Racketeering "Enterprise" and Racketeering "Pattern" ................................... 11

   A.   To Encourage Victims' Private Actions, Courts "Liberally Construe" RICO .......... 12

   B.   Defendants' Cherry-Picked Characterizations Cannot Overcome Plaintiffs' Detailed Allegations of an Association-in-Fact Enterprise ...................... 13

   C.   Defendants' Five-Year Ponzi Scheme Comprises a Racketeering "Pattern" ............ 15

III. Plaintiffs' 270 Paragraphs Adequately Plead Their Alternative Tort Claims................... 17

IV.  Defendants' Previous Filings Nullify Their New Personal Jurisdiction and Colorado River Abstention Arguments ................................................................................19

CONCLUSION............................................................................................................ 20

# TABLE OF AUTHORITIES

Page(s)

Cases

Ashcroft v. Iqbal,
   556 U.S. 662 (2009)..................................................................................................... 9, 10

Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC,
   Civ. No. 3658, 2009 WL 1124451 (Del. Ch. Apr. 20, 2009) ...................................... 17

Bell Atl. Corp. v. Twombly,
   550 U.S. 544 (2007)........................................................................................................ 9

Boyle v. United States,
   556 U.S. 938 (2009)...................................................................................................... 13

Brokerage Concepts v. U.S. Healthcare, Inc.,
   140 F.3d 44 (2d Cir. 1998)............................................................................................ 16

Cedric Kushner Promotions, Ltd. v. King,
   533 U.S. 158 (2001)...................................................................................................... 15

H.J. Inc. v. Nw. Bell Tel. Co.,
   492 U.S. 229 (1989)...................................................................................................... 16

In re Brokerage Antitrust Litig.,
   618 F.3d 300 (3d Cir. 2010)........................................................................... 12, 13, 14, 15

In re Conex Holdings, LLC,
   518 B.R. 792 (Bankr. D. Del. 2014) ............................................................................ 18

ITW Glob. Invs. Inc. v. Am. Indus Partners Cap. Fund IV, L.P.,
   No. N14C-10-236 JRJ CCLD, 2015 WL 3970908 (Del. Super. June 24, 2015)...................... 18

Kehr Packages, Inc. v. Fidelcor, Inc.,
   926 F.2d 1406 (3d Cir. 1991)........................................................................................ 16

Kelley v. Crosfield Catalysts,
   135 F.3d 1202 (7th Cir. 1998) ...................................................................................... 11

Lum v. Bank of America, N.A.,
   361 F.3d 217 (3d Cir. 2004)....................................................................................... 9, 16

McNally v. United States,
   483 U.S.  (1987) .......................................................................................................... 16

Palakovic v. Wetzel,
   854 F.3d 209 (3d Cir. 2017)........................................................................ 11

Philip A. Templeton, M.D., P.A. v. EmCare, Inc.,
   868 F. Supp. 333 (D. Del. 2012)................................................................. 17

PT China LLC v. PT Korea LLC,
   No. CIV.A. 4456-VCN, 2010 WL 761145 (Del. Ch. Feb. 26, 2010)...................... 19

Salinas v. United States,
   522 U.S. 52 (1997)...................................................................................... 12

Scarano v. Cent. R. Co. of N.J.,
   203 F.2d 510 (3d Cir. 1953)........................................................................ 10

Sedima, S.P.R.L. v. Imrex Co.,
   473 U.S. 479 (1985)............................................................................... 12, 16

Smith v. Berg,
   247 F.3d 532 (3d Cir. 2001)........................................................................ 12

United States v. Bergrin,
   650 F.3d 257 (3d Cir. 2011)................................................................... 14, 15

United States v. Turkette,
   452 U.S. 5767 (1981 ................................................................................... 12

W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank,
   712 F.3d 165 (3d Cir. 2013)................................................................... 10, 11

Statutes and Other Authorities

6 Del. C. § 18-109(a) ....................................................................................... 19

18 U.S.C. § 1961(4) ........................................................................................ 13

18 U.S.C. § 1962(c) ........................................................................................ 12

18 U.S.C. § 1962(d) ........................................................................................ 12

18 U.S.C. § 1962(4) ........................................................................................ 13

18 U.S.C. § 1965(b) ........................................................................................ 19

Fed. R. Civ. P. 8(a)(2)....................................................................................... 9

Fed. R. Civ. P. 8(d) ...................................................................................................... 17

Fed. R. Civ. P. 15(a) .................................................................................................... 10

6 Wright & Miller, <u>Federal Practice and Procedure</u> § 1476 (3d ed. 2010) ............................ 10, 11

Plaintiffs Ebury Street Capital, LLC, EB 1EMIALA, LLC, EB 2EMIALA, LLC, Ebury Fund 1 NJ LLC, and Ebury Fund 2 NJ LLC (together, "**Plaintiffs**") respectfully submit this brief in opposition to the Rules 12(b)(6) and 12(b)(2) Motion filed by Defendants Thomas R. McOsker, Andrew Kernan, Badel Hernadez, Lienclear – 0001, LLC ("**LC Purchaser**"), Lienclear – 0002, LLC ("**LC Escrow**"), Lienclear, LLC ("**LC Servicer**"), BloxTrade, LLC ("**Bloxtrade**" and with LC Purchaser, LC Escrow, and LC Servicer, the "**Tax Lien Defendants**"), BCMG Services, LLC ("**BCMG Services**"), BCMG International, LLC ("**BCMG International**"), and Sitona Ventures LLC's ("**Sitona**" and together, "**Defendants")**. See Dkt. 23 (Aug. 27, 2021) (the "**Motion**" or "**MTD**").

## PRELIMINARY STATEMENT

Plaintiffs' 270-paragraph Amended Complaint explains how Defendants engaged in a long-running Ponzi scheme, posing as legitimate brokers to trick clients like Plaintiffs into parting with millions of dollars' worth of tax lien "**Certificates**." Defendants then used the stolen Certificates to not only partially pay off their previous victims, but also to engage in a multitude of other wrongful activity, including defrauding the government and taxpayers of Puerto Rico. The McOsker Enterprise victimized clients from at least 2016 through 2019, including Plaintiffs, whom it defrauded in eight separate Transactions between June and December 2018.

Accordingly, the Amended Complaint pleads seven counts: (1) RICO § 1962(c) against Defendant McOsker, (2) RICO § 1962(d) against all Defendants, (3) Fraudulent Inducement against Defendants McOsker, LC Purchaser, and LC Escrow; (4) Breach of Contract against LC Escrow; (5) Conversion against all Defendants; (6) Civil Conspiracy against all Defendants; and (7) Unjust Enrichment against all Defendants. See Dkt. 16, Amended Complaint ¶¶ 224–270 (June 25, 2021) ("**Am. Compl.**").

While Defendants move to dismiss pursuant to 12(b)(6), they would rather talk about anything other than Plaintiffs' Amended Complaint. <u>See generally</u> MTD. Defendants' two-page "Statement of Facts" does not discuss the Amended Complaint's allegations at all, instead running through the Parties' history of other litigations—and conveniently omitting that in Puerto Rico, Defendants repeatedly argued that this dispute belongs in Delaware court. Despite the fundamental purposes of Rules 12 and 15(a), Defendants also claim that the differences between the original and Amended Complaints renders the latter inherently incredible, despite black-letter law that a pleading's truth or falsity is irrelevant at this pleading stage.

Defendants' distractions fail to address, let alone overcome, the Amended Complaint's 270 paragraphs of detailed factual allegations, which plead each and every element of Plaintiffs' seven claims. The Court should deny the Motion in its entirety.

## BACKGROUND

### I.     The Individual and Tax Lien Defendants Tricked Plaintiffs Into Handing Over Millions of Dollars' Worth of Tax Lien Certificates

Defendant Thomas R. McOsker owns and manages a panoply of Delaware and Puerto Rico LLCs that purport to engage in legitimate financial services, including all of the "**Corporate Defendants**:" LC Purchaser, LC Escrow, LC Servicer, BCMG Services, BCMG International, and Sitona. Am. Compl. ¶¶ 6, 31–37. Defendant McOsker also owned non-party Cactus Ventures LLC ("**Cactus**"), which was a Delaware LLC established in 2014 and canceled in 2018. <u>Id.</u> ¶¶ 40–43.

Defendants Andrew Kernan and Badel Hernandez (with McOsker, the "**Individual Defendants**") help McOsker run the Corporate Defendants. <u>Id.</u> ¶ 7. Defendant Kernan is Chief Financial Officer of Defendant BCMG Services and the Tax Lien Defendants, while Defendant Hernandez is in-house counsel and business manager of Defendants LC Servicer, BloxTrade, and BCMG Services. <u>Id.</u> ¶¶ 45, 46.

2

Plaintiffs, meanwhile, are investors in tax lien Certificates, which give their holders the right to collect unpaid taxes and interest from property owners. Am. Compl. ¶¶ 2, 64–68. Because there is no exchange or other centralized mechanism for secondary trading, investors like Plaintiffs often engage brokers and market-makers when it comes time to sell their Certificates. Id. ¶ 70. The Tax Lien Defendants—LC Purchaser, LC Escrow, LC Servicer, and BloxTrade—purport to be such brokers, advertising that they (1) purchase Certificates and then sell them at a mark-up (2) after providing escrow, clearing, and transfer services. Id. ¶¶ 4, 5.

In 2018, Plaintiffs began working with Defendant BloxTrade to sell their Certificates, eventually engaging in eight separate transactions (the "**Transactions**"), including four completely "**Unpaid Transactions**:"

1. 41 Alabama Certificates for $413,653.99 on June 27, 2018;
2. 242 Alabama Certificates for $834,291.64 on October 1, 2018;
3. 18 New Jersey Certificates for $450,384.95 on November 21, 2018; and
4. 666 New Jersey Certificates for $1,828,267.72 in December 2018.

Am. Compl. ¶¶ 91–111.

All of the Transactions are governed by a functionally-identical set of three contracts, which all include Delaware forum selection clauses and provide that their parties consent to Delaware's personal jurisdiction (together, the "**Transaction Agreements**"). Id. ¶¶ 72–73, 77; Dkt. 16-1 at 8, 27, 47.

To induce Plaintiffs to engage in the Transactions and convey title to Plaintiffs' Certificates, the Tax Lien Defendants represented that they would make sure that Plaintiffs received the ultimate, third-party purchasers' money in exchange for Plaintiffs' Certificates. Id. ¶ 84. The Tax Lien Defendants promised to structure the Transactions as follows:

1. Plaintiffs would sell the Certificates directly to LC Purchaser, as memorialized in Purchase and Sale Agreements (the "**P/S Agreements**");
2. Defendant LC Escrow would act as a "third-party escrow agent," as memorialized in the three "**Escrow Agreements**;"
3. Defendant LC Servicer would effectuate the transfer and assignment of the Certificates, as memorialized in the three "**Service Agreements**;"
4. Before the unaffiliated third parties took title of the Certificates, the money that LC Purchaser was providing to purchase Plaintiffs' Certificates would be held in an escrow account maintained by Defendant LC Escrow;
5. Once third-party purchaser bought the Certificates from LC Purchaser via BloxTrade, LC Escrow would release the remainder of the purchase money to Plaintiffs.

Id. ¶¶ 74–76, 78–83.

For each set of Transactions, the Tax Lien Defendants were supposed to make two payments to Plaintiffs: (1) 60% of the Transaction price when Plaintiffs provided satisfactory assignment forms, and (b) the remaining 40% once LC Servicer actually transferred the Certificates to the third-party buyers. Id. ¶ 86. But in four of the eight Transactions, the Tax Lien Defendants dragged their feet for months after re-selling Plaintiffs' Certificates, continually manufacturing new excuses for their failure to pay Plaintiffs the money that the Tax Lien Defendants supposedly had escrowed. Id. ¶ 89.

In the remaining four Transactions—in which Plaintiffs transferred title to 932 Certificates, for which Defendants promised they would pay Plaintiffs $3.5 million—the Tax Lien Defendants never paid Plaintiffs at all (the "**Unpaid Transactions**"). Id. ¶¶ 90–111.

4

## II.   Defendants Did Not Just Fail to Pay; They Always Intended to Steal Plaintiffs' Property

Eventually, Plaintiffs learned that the Tax Lien Defendants' failures to pay for their Certificates were not mere contractual breaches, but instead were part of a long-running Ponzi scheme perpetrated by the McOsker Enterprise. Id. ¶¶ 150–62. Defendants paid Plaintiffs just enough to steal hundreds more valuable Certificates, which the McOsker Enterprise liquidated for millions of dollars. Id. ¶ 126.

Defendants repeatedly lied about why the Escrowed Funds were late, including in August 2018, when LC Escrow sent Plaintiffs a purported screenshot of a Scotia Bank account with a balance of approximately $300,000 and claimed that these were Plaintiffs' escrowed funds (the "**Scotia Screenshot**"). Id. ¶ 143. Plaintiffs later learned that the McOsker Enterprise repeatedly used that very same image file to trick other Tax Lien Defendants, including non-party Laveer Capital Management, LLC ("**Laveer**") in July 2019. Id.  ¶¶ 149, 160–62. After the Tax Lien Defendants failed to pay Plaintiffs for their Certificates, Plaintiffs learned that the Tax Lien Defendants never really escrow client funds at all: instead, they move client money from account to account, jurisdiction to jurisdiction, to steal client money for the McOsker Enterprise's own unlawful purposes. Id. ¶ 115.

First, instead of segregating client money into proper escrow accounts, the Tax Lien Defendants simply deposit clients' "escrowed" funds into a New York checking account held by LC Escrow, which the McOsker Enterprise uses as a piggy bank. Id. ¶¶ 117–18. Then, the Individual Defendants transfer client funds to Puerto Rico Accounts held by Defendants BCMG Services and LC Servicer, after which Defendants withdraw client money to suit their own purposes, including inducing new, unsuspecting clients to give the Tax Lien Defendants even more Certificates and money. Id. ¶¶ 121–23.

The McOsker Enterprise misappropriated client money not only to further its Ponzi scheme, but even to attempt to defraud Puerto Rican taxpayers of over $6.5 million. Id. ¶¶ 163–99. Under Act 73, a corporation's purchase of intellectual property is eligible for a 50% tax credit. Id. ¶ 163. From 2017 through 2019, the McOsker Enterprise converted Plaintiffs' and others' property held by LC Escrow to further a tax fraud scheme in which Defendant BCMG Services purported to purchase millions of dollars of intellectual property in arm's-length transactions—but actually just arranged and executed circular payments made at vastly inflated prices among Defendants BCMG Services, Sitona, and non-party Cactus, all owned by Defendant McOsker and operated by all three Individual Defendants. Id. ¶¶ 164–99.

Defendants did so at least twice: after purchasing the "**LienLog IP**" for $160,000 in 2014, now-defunct Cactus sold it to BCMG Services for $2,044,250 in 2017, a price set by Defendant Kernan and paid with money that LC Escrow had purported to hold for Plaintiffs and other clients. Id. ¶¶ 169–86. Defendants knew that there was no justification for the LienLog IP's 1300% increase: by September 2017, Lienlog.com was not even an active website, and in March 2019, the trademarks were cancelled. Id. ¶¶ 182–83. In 2018, Defendant BCMG Services perpetrated the exact same sham transaction with Defendant Sitona, this time selling the very same intellectual property for $13,189,500: over 100 times its 2014 price. Id. ¶¶ 187–99.

6

### III.   The McOsker Enterprise Perpetrated the Same Ponzi Scheme Against Third Parties Both Before and After It Victimized Plaintiffs

From 2016 through at least 2019, the McOsker repeatedly converted money and property that rightfully belonged to the Tax Lien Defendants' clients, including non-parties Tang Capital Management LLC, INA Group LLC, Millennium Trust Company, LLC, HGM Holdings LLC, Kite Capital Partners, LLC, and Laveer. Id. ¶ 151. The McOsker Enterprise stole those clients' money in the same manner and for the same reasons that it stole Plaintiffs' money: by pretending that the Tax Lien defendants would properly escrow proceeds from the sales of clients' Certificates, but instead transferring clients' property across jurisdictions and bank accounts for Defendants' illegal profit. Id. ¶ 153. As discussed above, Defendants even used the exact same Scotia Screenshot to trick their clients, presumably assuming that the clients would not communicate with each other and learn the truth. Id. ¶ 162.

Through the years of individual acts of theft, fraud, and obfuscation, Defendants stole money from Plaintiffs and the Tax Lien Defendants' other clients, as well as from the Commonwealth of Puerto Rico. Id. ¶ 201. While Defendant McOsker headed the McOsker Enterprise, Defendants Hernandez and Kernan acted closely with him and themselves committed several illegal acts, including siphoning client money from account to account, tricking new clients into handing over their Certificates, and structuring and executing sham transactions. See, e.g., supra; see also id. ¶¶ 203–04.

## IV.     Defendants Have Repeatedly Argued that This Dispute Belongs Here in Delaware

Plaintiffs first sought justice in Puerto Rico, suing Defendants McOsker, BCMG Services, BCMG International, as well as several other entities controlled by McOsker (the "**Puerto Rico Defendants**"). <u>See generally</u> Bennett Decl. Exs. 1, 4, 5, Dkts. 22-1, 22-4, 22-5 (Aug. 27, 2021). But in Puerto Rico, Defendants McOsker, BCMG Services, and BCMG International repeatedly argued that the dispute belonged in Delaware, moving to dismiss both Plaintiffs' original, federal suit and second, state court suit on that basis. <u>See</u> Dkt. 22-2, Declaration of Blake A. Bennett Exhibit 2 at 11 ("Plaintiffs are contractually impeded from objecting to the jurisdiction of the Delaware courts."); <u>id.</u> at 15 ("[T]his factor alone tilts the scale unequivocally in favor of a transfer to the U.S. District Court for the District of Delaware. [ . . . ] Delaware courts should presumably have a keen interest in resolving business controversies at home in light of the considerable body of case law in that particular state."); Declaration of Ryan J. Whalen ("**Whalen Decl.**") Exhibit A, McOsker et al. Motion to Dismiss at 9 (P.R. Super. Sept. 16, 2019) ("[D]ichos contratos contienen cláusalas de selección de foro que invocan el estado de Delaware como law jurisdicción exclusiva para attender controversias que surjan de los mismos.").

In other words, Plaintiffs filed this lawsuit in this Delaware court **because** Defendants repeatedly argued that this was the **only** forum that could hear this dispute. <u>See, e.g.</u>, <u>id.</u> at 20 ("Dos de ellas claramente establecen a Delaware como law jurisdicción obligatoria y exclusiva [ . . . ] Section 15 del Contrato de Plica indica que les partes 'agree to the personal jurisdiction by and venue in the state and federal courts in the State of Delaware.'") (emphasis in Defendants' Puerto Rico brief). Plaintiffs moved to stay the pending Puerto Rico litigation on October 12, 2021. Whalen Decl. ¶ 12.

## LEGAL STANDARD

To survive Defendants' 12(b)(6) Motion, the Amended Complaint need only allege a "short and plain statement" that "give[s] [D]efendants fair notice of what the claim is and the grounds upon which it rests." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 545 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). The Amended Complaint's wire fraud allegations also must satisfy Rule 9(b)'s particularity requirement by stating either the "date, place, or time" of the fraud, or alleging "alternative means of injecting precision and some measure of substantiation." <u>Lum v. Bank of America, N.A.</u>, 361 F.3d 217, 223 (3d Cir. 2004), <u>abrogated in part on other grounds</u>, <u>Twombly</u>, 550 U.S. at 557 (citation omitted).

While determining whether the Amended Complaint states a claim is a "context-specific task that requires [this C]ourt to draw on its judicial experience and common sense," a well-pleaded complaint must survive "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 680 (2009); <u>Twombly</u>, 550 U.S. at 566. So long as the Amended Complaint alleges "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]," the Court must deny Defendants' Motion. <u>Twombly</u>, 550 U.S. at 566.

## ARGUMENT

### I.       Defendants' Factual Attack is Irrelevant at This 12(b)(6) Pleading Stage

Defendants' Motion misconstrues the doctrine of judicial estoppel; ignores Rule 15(a)'s animating purpose; and flouts Rule 12(b)(6)'s dictate to consider only the adequacy of a pleading in deciding whether to dismiss a pleading. Compare MTD at 11 (arguing that the original Complaint "judicially estop[s]" the Amended Complaint's new allegations) and, e.g., Iqbal, 556 U.S. at 696 ("[A] court must take the allegations as true, no matter how skeptical the court may be.").

As a threshold matter, judicial estoppel is irrelevant: it only applies against a party that has "obtained relief from an adversary by asserting and offering proof to support one position." Scarano v. Cent. R. Co. of N.J., 203 F.2d 510, 511–14 (3d Cir. 1953). Even Defendants do not attempt to argue that Plaintiffs have "obtained relief" from them in any proceeding, let alone "asserted and offered proof" regarding the original Complaint's allegations. See generally MTD.

Moreover, Rules 12 and 15's plain text and animating purposes prohibit deciding this Motion by comparing the original and Amended Complaints. Rule 15 allows amendments "as a matter of course" in response to Rule 12 motions. See Fed. R. Civ. P. 15(a)(1)(B). Even assuming that Defendants accurately characterize both Complaints—they don't—"[p]erhaps the most common use of Rule 15(a) is by a party seeking to amend in order to cure a defective pleading." W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank, 712 F.3d 165, 172 (3d Cir. 2013) (citing, inter alia, 6 Wright & Miller, Federal Practice and Procedure § 1476 (3d ed. 2010)). Indeed, the entire purpose of Rule 15(a) is to facilitate plaintiffs' amendments of their claims, even when their amendments "flatly contradict[] the initial allegation[s]." W. Run, 712 F.3d at 172.

Because an amended complaint "supersedes the earlier pleading and renders the original pleading a nullity," unless the amended pleading incorporates the original's facts, they are *functus officio* and "cannot be considered by the court on a motion to dismiss the amended complaint." Palakovic v. Wetzel, 854 F.3d 209, 220 (3d Cir. 2017) (citing W. Run, 712 F.3d at 171; 6 Wright & Miller § 1476); W. Run, 712 F.3d at 172 (quoting Kelley v. Crosfield Catalysts, 135 F.3d 1202, 1204 (7th Cir. 1998)). Neither Defendants nor the Court can "resuscitate these facts when assessing whether the amended complaint states a viable claim." Id.

## II.   Defendants' Ponzi Scheme and Tax Fraud Demonstrate Both the Requisite Racketeering "Enterprise" and Racketeering "Pattern"

In arguing that Plaintiffs failed to plead the pattern or enterprise necessary to state their RICO claims, Defendants refuse to even cursorily analyze the Amended Complaint's 270 paragraphs. See MTD at 7–12. Instead, they repeatedly mischaracterize even those few allegations that they cherry-pick, and—without a hint of irony—block-cite 84 paragraphs to argue that Plaintiffs "offer[] only insufficient and mere conclusory" statements of a racketeering pattern. See MTD at 8 (citing Am. Compl. ¶¶ 114–97). In doing so, Defendants fail to analyze, or even just identify, a single one of those supposedly-conclusory paragraphs. See id.

Defendants' distractions are no substitute for explaining how or why Plaintiffs' actual allegations supposedly fail to plead the enterprise or pattern necessary to state their RICO claims. The Court should deny Defendants' Motion.

## A.  To Encourage Victims' Private Actions, Courts "Liberally Construe" RICO

The Supreme Court consistently declares that RICO must be "read broadly," not just because of "Congress's self-consciously expansive language and overall approach," but also because of the statute's "express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'" Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 500 (1985) (citing United States v. Turkette, 452 U.S. 576, 586–87 (1981); Pub. L. 91-452, § 904(a), 84 Stat. 947). RICO's "'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity," whether against "respected and legitimate enterprises" or criminal organizations. Sedima, 473 U.S. at 499.

Consequently, Section 1962(c) prohibits "any person employed by or associated with any enterprise engaged in" interstate commerce from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," while Section 1962(d) prohibits any person from conspiring to violate Section 1962(c). 18 U.S.C. §§ 1962(c), (d). Unlike with Section 1962(c), a defendant may violate Section 1962(d) "even where its own actions would not amount to a substantive RICO violation," so long as it "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise." In re Brokerage Antitrust Litig., 618 F.3d 300, 372 (3d Cir. 2010) (citing Salinas v. United States, 522 U.S. 52, 65 (1997); Smith v. Berg, 247 F.3d 532, 537 (3d Cir. 2001)).

Because there often is significant overlap between the "enterprise" and "pattern" elements, Plaintiffs may use the same facts to allege both (1) the existence of an association-in-fact enterprise and (2) that enterprise's pattern of racketeering activity. Turkette, 452 U.S. at 583; Brokerage, 618 F.3d at 368.

**B. Defendants' Cherry-Picked Characterizations Cannot Overcome Plaintiffs' Detailed Allegations of an Association-in-Fact Enterprise**

Defendants' enterprise argument again misstates the governing law and relevant allegations, arguing that Plaintiffs plead no "common purpose" but Defendant McOsker's purchases of a volleyball team and coffee farm. See MTD at 9–10. Needless to say, this case is not about McOsker's vanity projects: it is about the McOsker Enterprise's multi-year Ponzi scheme and tax fraud, which it perpetrated against at least six other entities that are not even parties to this case, both before and after it victimized Plaintiffs. See generally Am. Compl.

RICO "liberally defines" an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Brokerage, 618 F.3d at 367; 18 U.S.C. § 1961(4); see also, e.g., Boyle v. United States, 556 U.S. 938 (2009) (quoting § 1962(4)) (emphasis in original) (the statute's definition of "enterprise" is "obviously broad, encompassing '**any** group of individuals associated in fact'").

"[T]he existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure," particularly since it need not have any "purpose or economic significance beyond or independent of the group's pattern of racketeering activity." Boyle, 556 U.S. at 951; Brokerage, 618 F.3d at 369 (quotation omitted).

In fact, an association-in-fact enterprise "need not **do** anything other than engage in the pattern of racketeering activity, so long as it has the requisite structural features" of a "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Brokerage, 618 F.3d at 368, 374 (quoting Boyle, 129 S.Ct. at 2244) (emphasis in original).

Despite Defendants' mischaracterizations, Plaintiffs do not claim that the McOsker Enterprise consisted of "McOsker dominat[ing] all other Defendants [ . . . ] to further McOsker's

13

own interests and purposes," nor do Plaintiffs argue that the Enterprise's sole purposes were to buy a volleyball team and coffee farm. See MTD at 9–10; but see Brokerage, 618 F.3d at 378 ("It will often be the case that the interests of the enterprise are congruent with those of its members; such congruence presumably provides the incentive for members to participate in the enterprise.").

Instead, Plaintiffs argue that from at least 2016 through 2019, Defendants worked together to defraud the Tax Lien Defendants' clients by (1) tricking new clients into conveying title to valuable Certificates and (2) using those stolen proceeds to (a) partially pay both new and old clients just enough to keep tricking them into conveying additional Certificates and (b) commit Act 73 tax fraud against Puerto Rico by using Tax Lien Defendants' client money to perpetrate sham intellectual property transactions, as well as (c) lining each of their own pockets. See supra at Background § III.

The McOsker Enterprise needed all of the Defendants in order to perpetrate its schemes: the Tax Lien Defendants to trick Plaintiffs and other clients into handing over valuable property; BCMG Services, BCMG International, and Sitona to engage in the sham, circular intellectual property transactions; and the Individual Defendants to puppet the Corporate Defendants' wrongful activity. See id.

Finally, while Defendants' judicial estoppel argument is meritless—considering the original Complaint would be reversible error—even if the Amended Complaint did allege that the Corporate Defendants were McOsker's alter egos, Defendants have not cited, and Plaintiffs' counsel has not identified, any law suggesting that the veil-piercing doctrine destroys an otherwise-viable RICO enterprise. See MTD at 10–11. Plaintiffs' original Complaint did not allege that defendants were alter egos of the McOsker **Enterprise**; it alleged that multiple defendants were alter egos of **each other**. See MTD at 10–11 (quoting United States v. Bergrin, 650 F.3d 257, 266

14

(3d Cir. 2011)) (holding that the government sufficiently alleged existence of criminal enterprise where it pleaded that natural defendants "worked together and in conjunction with multiple corporations to achieve long-term common goals, and thus each individual defendant was merely a part of, not an alter ego of, the 'association-in-fact' enterprise."). And the Supreme Court and Third Circuit have explicitly recognized that natural defendants and their wholly-owned defendant corporations comprise distinct members of a RICO enterprise. See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001)) ("The corporate employer / employee, a natural person, is distinct from the corporation itself, a legally different entity [ . . . ] and we can find nothing in the statute that requires more 'separateness' than that."); Bergrin, 650 F.3d at 265–66 (3d Cir. 2011) (quoting Cedric Kushner, 533 U.S. at 161).

Because the Amended Complaint explains exactly how the association-in-fact's members were "able to advance common interest[s] to a greater extent than would have been possible" if each Defendant acted alone, it sufficiently pleads the McOsker Enterprise's existence. See Brokerage, 618 F.3d at 377.

### C.  Defendants' Five-Year Ponzi Scheme Comprises a Racketeering "Pattern"

Defendants also argue that Plaintiffs plead no RICO pattern, claiming that the Amended Complaint alleges and that all of the alleged racketeering events "occurred in the span of less than one year." See MTD at 8. The Court should reject Defendants' wishful thinking, which ignores hundreds of paragraphs of allegations, not to mention the Ponzi scheme's six non-party victims and the Act 73 tax fraud.

Because Congress "had a fairly flexible concept of a pattern in mind," the Supreme Court has held that "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, **or** methods of commission, **or** otherwise are

interrelated by distinguishing characteristics and are not isolated events." <u>H.J. Inc. v. Nw. Bell Tel.</u> <u>Co.</u>, 492 U.S. 229, 238 (1989) (quoting <u>Sedima</u>, 473 U.S. at 496 n.14) (emphasis added). Plaintiffs need only allege "a series of related predicates extending over a substantial period of time" that lasted longer than "a few weeks or months." <u>H.J.</u>, 492 U.S. at 242.

Where, as here, Plaintiffs allege predicate acts of wire fraud, they need only plead a scheme that "involve[s] some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension;" the racketeering "need not be fraudulent on its face." <u>Lum</u>, 361 F.3d at 223 (quoting <u>Brokerage Concepts v. U.S. Healthcare,</u> <u>Inc.</u>, 140 F.3d 44, 528 (2d Cir. 1998)). The predicate fraud "need not involve affirmative misrepresentation;" it is enough to allege "the deprivation of something by value by trick, deceit, chicane, or overreaching." <u>Kehr Packages, Inc. v. Fidelcor, Inc.</u>, 926 F.2d 1406, 1415 (3d Cir. 1991) (quoting <u>McNally v. United States</u>, 483 U.S. 358, 358 (1987)).

Here, Plaintiffs do not claim that the McOsker Enterprise's sole fraudulent act was a unified theft of Plaintiffs' 1,000 Certificates; instead, they argue that:

1. The McOsker Enterprise induced Plaintiffs to engage in eight separate Transactions, across six months, in furtherance of Defendants' Ponzi scheme, Am. Compl. ¶¶ 91–111;
2. Between at least 2016 and 2019, the McOsker Enterprise perpetrated the same Ponzi scheme against at least six other investors that are not parties to this litigation "in the same manner and for the same reasons that it stole Plaintiffs' money: by pretending that the Tax Lien Defendants would properly escrow proceeds from the sale of clients' Certificates, but instead transferring clients' revenues across jurisdictions and bank accounts so Defendants could profit from those thefts," <u>id.</u> ¶ 153;
3. Defendants even used the exact same fake Scotia Screenshot when non-party Laveer asked for its own money back, <u>id.</u> ¶¶ 160–61; and
4. Between at least 2017 and 2019, Defendants used Plaintiffs' and other victims' money to perpetrate Act 73 tax fraud against Puerto Rico, <u>id.</u> ¶¶ 163–99.

Defendants' faulty arithmetic cannot overcome these facts. <u>Compare</u> <u>id.</u> and MTD at 8 (claiming that "[t]he genesis of the present action is only one event, the sale of the 1,000 tax liens

[ . . . ] No pattern is alleged beyond the alleged misuse of the four outstanding transactions' proceeds, and the whole of the events argued therein occurred in the span of less than one year").

### III.     Plaintiffs' 270 Paragraphs Adequately Plead Their Alternative Tort Claims

In arguing that Plaintiffs' fraudulent inducement, conversion, and unjust enrichment claims merely duplicate their breach-of-contract claim, Defendants again misstate the Amended Complaint's allegations and governing law. See generally MTD at 12–16. For example, none of those tort claims have different defendants than the contract claim does: Plaintiffs seek to hold only LC Escrow liable for breach of contract, but sue (a) Defendants McOsker, LC Purchaser, and LC Escrow for fraudulent inducement and (b) all Defendants for conversion, unjust enrichment, and civil conspiracy. See Am. Compl. ¶¶ 242–70.

Furthermore, here in federal court, plaintiffs may pursue claims in the alternative even if alternative theories of liability may share the same damages. Philip A. Templeton, M.D., P.A. v. EmCare, Inc., 868 F. Supp. 333, 340 (D. Del. 2012) (citing Fed. R. Civ. P. 8(d); Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC, Civ. No. 3658, 2009 WL 1124451, at *1 (Del. Ch. Apr. 20, 2009)). Accordingly, Plaintiffs' unjust enrichment and civil conspiracy claims must survive. See MTD at 15–16 (arguing for dismissal of unjust enrichment claim because it is duplicative of contract claim, and for only that reason); id. at 15 (arguing for dismissal of civil conspiracy claim because "all Plaintiffs' tort claims fail").

Substantively, Plaintiffs' fraudulent inducement claim is not "based on alleged representations **in the contracts,**" MTD at 12 (emphasis in original)—it alleges that Defendants' Ponzi scheme began at least two years before their Transactions with Plaintiffs, and that Defendants lied about their own business practices and intentions to pay Plaintiffs in order to trick Plaintiffs into handing over their Certificates—i.e., that Defendants lied **before** the Parties

17

executed the Transaction Documents. <u>Compare, e.g.</u>, Am. Compl. ¶¶ 88, 150–62 <u>and</u> MTD at 13 (citing <u>ITW Glob. Invs. Inc. v. Am. Indus Partners Cap. Fund IV, L.P.</u>, No. N14C-10-236 JRJ CCLD, 2015 WL 3970908, at *7 (Del. Super. June 24, 2015)) ("For a fraudulent inducement claim to survive concurrently with a breach of contract claim, the alleged fraud must have occurred **prior to the execution of the contract**.") (emphasis added). As in <u>ITW</u>, Plaintiffs allege that Defendants defrauded them **before** they ever closed the Transactions or executed the Transaction Agreements. <u>Compare</u> Am. Compl. ¶¶ 88, 150–62 <u>and</u> <u>ITW</u>, 2015 WL 3970809, at *6–7 (plaintiffs state fraudulent inducement by alleging "fraudulent conduct occurring **prior** to entering the contract" and misrepresentations "**before** the closing of the SPA") (emphasis in original).

Plaintiffs' conversion claim also must survive: Defendants did not just "wrongfully exert" dominion over Plaintiffs' money—they also interfered with Plaintiffs' right to possess the 1,000 Certificates. <u>Compare</u> MTD at 15 (citation omitted) ("Delaware law generally does not recognize a claim for the conversion of money") <u>and generally</u> Am. Compl.

Finally, Plaintiffs also state unjust enrichment against Defendants McOsker, Kernan, Hernandez, BloxTrade, BCMG Services, BCMG International, and Sitona: Plaintiffs allege that each and every single one of those Defendants enriched themselves by stealing Plaintiffs' Certificates, and Plaintiffs do not have enforceable contracts with any of them. <u>See</u> <u>In re Conex Holdings, LLC</u>, 518 B.R. 792, 806 (Bankr. D. Del. 2014) (unjust enrichment elements are (1) an enrichment, (2) an impoverishment, (3) a relation between enrichment and impoverishment, (4) the absence of justification, and (5) the absence of remedy provided by law).

18

## IV.    Defendants' Previous Filings Nullify Their New Personal Jurisdiction and Colorado River Abstention Arguments

Finally, Defendants' Puerto Rican filings demonstrate exactly why this Court may exercise personal jurisdiction over Defendants Kernan and Hernandez and should refuse to stay the case pursuant to the <u>Colorado River</u> doctrine:

- Pursuant to the Transaction Agreements, "Plaintiffs are contractually impeded from objecting to the jurisdiction of the Delaware courts," Bennett Decl. Ex. 2 at 11;
- "[T]he selection of Delaware as the forum of choice is eminently reasonable as it is roughly halfway between Plaintiffs' alleged principal places of business and those of Defendants," <u>id.</u> at 12;
- "Plaintiffs are *bona fide* business entities and were aware that they would be required to litigate any dispute outside of Puerto Rico," <u>id.</u>;
- Because the median time for disposing of a civil case is much shorter in the District of Delaware, "this factor alone tilts the scale unequivocally in favor of a transfer to the U.S. District Court for the District of Delaware," <u>id.</u> at 15; and
- "[P]ues sería patentemente frívolo alegar que el estado de Delaware sería un foro irrazonable o injusto, o que de utilizarlo se incurriría en inequidad. El foro del estado de Delaware es eminente razonable, pues se encuentra entre los alegados principals lugares de negocious de los Demandes y los de los Demandados," Whalen Ex. A at 21.

As Defendants acknowledge, 18 U.S.C. § 1965(b) provides for nationwide service and jurisdiction over "other parties" so long as at least one RICO defendant is subject to the Court's jurisdiction. <u>See</u> MTD at 19. Defendants offer no explanation or authority explaining why "[t]he ends of justice do not require" haling Defendants Kernan and Hernandez before this Court—a questionable premise particularly because both men are executives of the Delaware Corporate Defendants, which repeatedly argued that this dispute should "transfer[red] to the U.S.. District Corut for the District of Delaware." Bennett Decl. Ex. 2 at 15.

While Plaintiffs agree that the Court should not exercise supplemental jurisdiction if it dismisses all of their federal claims, the Delaware long-arm statute also allows this Court to exercise jurisdiction over both men, since they perpetrated the alleged misconduct as officers of

the Delaware entities. See PT China LLC v. PT Korea LLC, No. CIV.A. 4456-VCN, 2010 WL 761145, at *8 (Del. Ch. Feb. 26, 2010) ("[T]he critical determination [under 6 Del. C. § 18-109(a)] is whether the dispute is intertwined with the defendant's managerial position" in Delaware LLCs).

## CONCLUSION

Defendants' 12(b)(6) Motion refuses to analyze the pleading they seek to dismiss, and their 12(b)(2) Motion similarly ignores the relevant jurisdictional statutes' plain text, let alone Defendants' Puerto Rico arguments that only Delaware could hear this dispute. Defendants have attempted to avoid justice long enough. Plaintiffs respectfully request that the Court deny the Motion in its entirety.

Dated:  October 12, 2021

SMITH KATZENSTEIN & JENKINS LLP

/s/ Kathleen M. Miller
Kathleen M. Miller (No. 2898)
Julie M. O'Dell (No. 6919)
Brandywine Building
1000 N. West Street, Suite 1501
Wilmington, Delaware 19801
(302) 652-8400
kmiller@skjlaw.com
jodell@skujlaw.com

GUSRAE KAPLAN NUSBAUM PLLC

Ryan J. Whalen (*pro hac vice*)
Kari Parks (*pro hac vice*)
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
rwhalen@gusraekaplan.com
kparks@gusraekaplan.com

*Counsel for Plaintiffs*