## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EBURY STREET CAPITAL, LLC, EB
1EMIALA, LLC, EB 2EMIALA, LLC,
EBURY FUND 1 NJ LLC, and EBURY FUND
2 NJ, LLC,

        Plaintiffs/Counterclaim
        Defendants,

    v.

THOMAS R. MCOSKER, ANDREW
KERNAN, BADEL HERNANDEZ,
LIENCLEAR – 0001, LLC, LIENCLEAR –
0002, LLC, LIENCLEAR, LLC,
BLOXTRADE, LLC, BCMG SERVICES,
LLC, BCMG INTERNATIONAL, LLC, and
SITONA VENTURES LLC,

        Defendants/Counterclaimants/
        Third-Party Plaintiffs.

    v.

JOHN HANRATTY, PING XIE, SARAH
WELLS, DENNISSE MENDEZ, SHIRLEY
VEGA, JOHN BRONZO, PATRICK
SEYMOUR, EB LEVRE I, LLC, EBURY
FUND I, LP, EBURY FUND 2, LP, EB
1EMIDC, LLC, RED CLOVER 1, LLC,
WHITE CLOVER 1, LLC, BLACK CLOVER
I, LLC, EBURY FUND IC1, LLC, EBURY
FUND 2CI, LLC, and EBURY RE, LLC,

        Third-Party Defendants.

Civil Action No. 1:21-cv-00203-RTD

## DEFENDANTS/COUNTERCLAIMANTS/THIRD-PARTY PLAINTIFFS'
## ANSWER TO THE AMENDED COMPLAINT, AFFIRMATIVE DEFENSES,
## COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT

Defendants/Counterclaimants/Third-Party Plaintiffs Thomas R. McOsker, Andrew

Kernan, Badel Hernandez, Lienclear – 0001, LLC, Lienclear – 0002, LLC, Lienclear, LLC,

BloxTrade, LLC, BCMG Services, LLC, BCMG International, LLC, and Sitona Ventures LLC ("Defendants"), by counsel, respond to Plaintiff/Counter-Defendant's ("Plaintiff") Amended Complaint (the "Complaint") and allege in the Counterclaims as follows.  For the Court's convenience, Plaintiff's allegations are set forth verbatim with Defendants' responses immediately following.

Except as expressly admitted herein, Defendants deny all allegations in the Complaint, including legal conclusions (which are for the Court to determine) and any allegations in headings and/or footnotes. To the extent Defendants answer allegations containing terms defined in the Complaint, such answer is not an acknowledgement, admission, or adoption of any fact or characterization made by Plaintiff.  In addition, to the extent Defendants refer the Court to a document referenced in the Consolidated Complaint for the complete contents thereof, they deny any allegations in the Complaint that are inconsistent with the contents of such documents.

## NATURE OF ACTION

1.      This action is brought under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et. seq.* and Delaware state law for treble, actual and punitive damages and for the recovery of attorneys' fees and costs incurred in this action.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

2.      Plaintiffs are in the tax lien investment business.

**RESPONSE: Denied.**

3.      Plaintiff ESC is the managing member of Plaintiffs EF 1 and EF 2, which own New Jersey tax lien certificates, and Plaintiffs EB 1 and EB 2, which own Alabama tax lien certificates.

**RESPONSE: Defendants**

4.      Defendants LC Purchaser, LC Escrow, LC Servicer, and BloxTrade (collectively, the "**Tax Lien Defendants**") advertise themselves as market-makers in and brokers of tax lien certificates ("**Certificates**").

**RESPONSE: Denied.**

5.     The Tax Lien Defendants purport to facilitate transactions by (1) purchasing Certificates and then selling the Certificates at a mark-up (2) after providing escrow, clearing, and transfer services to Certificates' sellers and buyers.

**RESPONSE: Denied.**

6.     Defendant Thomas R. McOsker ("**McOsker**") owns and manages a panoply of Delaware and Puerto Rico LLCs that purport to engage in legitimate financial services, including the Tax Lien Defendants and Defendants BCMG Services, BCMG International, and Sitona (collectively, the "**Corporate Defendants**").

**RESPONSE: Denied.**

7.     Defendants Andrew Kernan, and Badel Hernandez (with McOsker, the "**Individual Defendants**") help McOsker manage the Tax Lien Defendants and the Corporate Defendants.

**RESPONSE: Denied.**

8.     Defendants comprise the "**McOsker Enterprise**," an association-in-fact which defrauds the Tax Lien Defendants' clients into depositing escrow funds with Defendant LC Escrow, which Defendants then steal and use for their own purposes.

**RESPONSE: Denied.**

9.     Defendants work in tandem to "offer" unsuspecting clients an efficient, closed-loop tax lien brokerage service.

**RESPONSE: Denied.**

10.     In reality, Defendants defraud the public and their own clients by presenting the Corporate Defendants as legitimate financial services companies, then spending their clients' money to line their own pockets.

**RESPONSE: Denied.**

11.     In several separate transactions throughout 2018, ESC and the Tax Lien Defendants executed a series of contracts (the "**Transaction Agreements**") to facilitate Plaintiffs' sale of nearly one thousand Certificates to Defendant LC Purchaser.

**RESPONSE: Denied.**

12.     Plaintiffs assigned to, and the Tax Lien Defendants gained title of, all Certificates promised in the Transaction Agreements.

**RESPONSE: Denied.**

13.    In exchange for Plaintiffs' Certificates, the Tax Lien Defendants promised to lawfully perform all transaction services and pay Plaintiffs over $3.5 million in supposedly escrowed funds.

**RESPONSE: Denied.**

14.    But unbeknownst to Plaintiffs, the Tax Lien Defendants did not even maintain a proper escrow account.

**RESPONSE: Denied.**

15.    Instead, the Tax Lien Defendants simply deposited the funds into a JPMorgan Chase checking account held by LC Escrow in New York (the "**Chase Account**").

**RESPONSE: Denied.**

16.    Furthermore, instead of disbursing Plaintiffs' money as required by the Transaction Agreements, and as repeatedly requested by Plaintiffs, Defendants McOsker, Kernan, and Hernandez repeatedly transferred cash from the New York Chase Account into Puerto Rico bank accounts held by Defendants BCMG Services and LC Servicer (the "**Puerto Rico Accounts**").

**RESPONSE: Denied.**

17.    Once the Individual Defendants moved Plaintiffs' millions into the Puerto Rico Accounts, the McOsker Enterprise misappropriated the money, lining their own pockets and otherwise using Plaintiffs' $3.5 million for anything other than what they had promised Plaintiffs.

**RESPONSE: Denied.**

18.    The McOsker Enterprise misappropriated Plaintiffs' money for a variety of unlawful purposes that comprise violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et. seq.,* (RICO) through their predicate acts of wire fraud, violations of the National Stolen Property Act, and money laundering.

**RESPONSE: Denied.**

19.    Defendants' conduct also violates Delaware common law, including breaches of contract, fraud, unjust enrichment, and conversion.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required but to the extent that any allegation, accusation or insinuation is being made regarding Defendant's behavior, conduct or actions then it is denied in its entirety.**

20.     For example, Defendants perpetrated what amounted be essentially a Ponzi Scheme by using new clients' money to pay off the Tax Lien Defendants' existing clients.

**RESPONSE: Denied.**

21.     Defendants also used Plaintiffs' $3.5 million of supposedly escrowed funds to (1) finance Defendants BCMG Services's fraudulent scheme to qualify for tax credits issued by the Commonwealth of Puerto Rico; (2) fund Defendant BCMG Services's routine business expenses; (3) bankroll Defendant McOsker's personal whims, including buying a volleyball team and coffee farm; and (4) pay off Defendants Kernan and Hernandez for their help in committing these crimes.

**RESPONSE: Denied.**

22.     As Plaintiffs became aware that Defendants stole the money, Plaintiffs learned that Defendants had perpetrated similar frauds on other clients of the Tax Lien Defendants since at least 2016.

**RESPONSE: Denied.**

23.     Plaintiffs believe that the McOsker Enterprise is using the Tax Lien Defendants to lure other innocent victims to this day.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.  By way of further answer, Defendants deny that they compromise the McOsker Enterprise and that they have "lured" any person or entity.**

24.     Plaintiffs seek to recover damages caused by the McOsker Enterprise and Defendants to the fullest extent permitted under the law, including treble, actual, and/or punitive damages, together with interest, costs and fees; and all other relief this Court deems just and proper.

**RESPONSE: Denied that Plaintiffs are entitled to any relief.**

## THE PARTIES

25.     Plaintiff ESC is a New York limited liability company and the managing member of the other Plaintiffs.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

26.     Plaintiff EB 1EMIALA, LLC is an Alabama limited liability company that purchases, owns, and sells Alabama tax lien certificates.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

27.     Plaintiff EB 2EMIALA, LLC is an Alabama limited liability company that purchases, owns, and sells Alabama tax lien certificates.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

28.     Plaintiff Ebury Fund 1 NJ, LLC is a New Jersey limited liability company that purchases, owns, and sells New Jersey tax lien certificates.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

29.     Plaintiff Ebury Fund 2 NJ, LLC is a New Jersey limited liability company that purchases, owns, and sells New Jersey tax lien certificates.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

30.     Each Plaintiff's principal place of business is 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

31.     Defendant Thomas R. McOsker is a resident of Puerto Rico. McOsker owns all of the Corporate Defendants and manages the other Individual Defendants.

**RESPONSE: Denied.**

32.     Defendant LienClear, LLC (defined above as "**LC Servicer**") is a Puerto Rico limited liability company. Defendant McOsker owns LC Servicer.

**RESPONSE: Denied.**

33.     Defendant LienClear – 0001, LLC (defined above as "**LC Purchaser**") is a Delaware limited liability company. Defendant McOsker owns LC Purchaser.

**RESPONSE: Admitted.**

34.     Defendant LienClear 0002, LLC (defined above as "**LC Escrow**") is a Delaware limited liability company. Defendant McOsker owns LC Escrow.

**RESPONSE: Admitted.**

35.     Defendant BloxTrade, LLC ("**BloxTrade**") is a Puerto Rico limited liability company. Defendant McOsker owns BloxTrade, which purports to be a tax lien broker.

**RESPONSE: Denied.**

36.      Defendant BCMG Services, LLC (defined above as "**BCMG Services**") is a Puerto Rico limited liability company. Defendant McOsker owns BCMG Services.

**RESPONSE: Denied.**

37.     Defendant BCMG International, LLC (defined above as "**BCMG International**") is a Puerto Rico limited liability company wholly owned by BCMG Services. The Tax Lien Defendants, BCMG Services, and BCMG International all have the same principal place of business: 53 Palmeras Street, Suite 901 San Juan, Puerto Rico 00901.

**RESPONSE: Denied.**

38.     Defendant Sitona Ventures, LLC (defined above as "**Sitona**") is a Delaware limited liability company whose principal place of business is 401 Park Avenue South, 10th Floor, New York, NY 10016. Defendant McOsker owns Sitona.

**RESPONSE: Denied.**

39.     The application for authority of Sitona filed with the New York State Department of State, Division of Corporations dated July 29, 2015 is signed by McOsker, as "member" with an address of 401 Park Avenue South, 10th Floor, New York, NY 10016.

**RESPONSE: Admitted.**

40.     Non-party Cactus Ventures LLC ("**Cactus**") was a Delaware limited liability company whose principal place of business was 401 Park Avenue South, 10th Floor, New York, NY 10016. Defendant McOsker owned Cactus.

**RESPONSE: Denied.**

41.     The application for authority of Cactus filed with the New York State Department of State, Division of Corporations dated November 7, 2014 and is signed by McOsker, as "member" with an address of 401 Park Avenue South, 10th Floor, New York, NY 10016.

**RESPONSE: Admitted.**

42.     Cactus identified its principal place of business at 1 Little West 12th Street, New York, New York, 10014, which is the same business address as Defendants LC Purchaser and LC Escrow.

**RESPONSE: Denied.**

43.     Plaintiffs do not sue Cactus because its limited liability company certificate was canceled in 2018.

**RESPONSE: Admitted that Cactus was dissolved in 2018.**

44.     Defendant Andrew Kernan is a resident of New York and personally profited at least $85,000 from the McOsker Enterprise's wrongdoing against Plaintiffs.

**RESPONSE: Denied.**

45.     Defendant Kernan is an independent contractor and Chief Financial Officer ("**CFO**") of Defendant BCMG Services and the Tax Lien Defendants.

**RESPONSE: Denied.**

46.     Defendant Badel Hernandez is a resident of Puerto Rico and personally profited at least $62,000 from McOsker Enterprise's wrongdoing against Plaintiffs.

**RESPONSE: Denied.**

47.     Defendant Hernandez is the in-house counsel and business manager of Defendants LC Servicer, BloxTrade, and BCMG Services.

**RESPONSE: Denied.**

48.     Each Tax Lien Defendant is undercapitalized and lacks corporate formalities.

**RESPONSE: Denied.**

49.     The Tax Lien Defendants did not engage in arm's-length transactions with each other, but instead freely exchanged assets that they had stolen from their clients.

**RESPONSE: Denied.**

50.     The McOsker Enterprise used the Tax Lien Defendants to commit federal felonies, from which the Individual Defendants personally profited.

**RESPONSE: Denied.**

51.     The Individual Defendants planned, organized, and directed the wrongful events alleged herein primarily through the Corporate Defendants, including by wrongfully converting the supposedly-escrowed funds due to Plaintiffs for the Corporate Defendants' own business expenses and the Individual Defendants' personal profits.

**RESPONSE: Denied.**

52.     For example, the McOsker Enterprise used the Tax Lien Defendants to gain control of, and steal, Escrow Funds belonging to Plaintiffs.

**RESPONSE: Denied.**

53.     There is substantial overlap in ownership, officers, directors and personnel among Defendants.

**RESPONSE: Denied.**

54.     For example, the Individual and Tax Lien Defendants share common office spaces, addresses, and phone numbers in Puerto Rico.

**RESPONSE: Denied.**

55.     As part of the sale of Plaintiffs' tax liens, the Tax Lien Defendants did not act at arm's-length with each other, despite contractual obligations to do so, but rather engaged in conflicted, interested transactions with one another.

**RESPONSE: Denied.**

## JURISDICTION AND VENUE

56.     Pursuant to 28 U.S.C. § 1331, this Court has subject-matter jurisdiction because Plaintiffs allege RICO violations in violation of 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. §1964(c).

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

57.     Pursuant to 28 U.S.C. § 1367, the Court may exercise supplemental jurisdiction over Plaintiffs' state law claims.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

58.     This Court has personal jurisdiction over Defendants LC Purchaser, LC Escrow, and Sitona, each of which is a Delaware limited liability company and may be served by serving its registered agent in Delaware.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

59.     The Court has personal jurisdiction over the Tax Lien Defendants because each entered into agreements with Plaintiff in which they consented to the jurisdiction of Delaware Courts.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

60.     The Court has personal jurisdiction over the Individual Defendants because they are citizens of the United States, reside in Puerto Rico and New York, and upon information and belief, manage Delaware limited liability companies LC Purchaser, LC Escrow, and Sitona thus have consented to personal jurisdiction in Delaware pursuant to 6 *Del. C.* § 18-109(a).

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

61.     The Court has personal jurisdiction over all of the Defendants pursuant to 18 U.S.C. § 1965 because this action may be brought in this jurisdiction against Defendants LC Purchaser, LC Escrow, and Sitona.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

62.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because Defendants LC Purchaser, LC Escrow, and Sitona are Delaware entities and the Tax Lien Defendants executed agreements with Plaintiff ESC in which the parties consented to Delaware as the venue for any and all disputes that arise out of the agreements.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

63.     Moreover, in a related Puerto Rico proceeding, Defendants moved to dismiss on the basis of, inter alia, forum non conveniens, claiming that Delaware court was the proper jurisdiction for this dispute.

**RESPONSE: Admitted that Defendants moved to dismiss the ongoing Puerto Rico proceeding on the basis of *forum non* conveniens.  Denied that "this dispute" is the same dispute in the ongoing Puerto Rico proceeding.**

## FACTUAL BACKGROUND

**Tax Lien Investments**

64.     Plaintiffs invest in tax lien Certificates, which are certificates of claims against properties that have liens against them due to unpaid property taxes.

**RESPONSE: Admitted.**

65.     Investors like Plaintiffs can buy Certificates in jurisdictions that levy property taxes, which typically are counties and municipalities.

**RESPONSE: Admitted.**

66.     The investor pays the property's outstanding taxes to the municipality.

**RESPONSE: Admitted.**

67.     In exchange, the municipality issues the Certificate to the investor, which gives the investor the right to collect the unpaid taxes and interest from the property owner.

**RESPONSE: Admitted.**

68.     Certificates can be valuable investments because they not only provide stable cash flow, but also have superiority to the vast majority of other liens that can be imposed upon real property.

**RESPONSE: Admitted.**

69.     Because there is no central exchange for the secondary trading of Certificates, when investors like Plaintiffs want to sell their Certificates, they often engage the services of brokers and market-makers.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

70.     The Tax Lien Defendants purport to offer such brokerage and market-making services for Certificates.

**RESPONSE: Denied.**

**The Transactions**

71.     Between 2015 and 2017, Plaintiffs acquired approximately one thousand Certificates on properties located across the United States.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

72.     In 2018, Plaintiffs began working with Defendant BloxTrade to sell Plaintiffs' Certificates.

**RESPONSE: Admitted in-part. "Plaintiffs' Certificates" and the proceeds from the sale thereof were to be used, in-part, to fund activities related to the CRIM Proposal.**

73.     In 2018, Plaintiffs sold thousands of Certificates in eight separate transactions with Defendant BloxTrade, understanding that BloxTrade would, in turn, sell the Certificates to third parties unaffiliated with Plaintiffs or Defendants (the "**Transactions**").

**RESPONSE: Denied.**

74.     Defendant BloxTrade and the Tax Lien Defendants purported to structure the transactions so that Plaintiffs would sell the Certificates directly to Defendant LC Purchaser, while Defendant LC Escrow would act as a "third-party escrow agent" and Defendant LC Servicer would perform the transfer and assignment of the Certificates in connection with each Transaction.

**RESPONSE: Admitted that LC Purchaser purchased the Certificates. Admitted that LC Escrow acts as an escrow agent. Admitted that LC Servicer performs the transfer and assignment of the Certificates. The remainder of the allegations of this Paragraph are denied.**

75.     The Tax Lien Defendants told Plaintiffs that as the Transactions were pending, the money that Defendant LC Purchaser was providing to purchase Plaintiffs' Certificates would be held in an escrow account maintained by Defendant LC Escrow.

**RESPONSE: Denied.**

76.     The Tax Lien Defendants claimed that LC Escrow would release the purchase money to Plaintiffs once the third-party sellers purchased the Certificates from Defendant LC Purchaser via Defendant BloxTrade.

**RESPONSE: Denied.**

77.     A functionally-identical set of three contracts governed each Transaction: (1) a Tax Lien Purchase and Sale Agreement, (2) an Escrow Agreement, and (3) a Service Agreement, which each have Delaware choice-of-law and venue provisions (together, the "**Transaction Agreements**").

**RESPONSE: Admitted in part.  The Transactions Agreements do not contain the entire agreement of the parties.**

78.     The Tax Lien Purchase and Sale Agreements ("**P/S Agreements**") memorialize the terms on which Defendant LC Purchaser bought the Certificates from Plaintiffs.

**RESPONSE: Denied.**

79.     The Transaction Agreements established the terms on and process with which Defendant LC Escrow would conduct escrow services for Plaintiffs and the ultimate third-party purchasers.

**RESPONSE: Denied.**

80.     The Service Agreements require Defendant LC Servicer to perform all acts necessary to effect each Transaction, including delivering the Certificates from Plaintiffs to Defendant LC Purchaser, certifying those deliveries, and sending the relevant county clerk Plaintiffs' assignments of the Certificates.

**RESPONSE: Denied.**

81.     Each Transaction Agreement was executed by Plaintiff ESC, on the one hand, and one or more of the Tax Lien Defendants, on the other hand.

**RESPONSE: Admitted.**

82.     Plaintiff ESC executed each Transaction Agreement as the Managing Member of the Plaintiffs selling their respective Certificates.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of this Paragraph and they are denied.**

83.     Annexed to this Complaint as Exhibit 1 are true and correct copies of the Transaction Agreements for the October 1, 2018 Transaction and related transaction documents, including the Certificate of Servicer Evidencing Transfer of Tax Liens executed by Defendant LC Servicer.

**RESPONSE: Denied.**

84.     To induce Plaintiffs to engage in the Transactions and execute the Transaction Agreements, the Tax Lien Defendants represented that they would ensure that Plaintiffs received the ultimate purchasers' money in exchange for Plaintiffs' Certificates.

**RESPONSE: Denied.**

85.     In every single one of the eight Transactions, Plaintiffs delivered all relevant Certificates to the Tax Lien Defendants.

**RESPONSE: Denied.**

86.     The Tax Lien Defendants, meanwhile, were supposed to make two payments to Plaintiffs per Transaction: (a) 60% of the Transaction price when Plaintiffs provided satisfactory assignment forms, and (b) the remaining 40% once LC Servicer actually transferred and assigned the Certificates.

**RESPONSE: Denied.**

87.     The Tax Lien Defendants repeatedly acknowledged that Plaintiffs had fulfilled all of their contractual duties for each Transaction.

**RESPONSE: Denied.**

88.     The Tax Lien Defendants, however, did not fulfill their own—and, as discussed below, planned to steal Plaintiffs' money before the parties ever executed the Transaction or P/S Agreements.

**RESPONSE: Denied.**

89.     In four of the eight Transactions, the Tax Lien Defendants dragged their feet for weeks and months after re-selling Plaintiffs' Certificates, continually manufacturing new excuses for their failure to pay Plaintiffs money that Defendants supposedly had escrowed.

**RESPONSE: Denied.**

90.     In the remaining four Transactions, the Tax Lien Defendants never paid Plaintiffs at all (the "**Unpaid Transactions**").

**RESPONSE: Denied.**

91.     In June 2018, Plaintiffs EB 1 and EB 2 sought to sell 41 Certificates on Alabama properties.

**RESPONSE: Admitted.**

92.     On June 27, 2018, Plaintiff ESC contracted with Defendant BloxTrade to sell EB 1's and EB 2's 41 Alabama Certificates to LC Purchaser for $413,635.99 (the "**June 2018 Transaction**").

**RESPONSE: Denied.**

93.     Defendant LC Purchaser was not the ultimate buyer of the June 2018 Transaction's 41 Certificates, but instead a pass-through entity that conveyed the titles to the ultimate buyer.

**RESPONSE: Denied.**

94.     Defendant BloxTrade confirmed that the June 2018 Transaction became effective on June 28, 2018.

**RESPONSE: Denied.**

95.     On June 27, 2018, Defendant McOsker confirmed that LC Purchaser had re-sold the 41 Certificates. See Exhibit 2, the trade confirmation for the June 2018 Transaction.

**RESPONSE: Denied.**

96.     In other words, on June 27, 2018, Defendant McOsker certified that Plaintiffs should receive all of the supposedly-escrowed funds for these 41 Certificates.

**RESPONSE: Denied.**

97.     But Defendants never paid, and Plaintiffs never received, the $431,635.99 due from the June 2018 Transaction.

**RESPONSE: Denied.**

98.     In late September 2018, EB1 and EB2 decided to sell 242 more Certificates on Alabama properties.

**RESPONSE: Admitted.**

99.     On October 1, 2018, ESC agreed to sell the 242 Certificates to LC Purchaser for $834,291.64 (the "**October 2018 Transaction**").

**RESPONSE: Admitted.**

100.     LC Purchaser sold the tax liens for more than the $834,291.64 it had contracted to pay Plaintiffs.

**RESPONSE: Denied.**

101.     LC Servicer certified that all conditions necessary to pay Plaintiffs pursuant to the October 2018 Transaction had been met. See Exhibit 3, the trade confirmation for the October 2018 Transaction.

**RESPONSE: Denied.**

102.    As they had in June, the Tax Lien Defendants again claimed that they had escrowed Plaintiffs' $834,291.64, yet refused to disburse the proceeds to Plaintiffs.

**RESPONSE: Denied.**

103.    In November 2018, ESC, sought to sell 18 New Jersey Certificates owned by Plaintiff EF 1.

**RESPONSE: Denied.**

104.    On November 21, 2018, ESC agreed to sell EF 1's 18 Certificates to LC Purchaser for $450,384.95 (the "**November 2018 Transaction**").

**RESPONSE: Admitted.**

105.    Again, LC Purchaser claimed that the Tax Lien Defendants had escrowed Plaintiffs' proceeds and that LC Purchaser had re-sold the Certificates for more than Plaintiffs' price.

**RESPONSE: Denied.**

106.    Again, the Tax Lien Defendants confirmed that all conditions precedent had been met to release Plaintiffs' proceeds from escrow to Plaintiffs. See Exhibit 4, the trade confirmation for the November 2018 Transaction.

**RESPONSE: Denied.**

107.    And again, the Tax Lien Defendants never conveyed, and Plaintiffs have never received, the $450,384.95 that the Tax Lien Defendants supposedly had held in escrow for Plaintiffs.

**RESPONSE: Denied.**

108.    The last Unpaid Transaction occurred in December 2018, when ESC agreed to sell 666 New Jersey Certificates owned by EF 1 and EF 2 to LC Purchaser for $1,828,267.72 (the "**December 2018 Transaction**").

**RESPONSE: Admitted.**

109.    LC Purchaser again sold those Certificates at a profit, after which the Tax Lien Defendants certified that all conditions precedent had been met to release the "escrowed" proceeds to Plaintiffs. See Exhibit 5, the trade confirmation for the December 2018 Transaction.

**RESPONSE: Denied.**

110.    Despite acknowledging that Plaintiffs met all conditions precedent to receiving their December 2018 Transaction fees, the Tax Lien Defendants refused to pay the $1,828,267.72 that they had supposedly been holding in escrow for Plaintiffs.

**RESPONSE: Denied.**

111.    The four Unpaid Transactions should have resulted in the Tax Lien Defendants' release of approximately $3,500,229 in escrowed funds to Plaintiffs (the "**Escrowed Funds**").

**RESPONSE: Denied.**

112.    To this day, the Tax Lien Defendants continue to owe Plaintiffs the Escrowed Funds.

**RESPONSE: Denied.**

113.    Yet the Tax Lien Defendants still refuse payment, providing no lawful excuse or justification.

**RESPONSE: Denied.**

**In a Ponzi-Like Scheme, Defendants Stole Over $3.5 Million of Supposedly-"Escrowed" Funds from Plaintiffs**

114.    After the Transactions, Plaintiffs learned the McOsker Enterprise has a practice and pattern of diverting "escrow" funds from clients like Plaintiffs.

**RESPONSE: Denied.**

115.    In fact, the Tax Lien Defendants never really "escrow" client funds at all.

**RESPONSE: Denied.**

116.    Instead, the Individual Defendants move the client money from account to account, jurisdiction to jurisdiction, in order to steal the client money for the McOsker Enterprise's own unlawful purposes.

**RESPONSE: Denied.**

117.    First, instead of placing the client money into a segregated escrow accounts, the Tax Lien Defendants simply deposit their clients' "escrow" funds into the Chase Account: a New York checking account held by Defendant LC Escrow.

**RESPONSE: Denied.**

118.    The Chase Account is not a true, segregated escrow account; the McOsker Enterprise uses the Chase Account as a piggy bank.

**RESPONSE: Denied.**

119.    The McOsker Enterprise opened and uses the Chase Account to trick its clients and law enforcement into thinking that the Tax Lien Defendants are legitimate, lawful entities that actually segregate client money.

**RESPONSE: Denied.**

120.    However, once client money hits the Chase Account, the Individual Defendants transfer the client money to the Puerto Rico Accounts held by Defendants BCMG Services and LC Servicer.

**RESPONSE: Denied.**

121.    After the client money clears in the Puerto Rico Accounts, the McOsker Enterprise allows Defendants to withdraw the money at will to suit their own whims.

**RESPONSE: Denied.**

122.    For example, the McOsker Enterprise uses existing clients' money to induce new, unsuspecting clients to give the Tax Lien Defendants even more money, in what amounts to a simple Ponzi scheme.

**RESPONSE: Denied.**

123.    The McOsker Enterprise uses misappropriated client funds to partly repay existing clients with new clients' supposedly-escrowed funds, as it did with four of Plaintiffs' Transactions.
124.    For example, in or about March 2018, the Tax Lien Defendants began diverting Plaintiffs' funds from the alleged Escrow Account.

**RESPONSE: Denied.**

125.    On four of the Parties' eight Transactions, the Tax Lien Defendants only paid Plaintiffs after an extreme delay and constant inquiry and concern from Plaintiffs.

**RESPONSE: Denied.**

126.    Upon information and belief, the Tax Lien Defendants chose to pay Plaintiffs for four of the Transactions in an attempt to string Plaintiffs along as long as possible, in order to steal hundreds more valuable Certificates, which the Tax Lien Defendants liquidated for millions of dollars.

**RESPONSE: Denied.**

127.    Eventually, the Tax Lien Defendants no longer bothered trying to placate their existing clients and stopped paying them altogether, moving on to new victims.

**RESPONSE: Denied.**

128.    As described below, the methods with which the McOsker Enterprise perpetrates this Ponzi-like scheme comprise wire fraud, violations of the NSPA, and money laundering.

**RESPONSE: Denied.**

129.    At all relevant times, Defendant LC Escrow told Plaintiffs that it was a legitimate escrow agent that would act independently of the other Defendants.

**RESPONSE: Admitted.**

130.    This was a lie.

**RESPONSE: Denied.**

131.    Defendant LC Escrow did not hold the Escrow Funds in any escrow account, but rather the Chase Account, which was a mere checking account at a JP Morgan Chase branch in New York.

**RESPONSE: Denied.**

132.    Defendants McOsker and Kernan controlled the Chase and Puerto Rico Accounts.

**RESPONSE: Denied.**

133.    Contrary to Defendants McOsker's and LC Escrow's representations, on at least four separate occasions, Defendant McOsker directed Defendant Kernan to wire the Escrowed Funds from LC Escrow's Chase Account to BCMG Services's and LC Servicer's Puerto Rico Accounts.

**RESPONSE: Denied.**

134.    Contrary to Defendants McOsker and LC Escrow's representations, without Plaintiffs' knowledge or permission, and without fulfillment of any of the conditions specified in the Transaction Agreements for the release of Escrow Funds and in violation of the Wire Fraud Act and the National Stolen Property Act ("**NSPA**"), McOsker directed the Tax Lien Defendants to knowingly and falsely represent in the Transaction Agreements that the Escrow Funds would only be released in the manner agreed to in the schedules of the Transaction Agreements.

**RESPONSE: Denied.**

135.    The Tax Lien Defendants made these false representations to induce Plaintiffs into agreeing to allow LC Escrow to act as the escrow agent for the Escrow Funds.

**RESPONSE: Denied.**

136.    At the time they induced Plaintiffs into the Transactions and providing their Certificates, McOsker and the Tax Lien Defendants knew that they would convert Plaintiffs' Certificates and the Escrowed Funds for McOsker and the McOsker Enterprise's benefit.

**RESPONSE: Denied.**

**Defendants Repeatedly Lied About Their Failures to Pay Plaintiffs**

137.    Plaintiffs made several requests to Defendants, including all three Individual Defendants, to close out the transactions and distribute the Escrow Funds due to Plaintiffs.

**RESPONSE: Denied.**

138.    In response, Defendants repeatedly lied about why the Escrowed Funds were late.

**RESPONSE: Denied.**

139.    For example, in connection with the December 2018 Transaction, in an email dated March 21, 2019, Defendant McOsker informed Plaintiffs' representative, John Hanratty, and others that:

> [Third-party Buyer A] deposited $1,835,767.72 ($1,828,267.72 plus $7,500 in fees) for NJ_0584_B with Ebury. Due to the overfunding error that has been previously discussed with the parties, [Buyer A] was refunded $379,000 of that purchase price on Feb. 15. As to Process, yes we can confirm that Ebury/MTAG first releases physical certs on or before tomorrow (Fri.) TLOAX processes assignments, John signs and then the funds are netted and released.

**RESPONSE: Plaintiffs purport to quote from and characterize an email.  Defendants respectfully refer the court to the parties' full correspondence (to be produced in discovery) for a full and accurate statement of their contents.**

140.    Defendant McOsker's representations were false: despite satisfaction of the preconditions needed to release the $1,828,767.72 of Escrow Funds to Plaintiffs, Defendants never released the December 2018 Transaction Escrowed Funds to Plaintiffs.

**RESPONSE: Denied.**

141.    On August 30, 2018, Plaintiffs' representative requested from the Tax Lien Defendants an updated proof of the Escrow Funds from the June 2018 Transaction.

**RESPONSE: Denied.**

142.    In response, on August 30, 2018, a representative of the Tax Lien Defendants, identified various entities, including BCMG International (a wholly owned subsidiary of BCMG Services) as entities allegedly holding the Escrow Funds.

**RESPONSE: Denied.**

143.    To prove that BCMG International held some of Plaintiffs' Escrowed Funds, the LC Escrow representative emailed Plaintiffs a purported screenshot of a Scotia Bank account that held approximately $300,000 (the "**Scotia Screenshot**").

**RESPONSE: Denied.**

144.    Defendant McOsker informed John Hanratty that a portion of the Escrow Funds was transferred into the BCMG International bank account because the bank had net capital requirements that required a minimum balance of $1 million and upon the approval of BCMG International as an International Financial Entity or upon receipt of a Puerto Rico Industrial Development Laws Act 73 of May 28, 2008 ("**Act 73**") Tax Credit from the government of Puerto Rico, the Escrow Funds would be transferred to Plaintiffs.

**RESPONSE: Denied.**

145.    Defendant McOsker's excuse was irrelevant: Plaintiffs never allowed Defendants to divert the Escrowed Funds away from the Escrow Account for any reason, let alone to BCMG International, another LLC owned by Defendant McOsker.

**RESPONSE: Denied.**

146.    BCMG International's supposed net capital requirements simply could never have justified Defendants' unilateral diversion of Plaintiffs' Escrowed Funds.

**RESPONSE: Denied.**

147.    Nor could a Puerto Rico Tax Credit for BCMG justified the McOsker Enterprise's theft of the Escrowed Funds from Plaintiffs.

**RESPONSE: Denied.**

148.    Moreover, Defendant McOsker's excuse was also a lie: Defendants never did transfer these supposed Scotia Bank funds to Plaintiffs.

**RESPONSE: Denied.**

149.    In fact, the Scotia Screenshot did not even represent an actual bank balance: as described below, it was just an image file that the McOsker Enterprise used to repeatedly trick its various clients.

**RESPONSE: Denied.**

**Defendants Have Perpetrated the Same Racketeering Scheme Against Other Victims**

150.    In addition to the four separate Unpaid Transactions, the McOsker Enterprise has routinely converted escrow funds from the Tax Lien Defendants' other clients for the McOsker Enterprise's own wrongful ends, including paying previous clients, funding its Tax Fraud Scheme, bankrolling Defendant McOsker's personal projects, paying off Defendants Kernan and Hernandez, and laundering funds.

**RESPONSE: Denied.**

151.    From 2016 through at least 2019, the McOsker Enterprise repeatedly converted funds from clients' escrow accounts in transactions, including funds of Tax Lien Defendant clients Tang Capital Management LLC, INA Group LLC, Millennium Trust Company, LLC, HGM Holdings LLC, Kite Capital Partners, LLC, and Laveer Capital Management, LLC.

**RESPONSE: Denied.**

152.    The McOsker Enterprise stole those clients' money in the same manner and for the same reasons that it stole Plaintiffs' money: by pretending that the Tax Lien Defendants would properly escrow proceeds from the sale of clients' Certificates, but instead transferring clients' revenues across jurisdictions and bank accounts so Defendants could profit from those thefts.

**RESPONSE: Denied.**

153.    In 2017, the McOsker Enterprise routinely breached other clients' Transaction Agreements, diverting at least, $790,000 from client escrow accounts established and managed by the Tax Lien Defendants.

**RESPONSE: Denied.**

154.    As Defendants did with Plaintiffs' assets, the McOsker Enterprise diverted some of these client assets to cover the shortfalls in the escrow accounts of other clients of the Tax Lien Defendants.

**RESPONSE: Denied.**

155.    In May 2019, BloxTrade brokered a transaction in which non-party HGM sold real estate located in Indiana to non-party Laveer Capital Management, LLC ("**Laveer**").

**RESPONSE: Admitted.**

156.    Laveer deposited funds for the purchase with LC Escrow (the "**Laveer Transaction**").

**RESPONSE: Denied.**

157.    Defendant McOsker directed the Tax Lien Defendants to convert the escrow funds deposited by Laveer and instructed Defendant Hernandez to create fictitious reasons to delay the closing of the Laveer Transaction in order to conceal the conversion of the escrow funds deposited by Laveer.

**RESPONSE: Denied.**

158.    On or about June 11, 2019, HGM informed Defendants Hernandez and McOsker that due to the delays in the closing, the Laveer Transaction was cancelled.

**RESPONSE: Denied.**

159.    Throughout June and July 2019, Laveer repeatedly demanded that the Tax Lien Defendants refund Laveer's money, which LC Escrow purported to be holding in an escrow account.

**RESPONSE: Denied.**

160.    On July 8, 2019, Defendant Kernan, at the instruction of Defendant McOsker and in order to conceal the misuse of the escrow funds, sent Laveer's representative the exact same Scotia Screenshot that Defendants had sent to Plaintiffs in August 2018, now claiming that it showed Laveer's own escrowed funds. *See* ¶ 141 *supra.*

**RESPONSE: Denied.**

161.    Defendant Kernan knew that this representation to Laveer was false: he knew that it was the same Scotia Screenshot the Tax Lien Defendants had used almost a full year earlier to play the same trick on Plaintiffs.

**RESPONSE: Denied.**

162.    Upon information and belief, the Individual Defendants repeatedly used that exact Scotia Screenshot to defraud multiple clients, assuming that their clients would never communicate with each other and learn the truth.

**RESPONSE: Denied.**

**Defendants Used Plaintiffs' Escrowed Funds to Commit Tax Fraud Against Puerto Rico**

163.    Under Act 73, certain corporate expenses, including capital expenditures to acquire intellectual property, are eligible for a 50% tax credit.

**RESPONSE: Admitted.**

164.   From 2017 through 2019, the McOsker Enterprise converted Plaintiffs' and other clients' escrow funds to further a tax fraud scheme where BCMG Services would seemingly purchase millions of dollars of intellectual property in order to obtain millions of dollars of freely transferable tax credits under Act 73.

**RESPONSE: Denied.**

165.   BCMG Services—another Puerto Rican entity owned by McOsker—engaged in sham transactions designed to look like eligible intellectual property expenditures entitled to Article 73 tax credits.

**RESPONSE: Denied.**

166.   In reality, these transactions were simply circular payments made at vastly inflated prices among Defendants BCMG Services, Sitona, and non-party Cactus—all of which were owned by Defendant McOsker and operated by all three Individual Defendants.

**RESPONSE: Denied.**

167.   To further the tax fraud, Defendant McOsker directed Defendant Kernan to divert LC Escrow client funds, including Plaintiffs' assets, to BCMG Services's Puerto Rico Accounts.

**RESPONSE: Denied.**

168.   Defendant McOsker would then direct BCMG Services to wire the client funds back to New York to reflect BCMG Services's purported "purchases" of the intellectual property from Cactus and Sitona—again, two entities under common control with BCMG Services.

**RESPONSE: Denied.**

**Cactus Purchases LienLog Intellectual Property for $160,000 and Purports to Sell it to BCMG Services for Over $2,000,000**

169.   Defendant McOsker owned Cactus, which he operated with Defendants Kernan and Hernandez.

**RESPONSE: Denied.**

170.   According to United States Patent and Trademark Office ("**USPTO**"), in November 2014, Cactus purchased the trademarks "Lienlog.com" and "Lienlog" from non-parties LienLog LLC and LienMarket LLC (the "**LienLog IP**").
**RESPONSE: Admitted.**

171.   Cactus paid $160,000 for the Lienlog IP.

**RESPONSE: Admitted.**

172.    USPTO records identify the Lienlog IP as goods and services providing an Internet webpage for the management and technical support of various tax lien portfolios.

**RESPONSE: Admitted.**

173.    In 2016, Defendants McOsker and Kernan cooked up a fraudulent valuation of the Lienlog IP to be used in connection with Defendant BCMG Services' purported purchase of the Lienlog IP from Cactus for the purpose of acquiring intellectual property that could be used to obtain an Act 73 Tax Credit.

**RESPONSE: Denied.**

174.    Pursuant to Defendant Kernan's supposedly-independent valuation, BCMG Services purchased from Cactus Lienlog IP for $2,044,250—almost 13 times what Cactus had paid in the arm's-length transaction just three years earlier.

**RESPONSE: Denied.**

175.    The $2,044,250 purchase price was to be paid in installments in 2016 and 2017 from BCMG Services to Cactus.

**RESPONSE: Admitted.**

176.    Despite the fact that Defendants, themselves, came up with this purchase price, BCMG Services did not even have $2,044,250 to make the installment payments to Cactus.

**RESPONSE: Denied.**

177.    Defendant BCMG Services could not obtain the Article 73 Tax Credit unless it showed that it had actually paid Cactus the $2,044,250 purchase price.

**RESPONSE: Admitted.**

178.    To close the fictitious installment sale acquisition of the Lienlog IP, the Individual Defendants diverted Tax Lien Defendants' escrowed client funds to BCMG Services.

**RESPONSE: Denied.**

179.    The McOsker Enterprise then used these converted client assets to create a fictitious arm's-length transaction for BCMG Services to purchase the LienLog IP from Cactus.
**RESPONSE: Denied.**

180.    In 2017 and 2018, non-party law firm Pietrantoni Mendez & Alvarez LLC submitted tax credit applications that represented to the Puerto Rican tax authorities that $2,044,250 was paid by BCMG Services for the LienLog IP.

**RESPONSE: Admitted.**

181.    Defendants McOsker and Kernan intentionally grossly overvalued the acquisition value and cost of LienLog IP and converted client escrow funds so that they could create fraudulent Article 73 tax refund applications to submit to the Puerto Rician tax authorities.

**RESPONSE: Denied.**

182.    Defendants knew that there was no conceivable justification for the LienLog IP's 1300% increase: by September 30, 2017, Lienlog.com was not even an active website.

**RESPONSE: Denied.**

183.    USPTO records reflect that the LienLog trademarks were cancelled in March 2019.

**RESPONSE: Admitted.**

184.    In other words, the McOsker Enterprise structured its purchase and sale of the LienLog IP to create an economically circular transactions, using money diverted from the Tax Lien Defendants' clients, to defraud the Commonwealth of Puerto Rico.

**RESPONSE: Denied.**

185.    To make matters worse, even after stealing $1 million from Puerto Rico, the Individual Defendants did not deposit money back into the Chase Account to cover the escrow funds they had stolen from their clients.

**RESPONSE: Denied.**

186.    By the end of 2017, the client escrow accounts had deficits of over $790,000.

**RESPONSE: Denied.**

**The McOsker Enterprise Rebrands the LienLog IP as LienCloud IP and Purports to Resell it to BCMG Services for Over $13 million**

187.    Defendant McOsker also owned Defendant Sitona.

**RESPONSE: Admitted.**

188.    In 2018, Defendant BCMG Services purchased purported intellectual property called "Liencloud" for $13,189,500 from Sitona (the "**LienCloud IP**").

**RESPONSE: Admitted that BCMG Services purchased intellectual property called "Liencloud" from Sitona.**

189.    Defendant BCMG Services asserts that the LienCloud IP is a web-based portfolio management system for the tax lien industry.

**RESPONSE: Denied.**

190.    In fact, LienCloud IP is merely a rebranding by the McOsker Enterprise of the purported LienLog IP purchased by Cactus in 2014 for $160,000 and resold to BCMG Services via installments in 2016 and 2017 for $2,044,250.

**RESPONSE: Denied.**

191.    The McOsker Enterprise rebranded LienLog IP into LienCloud IP in furtherance of a scheme to obtain on behalf of BCMG Services an additional Act 73 tax credit in the amount of $6,594,750—for the very same IP on which BCMG Services fraudulently obtained tax credits in 2017 and 2018.

**RESPONSE: Denied.**

192.    Defendant BCMG Services made two payments to Defendant Sitona in connection with this purported purchase: $7 million in 2018, and another $6.189 million in 2019.

**RESPONSE: Denied.**

193.    In order to obtain the Act 73 Tax Credit for the purchase of LienCloud IP, BCMG Services was required to demonstrate to the Puerto Rican tax authorities that it paid Sitona $7 million in 2018.

**RESPONSE: Denied.**

194.    On March 26, 2019, Pietrantoni Mendez & Alvarez LLC, on behalf of BCMG Services, represented to the Puerto Rican tax authorities that Defendant BCMG Services paid $7 million for the LienCloud IP in 2018 and it would pay the remaining $6,189,500 in 2019.

**RESPONSE: Admitted.**

195.    Defendant BCMG Services again lacked the funds to pay for the IP, and did not have the $7 million it purportedly owed Sitona.

**RESPONSE: Denied.**

196.    The Individual Defendants again stole Tax Lien Defendant clients' funds from the Chase Account, depositing them into BCMG Services's Puerto Rico Accounts.

27

**RESPONSE: Denied.**

197.    The Individual Defendants then directed Defendant BCMG Services to divert the same funds to back to New York, into Sitona's bank account, to pay Sitona for the "LienCloud" IP.

**RESPONSE: Denied.**

198.    The McOsker Enterprise converted client escrow funds, including escrow funds due and owing Plaintiffs to allow BCMG Services to receive an Act 73 Tax Credit in excess of $6.5 million.

**RESPONSE: Denied.**

199.    At this time, Plaintiffs are not aware whether BCMG Services actually received that Act 73 Tax  Credit of over $6.5 million from Puerto Rico.

**RESPONSE: Defendants are without knowledge or information sufficient to form a belief as**

**to the truth of the allegations of this Paragraph and they are denied.**

**The McOsker Enterprise's Frauds, Thefts, and Money Laundering Comprise Racketeering Activity in Violation of 18 U.S.C. § 1962**

**The McOsker Enterprise**

200.    Defendants are a group of persons and entities associated together in fact as the McOsker Enterprise for the common purpose of carrying out an ongoing enterprise, as described in the foregoing paragraphs of this Amended Complaint.

**RESPONSE: Denied.**

201.    Through the years of individual acts of theft and fraud to coverup that theft, Defendants stole money from Plaintiffs and the Tax Lien Defendants' other clients, as well as the Commonwealth of Puerto Rico.

**RESPONSE: Denied.**

202.    As described above, the McOsker Enterprise is an organization that has existed for several years and functions as a continuing unit with an informal command structure that uses seemingly-legitimate business and investment entities to conduct illegal activity.

**RESPONSE: Denied.**

203.    At all times relevant to this Amended Complaint, the Individual Defendants engaged in the operation or management of the McOsker Enterprise.

**RESPONSE: Denied.**

204.   While Defendant McOsker acted as the head of the McOsker Enterprise, Defendants Hernandez and Kernan acted closely with him, knowing that they were engaging in illegal conduct and stealing from others.

**RESPONSE: Denied.**

205.   The predicate acts described herein constitute a pattern of racketeering activities and are part of a common scheme to enrich the McOsker Enterprise at the expense of Plaintiffs through acts constituting: (i) wire fraud, in violation of 18 U.S.C. § 1343; (ii) violations of the NSPA, 18 U.S.C. §§ 2314-15; and (iii) money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.

**RESPONSE: Denied.**

206.   The McOsker Enterprise's violations of § 1962(c) injured Plaintiffs.

**RESPONSE: Denied.**

207.   Under the provisions of 18 U.S.C. § 1964(c), Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing this suit, prejudgment interest and attorneys' fees.

**RESPONSE: Denied that Plaintiffs are entitled to any relief.**

**The McOsker Enterprise Committed Wire Fraud in Violation of 18 U.S.C. § 1343**

208.   By the acts described herein, the members of the McOsker Enterprise knowingly executed and/or intentionally participated in a scheme that defrauded, and that was intended to defraud, the Plaintiffs, and in furtherance of this scheme, Defendants transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures and/or sounds, but not limited to the following predicate acts:

(i) numerous email and telephone communications between Plaintiffs' representatives, including, John Hanratty, the Individual Defendants, and other representatives of the McOsker Enterprise between March 2018 and April 2019 in furtherance of the scheme to fraudulently induce Plaintiffs to enter into agreements and proceed with the transactions set forth herein above so that the McOsker Enterprise could divert the Escrow Funds for its own purposes;

(ii) numerous emails and telephone calls throughout all of 2018 between Plaintiffs' representatives, including John Hanratty, and the Individual Defendants and other representatives of the McOsker Enterprise in which the McOsker Enterprise, through Defendants LC Purchaser and LC Escrow, in furtherance of a scheme to fraudulently induce Plaintiffs to execute the Transaction Agreements, repeatedly and falsely represented to Plaintiffs that the proceeds from the sales of Plaintiffs' tax liens would be held in an escrow account and only distributed to Plaintiffs upon the occurrence of certain events;

(iii) numerous emails and telephone communications between Plaintiffs' representatives, including, John Hanratty and the Individual Defendants and other representatives of the McOsker Enterprise between June 2018 and April 2019 that contained numerous false representations and omissions concerning the location and use of the Escrow Funds; and (iv) Defendant McOsker's instructions to Defendants Kernan and Hernandez throughout 2018 to transfer the Escrow Funds from the Chase Account to the Puerto Rico Accounts are instances of wire communications in furtherance of the McOsker Enterprise that constitute violations of 18 U.S.C. 1343.

**RESPONSE: Denied.**

209.    The repeated diversions of the Escrow Funds reflect and constitute instances of wire communications in furtherance of the McOsker Enterprise that constitute violations of 18 U.S.C. §1343 occurred on, or shortly after Plaintiffs received trade confirmations from BloxTrade in June 2018, October 2018, November 2018, and December 2018.

**RESPONSE: Denied.**

210.    All transfers of the Escrow Funds are alleged to have been made by, or at the direction of, Defendant McOsker.

**RESPONSE: Denied.**

211.    The specific details of the monetary transactions in which LC Escrow wired Plaintiffs' Escrow Funds to BCMG Services and LC Services are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

**RESPONSE: Denied.**

**The McOsker Enterprise Committed Theft in Violation of The National Stolen Property Act, 18 U.S.C. §§ 2314–2315**

212.    By the acts described herein, the members of the McOsker Enterprise transmitted, transferred, and received money with a value of more than $5,000, knowing that the money had been converted and/or taken by fraud.

**RESPONSE: Denied.**

213.    The money was transmitted or transferred in interstate commerce among bank accounts in New York and Puerto Rico.

**RESPONSE: Denied.**

214.    By the acts described herein, the members of the McOsker Enterprise devised or intended to devise a scheme or artifice to defraud, or for obtaining money with a value of $5,000 or more by means of false or fraudulent pretenses, representations, or promises, transported or

caused to be transported in interstate or foreign commerce in the execution or concealment of the scheme or artifice to defraud.

**RESPONSE: Denied.**

215.     The acts include but are not limited to the unauthorized transfers of Escrow Funds from the LC Escrow account(s) in New York to accounts held by BCMG Services and LC Services in Puerto Rico, and from those accounts, to various other accounts controlled by the McOsker Enterprise, as well as the Puerto Rico Tax Credit fraud described above.

**RESPONSE: Denied.**

216.     The transfers reflecting and constituting instances of violations of 18 U.S.C. 2314-2135, are set forth in paragraphs 13, 117-125, 208(iv), 209 and 215, which occurred on, or shortly after Plaintiffs received trade confirmations from BloxTrade, and are believed to have occurred on or about June 27, 2018, October 1, 2018, November 21, 2018, and December 6, 2018.

**RESPONSE: Denied.**

217.     All transfers of the Escrow Funds are alleged to have been made at the direction of Defendant McOsker to Defendant Kernan.

**RESPONSE: Denied.**

218.     The specific details of the monetary transactions in which LC Escrow wired Plaintiffs' Escrow Funds to BCMG Services and LC Servicer are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

**RESPONSE: Denied.**

**Money Laundering in Violation of 18 U.S.C. §§ 2314–2315**

219.     Defendant McOsker committed, and aided and abetted, acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957 in connection with a scheme in which he used the McOsker Enterprise to divert escrow funds from Plaintiffs to BCMG Services, for various reasons, including to purchase LienLog IP and LienCloud IP while concealing the true relationships among BCMG Services and Cactus and Sitona.

**RESPONSE: Denied.**

220.     Defendant McOsker's violations of the other predicate acts (Wire Fraud and the NSPA) are specified unlawful activity within the meaning of 18 U.S.C. §§ 1956 and 1957

**RESPONSE: Denied.**

221.     Defendant McOsker concealed the source of the funding for, and his ownership of, entities involved in the racketeering scheme. For example:

(i) in 2016 and 2017, McOsker concealed that BCMG Services' purported purchase of the LienLog IP was from Cactus, an entity wholly owned by McOsker;

(ii) in 2017, McOsker concealed that LC Escrow was diverting clients' escrow funds from an LC Escrow account located in New York to a BCMG Services' account in Puerto Rico and then wired to back to New York for the purported arms'-length purchase of LienLog IP from Cactus (an entity McOsker owns);

(iii) in 2018, McOsker concealed that BCMG's purported purchase of the LienCloud IP was from an entity (Sitona) that was wholly owned by McOsker; and

(iv) in 2018, McOsker concealed that Plaintiffs' Escrow Funds were diverted from an LC Escrow account located in New York to a BCMG Services' account in Puerto Rico and then wire back to New York for the purported arms'-length purchase of LienCloud IP from Sitona (an entity that McOsker owns).

**RESPONSE: Denied.**

222.     McOsker directing the aforementioned wiring of the Escrow Funds between LC Escrow, BCMG Services, and their subsequent transfers of such monies constituted violations of (i) 18 U.S.C. § 1956 in that McOsker knew that the aforementioned financial transactions were intended to promote further predicate offenses, avoid tax reporting requirements, or otherwise conceal laundering funds; and (ii) 18 U.S.C. § 1957 in that McOsker knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity.

**RESPONSE: Denied.**

223.     Further evidence in support of this Court, including whether McOsker and the McOsker Enterprise is continuing one or more of the predicate acts set forth above, is peculiarly within the knowledge and control of McOsker and other Defendants.

**RESPONSE: Denied.**

### CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF

### RICO 18 U.S.C. § 1962(c)
### (AGAINST TOM MCOSKER)

224.     Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

**RESPONSE: Defendants incorporate and reallege the previous responses as though fully set forth herein.**

225.    At all relevant times, Plaintiffs were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

**RESPONSE: This paragraph contains a conclusion of law to which no response is required.**

226.    At all relevant times, all Defendants were/are/remain "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

**RESPONSE: This paragraph contains a conclusion of law to which no response is required.**

227.    At all relevant times, the McOsker Enterprise (i) has been an ongoing association-in- fact with a decision-making framework or mechanism for controlling the association; and (ii) has had associated members with a common purpose that function as a continuing unit, including all Defendants.

**RESPONSE: Denied.**

228.    At all relevant times, the McOsker Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

**RESPONSE: This paragraph contains a conclusion of law to which no response is required.**

229.    At all relevant times, Defendants were employed by, or associated with, the McOsker Enterprise and conducted and participated in the conduct of the McOsker Enterprise through a pattern of racketeering activity described in this Complaint.

**RESPONSE: Denied.**

230.    Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused Plaintiffs' injuries.

**RESPONSE: This paragraph contains a conclusion of law to which no response is required.**

231.    Pursuant to 18 U.S.C. § 1964(c), the Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing the suit, prejudgment interest, and attorneys' fees.

**RESPONSE: Denied that Plaintiffs are entitled to any relief.**

**SECOND CLAIM FOR RELIEF**
**RICO 18 U.S.C. § 1962(d)**
**(AGAINST ALL DEFENDANTS)**

232.    Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

**RESPONSE: Defendants incorporate and reallege the previous responses as though fully set forth herein.**

233.    At all relevant times, Plaintiffs were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

234.    At all relevant times, each of the Defendants was a "person" within the meeting of 18 U.S.C. §§ 1961(3) and 1962(d).

**RESPONSE: This paragraph contains a conclusion of law to which no response is required**

235.    At all relevant times, the McOsker Enterprise (i) was and is an ongoing association in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that function as a continuing unit.

**RESPONSE: Denied.**

236.    The Defendants entered into a series of agreements between and among each other to knowingly and willfully engage in a conspiracy to violate 18 U.S.C. 1962(c). Each Defendant entered into at least one agreement with at least one other Defendant to join the conspiracy, took acts in furtherance of that conspiracy, and knowingly participated in that conspiracy.

**RESPONSE: Denied.**

237.    The Defendants agreed and conspired to violate 18 U.S.C. 1962(c) by participating, directly or indirectly, in the conduct of the affairs of the McOsker Enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

**RESPONSE: Denied.**

238.    Each Defendant agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d) to engage in illegal predicate acts that formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. §1962(c), as demonstrated by, among other things the following facts:

(a) Kernan, as chief financial officer of the Tax Lien Defendants and BCMG Services, actively and knowingly participated in multiple predicate acts to further the scheme, including, but not limited to, working with McOsker to divert client escrow funds belonging to Plaintiffs and other clients of LC Escrow from accounts in New York to BCMG Services' and LC Servicer's accounts in Puerto Rico; and preparing an appraisal of the LienLog IP at a vastly inflated amount in order to further McOsker's scheme to obtain an Act 73 Tax Credit;

(b) Hernandez, as in-house counsel and business manager for the Tax Lien Defendants and BCMG Services, actively and knowingly participated in multiple predicate acts to further the scheme, including, but not limited to, working with McOsker to knowingly misrepresent to Plaintiffs and other clients the reasons why their escrow funds were not paid despite knowing that the McOsker Enterprise had stolen and was holding the escrow in the Puerto Rico Accounts and was using the client funds for impermissible purposes, including, but not limited to, furthering the McOsker Enterprise's Act 73 tax scheme;

(c) As described above, LC Purchaser, LC Escrow, LC Services, BloxTrade, BCMG Services, BCMG International, and Sitona were the principal co-conspirators and directly participated in multiple predicate acts to further the scheme.

**RESPONSE: Denied.**

239.    Further evidence of an agreement among Defendants is peculiarly within the knowledge and control of Defendants.

**RESPONSE: Denied.**

240.    Each Defendant is a member of the McOsker Enterprise and as co-conspirators, Defendants are liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by the Plaintiffs that were caused by any members of the conspiracy, regardless of whether Defendants themselves were directly involved in a particular aspect of the McOsker Enterprise.

**RESPONSE: Denied.**

241.    As a direct and proximate result of the violations set forth above, the Plaintiffs have been injured. Defendants' violations of 1962(d) are the proximate cause of this injury. Under the provisions of 18 U.S.C. § 1964(c), the Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing the suit, prejudgment interest and attorneys' fees.

**RESPONSE: Denied.  Further denied that Plaintiffs are entitled to any relief.**

### THIRD CLAIM FOR RELIEF
### FRAUDULENT INDUCEMENT TO CONTRACT
### (AGAINST TOM MCOSKER, LC PURCHASER AND LC ESCROW)

242.    Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

**RESPONSE: Claim dismissed.  No response required.**

243.    As described herein, McOsker caused LC Purchaser and LC Escrow to make numerous misrepresentations in the P/S Agreements and Transaction Agreements that Plaintiffs

would receive the Escrow Funds, *i.e.*, the proceeds from Plaintiffs' sales of the Certificates to LC Purchaser.

**RESPONSE: Claim dismissed.  No response required.**

244.   McOsker also personally lied to Plaintiffs in order to get them to execute the Agreements and give up their Certificates.

**RESPONSE: Claim dismissed.  No response required.**

245.   McOsker, LC Purchaser, and LC Escrow were aware at the time the P/S Agreements and Transaction Agreements were executed that contrary to the representations they made in the agreements that the Escrow Funds would not be held in an escrow account, that that the Escrow Funds would be diverted from the escrow account without Plaintiffs' knowledge or consent, that the Escrow Funds would be used for the benefit of Defendants, and that Plaintiffs would not receive some or all of the Escrow Funds

**RESPONSE: Claim dismissed.  No response required.**

246.   McOsker, LC Purchaser, and LC Escrow made these false representations in the P/S Agreements and Transaction Agreements to induce Plaintiffs to sell their Certificates to LC Purchaser, to induce Plaintiffs to agree to use LC Escrow as the escrow agent, and thereby, to be able to divert the Escrow Funds for the benefit of Defendants.

**RESPONSE: Claim dismissed.  No response required.**

247.   At the time McOsker made or caused LC Purchaser and LC Escrow to make these numerous misrepresentations and omissions, McOsker, LC Purchaser, and LC Escrow knew they had no intention of honoring their commitments, rather they intended to divert Plaintiffs' Escrow Funds.

**RESPONSE: Claim dismissed.  No response required.**

248.   Plaintiffs justifiably relied on McOsker, LC Purchaser, and LC Escrow's false representations in the P/S Agreements and the Transaction Agreements, and thereby, sold the Certificates to LC Purchaser.

**RESPONSE: Claim dismissed.  No response required.**

249.   As a result of Plaintiffs' reliance, they were injured in an amount to be determined at trial, but not less than $3,500,229.

**RESPONSE: Claim dismissed.  No response required.**

## FOURTH CLAIM FOR RELIEF
## BREACH OF CONTRACT
## (AGAINST LIENCLEAR 002, LLC)

250.    Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

**RESPONSE: Defendants incorporate and reallege the previous responses as though fully set forth herein.**

251.    Plaintiffs' forth claim for breach of contract is plead in the alternative to Plaintiffs' third claim for fraudulent inducement to contract.

**RESPONSE: The paragraph states a conclusion of law to which no response is required.**

252.    The Transaction Agreements were valid and binding contracts between Plaintiff and LC Escrow.

**RESPONSE: Admitted in part.   The Transaction Agreements do not contain the entire agreement of the parties.**

253.    Under the Transaction Agreements, LC Escrow was required to hold the Escrow Funds in an escrow account unless and until a condition for disbursement under the Transaction Agreements occurred – *e.g.*, (i) an instruction from the Servicer; (ii) an event on the agreed upon schedule; or, (iii) a joint written direction from the representatives of both LC Purchaser and Plaintiffs.

**RESPONSE: Denied.**

254.    Events on the agreed upon schedule for disbursement of funds set forth in the Transaction Agreements occurred – namely, titles to the tax lien Certificates at issue were successfully transferred to LC Purchaser.

**RESPONSE: Denied.**

255.    Nevertheless, LC Escrow willfully failed and refused to disburse the Escrow Funds to Plaintiffs, despite the formal transfer of title for all tax liens to LC Purchaser, in breach of the Transaction Agreements.

**RESPONSE: Denied.**

256.    As a result, Plaintiffs have been damaged in an amount to be determined at trial.

**RESPONSE: Denied.**

### FIFTH CLAIM FOR RELIEF
### CONVERSION
### (AGAINST ALL DEFENDANTS)

257.    Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

**RESPONSE: Claim dismissed.  No response required.**

258.    At all relevant times, Plaintiffs had an immediate and superior right of possession to the Escrow Funds.

**RESPONSE: Claim dismissed.  No response required.**

259.    By the wrongful actions described herein, Defendants intentionally stole and converted the Escrow Funds to the exclusion and detriment of the Plaintiffs' rights.

**RESPONSE: Claim dismissed.  No response required.**

260.    As a direct and proximate result of Defendants' actions, the Plaintiffs have been damaged and are entitled to compensatory damages in an amount to be determined at trial.

**RESPONSE: Claim dismissed.  No response required.**

### SIXTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

261.    Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

**RESPONSE: Defendants incorporate and reallege the previous responses as though fully set forth herein.**

262.    Defendants are a combination of two or more persons.

**RESPONSE: Denied.**

263.    As set forth herein, each Defendant engaged in at least one unlawful act in furtherance of a conspiracy against Plaintiffs.

**RESPONSE: Denied.**

264.    Defendants' conspiracy is the direct and proximate cause of the damage to Plaintiffs in an amount to be determined at trial.

**RESPONSE: Denied.**

265.    Each Defendant is jointly and severally liable for the acts of its co-conspirators committed in furtherance of the conspiracy.

**RESPONSE: Denied.**

## EIGHTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

266.    Plaintiffs incorporate and reallege the previously paragraphs as though fully set forth herein.

**RESPONSE: Claim dismissed.  Not response required.**

267.    Plaintiffs plead the eighth claim in the alternative to its fourth claim for breach of contract claim as to those Defendants.

**RESPONSE: Claim dismissed.  Not response required.**

268.    By their wrongful conduct as described herein, Defendants have been unjustly enriched at the Plaintiffs' expense.

**RESPONSE: Claim dismissed.  Not response required.**

269.    It is against equity and good conscience to permit the Defendants to retain the benefits of their wrongful conduct.

**RESPONSE: Claim dismissed.  Not response required.**

270.    Defendants' wrongful conduct was the direct and proximate cause of damage to the Plaintiffs in an amount to be determined at trial.

**RESPONSE: Claim dismissed.  Not response required.**


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for entry of a judgment in favor of Plaintiffs against

Defendants, jointly and severally, in an amount to be proven at trial, including an award of:

1. actual, compensatory, and consequential damages;
2. trebled actual damages;
3. restitution and a constructive trust over Defendants' assets;

4.  costs and expenses of this action, including reasonable attorneys' fees;
5.  Punitive damages;
6.  Pre- and post-judgment interest at the maximum legal rate; and
7.  Other and further relief as the Court deems just and proper.

**RESPONSE: Denied that Plaintiffs are entitled to any relief.**

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' Complaint fails to state a claim against Defendants upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' claims are barred, in whole or in part, because Plaintiffs/Counterclaim Defendants has not suffered any damages.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' claims and requests for relief are barred, in whole or in part, by Plaintiffs/Counterclaim Defendants' improper conduct, unclean hands, and breaches of the agreements.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' claims are barred, in whole or in part, due to Plaintiffs/Counterclaim Defendants' failure to join necessary and/or indispensable parties.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' claims are barred, in whole or in part, because Plaintiffs/Counterclaim Defendants assumed the risk.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' claims are barred, in whole or in part, because any injuries suffered by Plaintiffs/Counterclaim Defendants were caused by an intervening and/or superseding cause(s).

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' claims are barred, in whole or in part, because none of the alleged acts or omissions of the Defendants/Counterclaimants/Third-Party Plaintiffs were the proximate cause of the alleged damages sustained by Plaintiffs/Counterclaim Defendants.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs/Counterclaim Defendants' claims are barred by the applicable statute of limitations.

## NINTH AFFIRMATIVE DEFENSE

Defendants/Counterclaimants/Third-Party Plaintiffs reserve the right to supplement these affirmative defenses as additional information is discovered.

## COUNTERCLAIMS

### THE PARTIES

1.      Plaintiff/Counterclaim Defendant ESC is a New York limited liability company and the managing member of the other Plaintiffs.

2.      Plaintiff/Counterclaim Defendant EB 1EMIALA, LLC is an Alabama limited liability company with a principal place of business at 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907.

3.      Plaintiff/Counterclaim Defendant EB 2EMIALA, LLC is an Alabama limited liability company with a principal place of business at 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907.

4.      Plaintiff/Counterclaim Defendant Ebury Fund 1 NJ, LLC is a New Jersey limited liability company with a principal place of business at 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907.

5.      Plaintiff/Counterclaim Defendant Ebury Fund 2 NJ, LLC is a New Jersey limited liability company with a principal place of business at 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907.

6.      Defendant/Counterclaimant/Third-Party Plaintiff Thomas McOsker is a resident of Puerto Rico.

7.      Defendant/Counterclaimant/Third-Party Plaintiff Badel Hernandez is a resident of Puerto Rico.

8.      Defendant/Counterclaimant/Third-Party Plaintiff Andrew Kernan is a resident of the State of New York.

9.     Defendant/Counterclaimant/Third-Party Plaintiff LienClear, LLC is a Puerto Rico limited liability company.

10.     Defendant/Counterclaimant/Third-Party Plaintiff LienClear 0001, LLC is a Delaware limited liability company.

11.     Defendant/Counterclaimant/Third-Party Plaintiff LienClear 0002, LLC is a Delaware limited liability company.

12.     Defendant/Counterclaimant/Third-Party Plaintiff BloxTrade, LLC is a Puerto Rico limited liability company.

13.     Defendant/Counterclaimant/Third-Party Plaintiff BCMG Services, LLC is a Puerto Rico limited liability company.

14.     Defendant/Counterclaimant/Third-Party Plaintiff BCMG International, LLC is a Puerto Rico limited liability company.

15.     Defendant/Counterclaimant/Third-Party Plaintiff Sitona Ventures LLC is a Delaware limited liability company.

## JURISDICTION AND VENUE

16.     Pursuant to 28 U.S.C. § 1331, this Court has subject-matter jurisdiction because Defendants allege RICO violations in violation of 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. § 1964(c).

17.     Pursuant to 28 U.S.C. § 1367, the Court may exercise supplemental jurisdiction over Defendants/Counterclaimants/Third-Party Plaintiffs' state law claims.

18.     The Court has personal jurisdiction over Ebury Street Capital, LLC because it entered into agreements with Defendants in which it consented to the jurisdiction of Delaware Courts.

2

19.     The Court has personal jurisdiction over all the Plaintiffs pursuant to 18 U.S.C.§ 1965 because this action may be brought in this jurisdiction against Third-Party Defendants EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund 2, LP, EB 1EMIDC, LLC, Red Clover 1, LLC, White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC, Ebury Fund 2CI, LLC.

20.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because Third-Party Defendants EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund 2, LP, EB 1EMIDC, LLC, Red Clover 1, LLC, White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC, Ebury Fund 2CI, LLC are Delaware entities and Ebury Street Capital, LLC executed agreements with Defendants/Counterclaimants/Third-Party Plaintiffs in which the parties consented to Delaware as the venue for any and all disputes that arise out of the agreements.

## FACTUAL BACKGROUND

**McOsker and Hanratty Meet**

21.     On or around 2011, Thomas R. McOsker, a native of the State of Maine, met John Hanratty, an attorney by education, in the city of New York.

22.     At that time, McOsker worked as Head of Tax Receivables Brokerage Division at GFI Group.

23.     Specifically,  McOsker originally joined GFI Group to open a new division focused on creating a secondary market for property tax encumbrances, commonly known as "Tax Liens".

24.     The Tax Lien industry consists of the purchase and sale of encumbrances that governmental entities have over tax debts, which are trafficked in a secondary market.

25.     In 2011, Hanratty worked as the Chief Compliance Officer of OTA Advisors, LLC, a brokerage firm for option contracts.  In addition to his work at OTA, Hanratty also started an investment fund in tax encumbrances.

26.     The investment fund of Hanratty, today known as Ebury Street Capital, LLC, ("Ebury St.") conducted a series of transactions with the firm GFI Group where McOsker worked and there, they both met.

27.     Subsequently, McOsker left GFI Group to commence his own tax encumbrance brokerage firm, BloxTrade, LLC.  Hanratty ultimately left his employment with OTA Advisors to fully engage in his investment fund, Ebury Street Capital, LLC.

**McOsker and Hanratty Enter into the CRIM Proposal**

28.     In 2014, McOsker permanently moved from New York City to San Juan, Puerto Rico.

29.     McOsker is the holder of a decree under Law No. 22 of January 27, 2012, which grants preferential tax rates over the passive income for specific individuals that become bona fide residents of Puerto Rico in accordance with the Internal Revenue Code.

30.     In Puerto Rico, McOsker continued offering, through his companies, the same services that they offered in the United States, namely brokerage and clearing services for Tax Liens. All of the companies are separate entities and offer different business services.

31.     Due to the specialized knowledge of McOsker, he identified a business opportunity in the portfolio of tax encumbrances of the Center for the Collection of Municipal Taxes ("CRIM"), whose low levels of raising capital created a liquidity problem to CRIM and, subsequently, to the municipal governments.

32.     Through his specialty in the market of tax encumbrances, one of his corporate entities could purchase the portfolio of tax encumbrances of the CRIM through Law 21 of June 26, 1997, known as the 'Law of Sale of Tax Debts", thus granting an instant liquidity to the municipalities, and then proceed to sell the tax liens in the secondary market and/or foreclose them.

In the alternative, if the CRIM had no interest in selling its portfolio of encumbrances, the intention of McOsker was to increase the raising of capital of the CRIM through a public-private alliance, using the technology developed by his companies to obtain hundreds of millions for the CRIM through the payment of delinquent debtors (the "CRIM Proposal").

33.     In preparing to begin the CRIM Proposal McOsker contributed all the necessary investment capital to pursue the purchase of the encumbrances of the CRIM – investing approximately $7 million through his companies through the end of 2017. This was done without requesting external capital or incurring debt.

34.     During this time, McOsker and Hanratty remained in contact, in-part because Hanratty was interested in moving to Puerto Rico. Hanratty, who at that time resided in Rye, NY, believed that the fiscal crisis of the government of Puerto Rico and its instrumentalities created interesting opportunities that he wanted to exploit.

35.     In mid-2017, McOsker and Hanratty met in New York to discuss several matters, including the CRIM Proposal and the benefits of Hanratty moving to Puerto Rico (the "2017 Meeting").

36.     At the 2017 Meeting, Hanratty and McOsker began to form an understanding that they desired to become partners in the CRIM Proposal.

37.     McOsker did not require from Hanratty that he make an initial capital contribution under the Initial Agreement, even though McOsker had already invested millions of dollars in the CRIM Proposal, nor did he request what is known as a shared services allocation, which is an item commonly required between subsidiaries and partner relations.

38.     On the contrary, the Agreement between the parties at that time was that Hanratty would be a capital partner and his financing obligations would be for the future obligations

incurred by the common venture.  As discussed below, the parties' obligations related to the CRIM Proposal were clarified and further memorialized through various subsequent writings including various documents circulated in 2017 and 2018, emails in 2017, 2018 and 2019, and instant messages through various messaging services throughout 2017-2019.

39.    In September 2017, Hurricane Maria struck Puerto Rico causing catastrophic damage.  Maria left McOsker with a difficult decision to make: to stop pursuing the CRIM Proposal, to incur a loan to continue operations, or to expand the relationship with Hanratty to include a credit line that would finance the joint enterprise.

40.    In late September 2017, Hanratty represented to McOsker that he was in a very liquid financial position and that he had the ability to provide the financing contemplated by the parties. This would later prove to be false.

41.    Moving forward, in late 2017, Hanratty and McOsker agreed that each one would cover 50% of the expenses related to the CRIM Proposal onward, with Hanratty paying the expenses up-front and the partners netting out the amounts once the deal was finalized or the Provisional Credit Line was closed.  Similarly, they agreed that they would equally share the net profits originating from the CRIM Proposal.  Hanratty would have no claim to any other portion of McOsker's various other companies, including BCMG and Defendants.  At no time was Hanratty entitled to any assets of the BCMG companies, including but not limited to the Act 73 tax credits. Importantly, Hanratty was required to procure a formal credit line, in a significant amount (the "Formal Credit Line"), that would allow the partners to make the necessary capital investments so that the CRIM Proposal would be successful.  Another capital requirement was the development of a certain intellectual property that would allow McOsker and Hanratty to process and administer the tax encumbrances in a more efficient manner and to locate the defaulting

6

properties with greater precision. The final, and most significant, requirement, was for Ebury to lead the equity syndicate for the purchase or loan amount necessary to procure the CRIM Portfolio, initially for $400million and later for $800million, as well as to raise from third party financing partners through debt and equity any amount of this total  purchase price that Ebury was unable to cover to successfully purchase the portfolio(the "Agreement").

42.     Among other things, McOsker contributed to the partnership under licensing terms certain use of the intellectual property he had purchased and financed the development of, namely Map Plus Prime and its underlying databases which were of great interest to the CRIM and importance for the CRIM Proposal.  Hanratty and McOsker agreed that these terms would continue until such a time as the CRIM deal had been signed and funded, and which point Hanratty and McOsker's partnership interests would move to a new subsidiary of BCMG Services called BCMG Capital, LLC.

43.     In or around September 2018, they would formalize the Agreement through the BCMG Capital, LLC operating agreement, which was signed by both parties on February 19, 2019. Due to the fraud, misstatements, negligence, and actions of the Hanratty Enterprise (defined herein), the CRIM Proposal never closed, thus BCMG Partners, although formed in structure and approved to commence business, never started operations.

44.     In anticipation of the CRIM Deal closing, the BCMG Capital, LLC operating agreement provided that Lesser Flamingo, LLC, a Puerto Rico limited liability company wholly owned by Hanratty in his personal capacity, is a 49% partner-owner of BCMG Capital LLC and BCMG Services, LLC, wholly owned by BCMG LLC, is a 51% partner-owner of BCMG Capital LLC.

**Hanratty and Ebury St. Fail to Meet Their Obligations Under the CRIM Proposal**

45.     Hanratty and Ebury St. were unable to provide their own funds to finance the day-to-day operations of the CRIM Proposal.  As a result, Hanratty and Ebury St. employed alternate means to attempt to obtain the necessary financing.

46.     For example, on more than one occasion in 2017, Hanratty, through Ebury St., purchased tax encumbrances directly from Carry Trade, LLC, then owned by McOsker, with the intention that the capital originating from the transaction would be used to inject liquidity into the operations of BCMG, LLC and the CRIM Proposal.

47.     Similarly, Hanratty was unable to procure the Formal Credit line. Initially, Hanratty attempted to obtain credit and financing facilities through Ebury St. and its affiliated companies, since they had purportedly generated goodwill in the markets thanks to Hanratty's alleged good credit history.

**The Provisional Credit Line**

48.     In the interim, and as part of his relationship with McOsker and his companies, Hanratty, through Ebury St. and his other companies, entered into more than 10 transactions with Bloxtrade, LLC, Lienclear, LLC, Lienclear –0001, LLC and Lienclear – 0002, LLC. For this he executed structurally identical groups of contracts for transactions of tax encumbrances that consisted of: a Purchase and Sale Agreement, an Escrow Agreement, and a Services Agreement (the "Contract").

49.     It is necessary to clarify that prior to Hanratty and McOsker becoming partners, it was not a common practice in the companies of McOsker to serve as an escrow agent. For years previously, the companies used US Bank as a third-party escrow agent for transactions.  It was only at the suggestion of Hanratty that LienClear 0002, LLC began serving as an escrow agent,

and on several occasions throughout 2018 and 2019 Hanratty specifically told ultimate third-party purchasers of tax liens owned by Ebury that if they did not escrow their purchase funds with LienClear - 0002 , he would not sign the deal.

50.     Pursuant to the Escrow Agreement, the funds originating from the sale of the four groups of tax encumbrances would be given to Ebury St. when the transaction had finalized.

51.     However, since up until that moment Hanratty and Ebury St. had not successfully procured the Formal Credit Line, the parties agreed that the escrowed funds would act as a bridge loan, which would be repaid when the Formal Credit Line was obtained to make the necessary capital contributions (the "Provisional Credit Line").

52.     Operating under the belief that he would obtain the Formal Credit Line, Hanratty and Ebury St. used the sole provisional financing that they had available – the capital of Ebury St. deposited in the escrow accounts.  Hanratty, in his capacity as Managing Partner of Ebury St., authorized the use of the funds for the Provisional Credit Line. Over the course of 2017-2019 Hanratty repeatedly via phone, text, other electronic communication, and in person assured McOsker that he had sufficient "carried interest" in Ebury Fund 1 and Fund 2 to cover a Provisional Line of Credit in excess of $3million, that his Ebury Fund 2 investors would be liquidated shortly and therefore he essentially owned all of the Ebury Fund 2 assets outright personally and thus could convey the 50% Ebury Fund 2 ownership to McOsker, and that Hanratty's capacity as Manager and fiduciary for the Ebury Funds gave him authority to authorize the use of the Provisional Credit Line for the benefit of the partnership. Since Hanratty was the Managing Member of each entity in writing, had signatory authority, and refused to allow McOsker or his team to speak with Ebury CFO Ping Xie, McOsker took his partner Hanratty at his word.  The parties had agreed that, given that it was a bridge loan, the Provisional Credit Line would not be

payable until they obtained a formal financing line. This is documented in e-mails and text message communications between McOsker and Hanratty from 2017-2019, the last of which in early 2019 demonstrate a desperate attempt by Hanratty to document his meritless version of the Provisional Credit Line story.

**The Search for Financing and The Assets Involved**

53.     Hanratty and McOsker had agreed that the Formal Credit Line that they would request would be one collateralized with assets, to wit, with tax encumbrances.

54.     Searching for a financing line, Hanratty, acting as Director of Ebury St., approached several entities, including, but not limited to known financial entities such as Emigrant Bank ("Emigrant"), Blue Clover Financial, LLC ("Blue Clover"), AloStar Bank, which in turn is a subdivision of Cadence Bank ("Alostar"), and Hunt Financial Group for this purpose.

55.     For the sole purpose of allowing Hanratty to negotiate a financing line to capitalize the CRIM Proposal, McOsker assigned his 100% interest in several companies, including Carry Trade, LLC and BFNH, LLC, to BCLF Rev I, LLC, where Hanratty and McOsker were equal partners.

56.     Subsequently, Carry Trade, LLC and BFNH, LLC were assigned to Ebury Fund 2, LP, because, as Hanratty alleged, procuring a financing line under the name and the alleged goodwill of Ebury St. would be easier, and also that he wanted to collateralize the temporary Provisional Credit Line as it was taking Hanratty longer than he had promised to secure the financing. Defendants/Counterclaimants/Third-Party Plaintiffs would later learn that Hanratty neglected to inform his Ebury Fund 2 investors of this agreement, Provisional Line of Credit, and assets pledged into the Fund. On information and belief, Hanratty, Ping, and Mendez marked these

$5.3 million in assets on the books of the fund without paying for them, and it is unclear what cost basis they falsified to this effect.

57.     These transfers were documented through a series of loans. One loan in 2018 for approximately $1.8 Million was uncollateralized and was repaid in full the same year; a second loan in 2018 was structured as a collateralized revolving line of credit for up to $3 Million, which was drawn down to meet the ongoing partnership needs including draws for Ebury St at Hanratty's request. This loan was repaid in full, then partially drawn down and stood partially outstanding at the time Ebury fled the BCMG office and filed their meritless lawsuit in Puerto Rico in a desperate attempt to cover up the fraudulent actions of the Hanratty Enterprise. This net outstanding amount between the parties was presented in a reconciliation, discussed infra.

58.     In exchange for the assignments made, Hanratty also agreed to grant McOsker a proprietary interest in Ebury Fund 2, LP, of fifty percent (50%), the issuance of which never occurred despite repeated promises for close to a year that it would be "soon".  In this way, Hanratty induced McOsker to transfer the above referenced assets and ownership interests in exchange for the promise of the 50% ownership interest in Ebury Fund 2, LP.

59.     These companies had portfolios of Tax Liens that were to be used as collateral for the Formal Credit Line. Hanratty recommended transferring the limited liability companies and not the tax encumbrances that had these assets since it helped to reduce the transactional costs.

60.     Carry Trade, LLC and BFNH, LLC, had tax encumbrance assets whose redemption value was estimated to be approximately $5,325,290.85 at the time of the transfer. (The redemption value is the estimated measure of the appraisal of the value of the tax encumbrance).

61.     Similarly, for the sole purpose of allowing Hanratty to negotiate a financing line to capitalize the CRIM Proposal under the name of Ebury St., Hanratty and McOsker decided to

jointly reinvest $750,000 originating from the Provisional Credit Line to purchase additional joint assets that would serve as additional collateral for the Formal Credit Line.

62.     Hanratty and McOsker referred to this investment as the "Leper Line." With the investment of $750,000 originating from the Provisional Credit Line, Hanratty and McOsker were able to purchase tax liens whose redemption value exceeded $14 million due to McOsker's position in the marketplace.

63.     Despite the fact that Hanratty signed each of the Contracts and personally authorized the wires for the purchase amounts in writing, he somehow attempts to include this $750,000 draw from the Provisional Line of Credit as part of his baseless claims in this lawsuit. As indicated in writing between the partners, the purchase contracts, and the transfer documentation, the $750,000 was used to buy assets that, to Defendants' knowledge, are still being held by entities controlled by Hanratty or have since been sold or converted to the sole benefit of Hanratty and his entities. Discovery will show whether these assets have suffered the same fate as the other Ebury Fund 1 and Fund 2 assets at the hands of Hanratty; that is whether they have been wrongfully converted and comingled or transferred between funds and fund investors to perpetuate the Ponzi like scheme, or to falsify borrowing bases, mislead auditors, and commit fraud against his banks and investors.

64.     Said assets were purchased by BCLF Rev. I, LLC, where Hanratty and McOsker were partners, and subsequently BCLF Rev. I LLC and/or its assets were transferred to Ebury Fund 2, LP, solely owned by Hanratty and/or his affiliated companies. The assignment was made, as well as the assignment of Carry Trade LLC and BFNH, LLC, under the commitment that Hanratty would grant to McOsker a proprietary interest in Ebury Fund 2, LLP, of fifty percent (50%) which never occurred.

65.     Nevertheless, notwithstanding the efforts of McOsker to help Hanratty and Ebury St. to obtain a financing facility, Hanratty never procured the Formal Credit Line.

66.     On the contrary, Hanratty continuously created expectations and representations that there was only a short time left to achieve a permanent financing facility, when this was not the case.

67.     During the time in which Hanratty was supposed to be working to obtain the Formal Credit Line, he instead proceeded to use BCMG's and resources to attempt to solicit various municipal governments in Puerto Rico to extend them high interest loans which would solely benefit Hanratty and Ebury St.

68.     Thus, for example, Hanratty notified Kernan, Vazquez, McOsker, and several companies of McOsker, that there was only one week left to achieve the financing facility and that they make the corresponding preparations. Hanratty knew these statements were false when made.

69.     During this time, Hanratty moved his cousin, attorney Patrick Seymour, to the BCMG office to document and craft a legal case against McOsker and other individuals and entities while rifling through secure documents and assets under the cover of night.  Some of the documents and assets were stolen from the BCMG offices by Hanratty, Vega, and Seymour over a weekend when they vacated the office. It is unclear what other confidential documentation or assets of which they are in possession.

70.     Several initial attempts by Hanratty at procuring the Formal Credit Line failed. In the end, the last financing facility that Hanratty pursued, known as the Alostar line, never materialized. The understanding of McOsker and his employees, even mere weeks before the filing

of the complaint of Hanratty in the Federal Forum in June 2019, was that Hanratty continued to seek the financing facility with Alostar.

71. Hanratty pursued the credit line with Alostar acting in his capacity as "Founder and Principal" of Ebury St., as evidenced in the Proposal Letter of Alostar dated October 22, 2019 ("Alostar Proposal"). The Alostar Proposal was signed by Hanratty in his capacity as Managing Partner of Ebury St., an entity which, in turn, represented three funds as their General and Managerial Partner, Ebury Fund I, LP; Ebury Fund 2, LP; and Ebury RE, LLC.

72. Also, in an attempt to secure funding from Alostar, Hanratty represented himself to be the managing partner of BCMG and carried business cards to this effect that he distributed freely to private sector individuals, local government officials in Puerto Rico, and federal government officials in Washington DC. On at least one occasion in person and in writing, and without McOsker's prior knowledge or permission, Hanratty lied to banks, holding himself out at the CEO of BCMG Services, LLC, which he never held any interest in, nor was he ever promised any interest in.

**The Efforts to Formalize the Relationship and Reconcile Accounts**

73. At the beginning of 2019, knowing his own difficulties to procure a financing facility, Hanratty requested that the Provisional Credit Line of the funds originating from the escrow accounts for which Ebury Fund 2 held collateral be formalized (in his words, that they be "*papered*").

74. Hanratty also sought that the Provisional Loan be formalized due to the fact that he had made the decision to liquidate his Ebury St. fund and he told his investors that they would receive their capital within 90 days. When they were not delivered their capital on time, some of

them, including an investor named Michael Salerno, sued Hanratty and filed a complaint with the New York police.

75.     McOsker and his team welcomed this request from Hanratty, since McOsker and his companies had been seeking documentation from Hanratty for months and had incurred a number of expenses in the name of Hanratty and his companies in 2018 and continued to do so in 2019, wherefore it would be necessary to make a reconciliation of expenses to determine how much each one owed of the loan in net terms.

76.     Said reconciliation was prepared and presented for the first time on October 22, 2018, by Kernan to Hanratty during a strategy and planning meeting of expenses.

77.     To wit, the following are only some of the expenses which McOsker and his companies incurred for Hanratty and for which McOsker and his companies should receive a credit in the financial reconciliation between the parties:

> a. Payment of the recruitment and salary expenses of two employees nominally under the payroll of BCMG, Dennisse Méndez and Shirley Vega, but who worked solely and exclusively for Hanratty in matters of Ebury St. and its subsidiaries and affiliates. Their monthly salaries amounted, with benefits to $9,581 and $3,953, respectively;
> b. Greater than $900,000 in capital investment directly and exclusively for BCMG for the CRIM Proposal;
> c. Office space for Hanratty and his employees of Ebury St., Dennisse Méndez and Shirley Vega;
> d. A payment of $170,990.58 on May 15, 2019, to finalize a transaction of Ebury St. with an entity called Avenue Capital; and
> e. A loan of $100,000 requested on October 5, 2018, to cover a deficiency of liquidity of Ebury St., which was never returned.

78.     All of the above is limited to the expenses incurred by McOsker and his companies for the exclusive benefit of Hanratty. This does not include the expenses that were made to advance the CRIM Proposal, wherefore Hanratty and McOsker were severally responsible for 50%, which includes, but which is not limited to:

a. The equipment of Map Plus, LLC, who during 2018 worked on compiling a set if data that allowed the most efficient location of delinquent properties of the CRIM;
b. The contracting of the following firms:

      i. O'Neill & Borges, LLC;
      ii. Estudios Técnicos; and
      iii. PKMG.

79.    Even though during the months from February 2019 to June 2019 repeated proposals of reconciliation were sent for his approval, Hanratty was barely responsive to the same.

80.    When he responded, he sought to dispute certain expenses such as for example, the expense of human resources of Map Plus, LLC, which was dedicated in 2018 to working on the CRIM Proposal, which is duly documented by the billing system Harvest.  Now, it appears that these disputes were manufactured for the purpose of buying time to retain counsel, steal information, and craft a meritless lawsuit so that he would have sufficient time to cover his fraudulent actions in both Ebury Fund 1 and Ebury Fund 2.

81.    During all this time in which McOsker and his companies incurred in expenses for what was supposed to be a common venture, Hanratty continued to assure McOsker and his employees that he would promptly secure the Formal Credit Line. This never materialized and Hanratty and his companies filed a complaint in Puerto Rico without having agreed on a reconciliation to finally pay for those expenses which McOsker and his companies incurred for his benefit. Having little success in Puerto Rico, Hanratty and his companies filed this complaint in DE to further delay and allow time to perpetuate his Ponzi like scheme.

**Hanratty Realizes His Failures, Tucks Tail and Runs, and Files Meritless Slanderous Lawsuits against McOsker**

82.    Suddenly, Hanratty decided to leave the BCMG offices.  Hanratty's departure was in fact so unexpected that, after Hanratty mentioned to McOsker for the first time that he would seek new office space on a Thursday, by the following Monday, Hanratty had already left the

office with Shirley Vega and Dennisse Mendez and all their respective belongings. The very next day (three business days after Hanratty initially indicated that he was moving offices) McOsker was served with a complaint filed by Hanratty and his companies against McOsker and his companies in the US Federal Court for the District of Puerto Rico, which was later voluntarily dismissed. This would begin a string of meritless and slanderous lawsuits filed by Hanratty and his companies against McOsker and his companies.

83.     Among the things that Hanratty, Vega, and Seymour stole from the BCMG offices were certain certificates of tax encumbrances over the property of the State of Ohio belonging to Carry Trade and other affiliated entities. It is unclear what other items Hanratty, Vega, and Seymour stole, or took digital copies of, over the weekend between when Hanratty informed McOsker that he was moving offices and the first complaint was filed, or any time beforehand for that matter.

84.     The complaint filed by Hanratty against McOsker, twice in Puerto Rico and now here in the Federal District Court for the District of Delaware falsely represented the relationship between the parties as one of separate and independent parties when Hanratty well knew, and there are hundreds of documents that confirm, Hanratty and McOsker were partners.

85.     Not only did Hanratty file the scandalous and deceitful complaints in Puerto Rico and the Federal District Court for the District of Delaware, he also dedicated himself to spread this false information among relevant persons in the market of tax encumbrances of the United States, which caused damages to the reputation of McOsker and to the goodwill of BCMG, LLC and affiliated entities and subsidiaries.

86.     Hanratty's false and slanderous statements include, but are not limited to:

   a.   Falsely reporting to the Puerto Rican government that McOsker was defrauding the Puerto Rican Government related to tax credits;

b. Falsely reporting to the Puerto Rican Office of Industrial Tax Exemption that BCMG International was engaged in fraudulent acts;

c. Falsely reporting to the Puerto Rican Department of Economic Development that McOsker was defrauding the Puerto Rican Government related to tax credits;

d. Falsely reporting to the Puerto Rican Industrial Development Company that McOsker was defrauding the Puerto Rican Government related to tax credits;

e. Falsely reporting to the Puerto Rican Treasury Department (Hacienda) that McOsker was defrauding the Puerto Rican Government related to tax credits;

f. Falsely reporting to certain banking institutions in Puerto Rico that McOsker was defrauding the Puerto Rican Government related to tax credits;

g. In 2019 falsifying statements and directing Dudley at Lavaleer Capital via text message to create a false paper trail he would later attempt to use to have OITE cancel the decree of BCMG International

h. In 2019 falsely accusing McOsker of stealing from his friend and colleague Robert Sanchez in a building partnership; and

i. In 2019, approaching former members of the MapPlus team in order to falsely accuse McOsker of some of the allegations in this Amended Complaint.

j. Falsely informing multiple fund managers in the tax lien industry over the course of 2019-2021, and possibly ongoing, that McOsker stole his funds related to the four trades at issue.

87. Similarly, Hanratty attempted to use the dispute between the parties and the filing of his complaint to prevent BCMG Technologies and BCMG Services to be granted a tax credit to which they were creditors pursuant to Law 73-2008. This caused that the delivery of said tax credit to BCMG Services and BCMG Technologies be delayed, which caused these parties damages that are included but are not limited to accrued interests and legal expenses for payments owed.

88. Had the CRIM Proposal been successful, it was a business opportunity that would inject the necessary capital to the municipal governments of Puerto Rico and contribute to the fiscal sustainability of the government and its instrumentalities. The value of the asset purchase portion of the CRIM Proposal for the municipalities was initially $400 million in immediate liquidity in 2017, which later increased to a proposal of $800 million in immediate liquidity in 2018. The value of the servicing portion of the portfolio was 10% of collected assets, estimated to be roughly $1billion per year, for a proposed 15-year contract term. For McOsker and Hanratty, it was potentially worth hundreds of millions of dollars.

**Plaintiffs/Counterclaim Defendants/Third-Party Defendants Fraudulently Concealed Their Wrongful Activities**

89.     Plaintiffs/Counterclaim Defendants/Third-Party Defendants engaged in affirmative acts of concealment to put Defendants/Counterclaimants/Third-Party Plaintiffs off the trial of injury to prevent Defendants/Counterclaimants/Third-Party Plaintiffs from gaining knowledge of the facts to support their causes of action.

90.     Plaintiffs/Counterclaim Defendants/Third-Party Defendants acts of concealment include, but are not limited to:

   a.  In attempt to conceal his action from his own CFO, lenders, investors, and custodians, including McOsker, during several in-person meetings over the course of 2018 and early 2019 between McOsker and Hanratty, Hanratty insisted that McOsker and his team not speak with Ebury CFO Ping Xie.
   b.  In attempt to conceal his action from his own CFO, lenders, investors, and custodians, including McOsker, in at least two in person meetings over the course of 2018 between Hernandez and Hanratty, Hanratty insisted that Hernandez not speak with Ebury CFO Ping Xie.
   c.  In attempt to conceal his action from his own CFO, lenders, investors, and custodians, including McOsker, in at least one phone conversation in 2018 between Kernan and Hanratty, Hanratty insisted that Kernan not speak with Ebury CFO Ping Xie.
   d.  In order to cover his cash and redemption shortfalls caused by his own mismanagement and fraud, Hanratty, over the course of 2018 and it is believed in 2019 and to this day, altered data on excel documents sent to his banks, including Emigrant Bank, regarding the borrowing base for Ebury Fund certificates, specifically origination dates for hundreds of certificates, and other relevant financial data.
   e.  Hanratty directed Ping on financial information provided to their banks, current investors, potential investors, current and potential lenders to recognize the value to the pledged Carry Trade, BFNH, and Leper Line assets at 100% of redemptive value, while not disclosing to those parties that he didn't pay McOsker for the pledged Carry Trade, BFNH, and Leper Line assets.
   f.  In order to conceal sale proceeds from his lending institutions and other investors Hanratty would routinely instruct, in some cases verbally and others in writing, Kernan and Vazquez to send funds from Ebury Fund sales proceeds directly to investors, or other parties to cover his tracks. In one instance in August 2018, Hanratty approached Vazquez and Kernan with a request to wire approximately $2million owed to the two Ebury Funds directly to one investor Ira Levinthol, who was an investor in Ebury Fund 2 but not Ebury Fund 1. When questioned as to why this money would go directly to an investor instead of to

the fund to pay the bank first, then follow the normal fund procedure via his custodian, Hanratty became irate. Per Hanratty's instruction on August 15, 2018, BCMG wired from LienClear-0002 to National Fin. - Ira Leventhal IRA - (for Ebury Fund) - $800,000.00, and on the same day to National Fin. - Ira Leventhal IRA - (for Ebury Fund) - $1,289,504.77.

g.  Over the course of 2017-2019, Hanratty continuously insisted to McOsker that conversations regarding the Provisional Credit Line and his interest in Ebury Fund 2 be had in person or via telephone. In fact, on several occasions via telephone, text and electronic communication in 2018 Hanratty berated McOsker for sending written communication instead of verbal.

h.  Over the course of 2018, and especially in 2019, Hanratty deliberately would use intimidating and verbally abusive behavior to bully BCMG, Ebury, and other employees and contractors into getting his way, thus using this intimidation to dissuade individuals form questioning his requests and behavior, concealing his true actions and intent. On several occasions in 2018 McOsker was approached by members of the team who were concerned about the erratic, loud, and violent tendencies of Hanratty in the office. Mendez helped Hanratty with management of the Ebury St. employees, as well as the Philippine team that Ebury paid for services and paid healthcare for. Mendez often had to repair verbal and email damage done by Hanratty to that team, and over the course of 2018 and early 2019, several of the team members resigned citing similar issues. In fact, in late 2018, Mendez had to talk the office manager of the Philippines team Ana Yang, who later resigned.

i.  In early 2018, Hanratty deliberately hid from his Ebury Fund 1 and Ebury Fund 2 investors, including McOsker, that he had moved to Puerto Rico, often flying back to New York in order to pacify contentious financial and redemption issues with Fund Investors.

j.  Over the course of 2018, 2019, and believed today, Hanratty would conceal his location and via telephone instruct his employees and contractors in New York and the Philippines to sign documents on his behalf, notarize documents with his signature without him present, and perform any number of other tasks required for him to be in person.

k.  It is believed that, despite Delaware forum selection clauses in all relevant trade documents, Hanratty purposefully brought his meritless suit against McOsker and his companies in Puerto Rico in Puerto Rico due to the fact that it had a lower chance of being discovered by his investors versus bringing it in Delaware. This bought Hanratty over 2 years of time to conceal actions, liquidate liens, fraudulently transfer assets, procure hard money credit lines, and in his words "clean up" his Fund 1 and Fund 2 mismanagement. In fact, on an unsolicited phone call in 2020, certain Ebury Fund 1 investors, whom McOsker had never spoken with before nor had he ever met, contacted McOsker asking him if he would liquidate their fund assets because Hanratty was mismanaging them. When McOsker stated that he was confused as to why they would reach out to him, considering they were currently on opposite sides of a Puerto Rico state civil suit, the investors claimed to not know of the suit. Either Hanratty used the investors to deliberately try to gain information form McOsker during

the lawsuit, or he intentionally concealed the existence of the lawsuit form the very investors being sued.

l.   Hanratty forwarded an email in mid-2019 to Mendez where he mischaracterized the nature of the Provisional Line of Credit, and the ongoing relationship with McOsker, specifically in attempt to solicit her to work for him at Ebury and poison her against McOsker, and presumably to justify some of the actions that he directed her to take against BCMG.

m.   In 2018, Hanratty verbally and forcibly instructed Hernandez to prepare and sign the Carry Trade and BFNH operating agreements immediately so that he could have McOsker sign the same day.

n.   On several occasions in 2019, Hanratty would burst into McOsker's office with printed documents and instruct him to "just sign them" so that he could purportedly close the Provisional Line of credit. He routinely used disorganization, rushed tactics, pressure, and intimidation to force signatures and quick decisions to conceal his actions in all aspects of his business.

o.   On several occasions in 2019, Hanratty verbally walked McOsker through what he expected McOsker's response via email to be to his custodians MTAG, presumably so that it matched whatever story Hanratty had told them.

p.   On one occasion in 2018 Hanratty approached McOsker in person to "coordinate" McOsker's response to Tower Fund Services, his custodian, on several issues that the servicer was having with Hanratty. Again, trying to document his side of the story for this third party.

q.   At least weekly, via misleading, fraudulent, or deceptive statements in in-person comments, text messages, emails, phone calls, Hanratty concealed from McOsker, from the first meeting regarding the CRIM portfolio in 2017 all the way through the in-person meeting in 2019 where Hanratty finally admitted that he was not going to satisfy his requirement to procure the Formal Credit Line, that he would not be able to satisfy his duties under the partnership agreement.

r.   On several occasions in 2018 and early 2019, Hanratty misrepresented to McOsker that the syndicate of investors he was responsible for procuring were firmly committed to financing the CRIM portfolio, concealing the fact that they were not committed as he represented them to be.

s.   Hanratty concealed his illiquid personal and Fund level position from late 2017 through 2019.

t.   Under the guise of "helping with the CRIM portfolio", Hanratty concealed his cousin Seymour's actions, undertaken in BCMG offices day and night.

u.   On an ongoing basis throughout 2017 to 2019, Hanratty verbally assured McOsker that his fund investors were appraised of their partnership and agreements, and that his conflict of interest vis-à-vis Ebury was disclosed and waived, thus concealing potential risk for the partnership.

v.   Initially, Hanratty concealed from McOsker the police report and criminal lawsuit filed against him by his investors in 2018.

w.   From August 2018 through June 2019, but especially during the first half of 2019, Hanratty concealed from McOsker his conversations with and private instructions for Mendez which were directly in conflict with her employment

agreement with BCMG Services, as well as the interest of the Hanratty/McOsker partnership and McOsker personally.

x. Over the course of 2018 and early 2019, Hanratty concealed from McOsker his private instructions and direction of Andrew Adler, a former Ebury employee that Hanratty suggested that BCMG hire as a broker to gain inside knowledge about BCMG trades, all while Adler was an employee of BCMG Services.

y. Hanratty concealed from McOsker the fact that his Ebury funds were over-leveraged, that he was falsifying borrowing bases to avoid capital call requirements, and that McOsker's assets and promised equity positions were in jeopardy.

z. From Fall 2018 to Winter 2019 Hanratty played a "wait and see" game. Hanratty continually and consistently advised McOsker, Kernan, and Vazquez that the Formal Line of Credit was in final stages - only a week or two away from being finalized, when in reality he had no commitment from anyone to finance the Formal Line of Credit.

aa. From Winter 2018 to Spring 2019, Hanratty refused to confirm detailed reconciliation of financial matters - after repeated in--person and email requests via Kernan, to conceal his actions to try and document, after-the-fact, his side of the story before filing litigation in multiple forums.

**The Hanratty Enterprise**

91.     Plaintiffs are a group of persons and entities associated together in fact as the Hanratty Enterprise for the common purpose of carrying out an ongoing enterprise.

92.     John Hanratty acted as the head of the Hanratty Enterprise, directing his employees and contractors to inappropriately transfer investor assets, mismanage investor funds, falsify notarized documents, defraud investors, and outright steal from his partner, McOsker.

93.     Sarah Wells is Hanratty's personal assistant and functioned as the office manager for Ebury St.'s New York office.  From at least the formation of the partnership in 2017to the present, at Hanratty's instruction, Wells would notarize documents on Hanratty's behalf while Hanratty was neither present nor in the same state when said notarizations occurred.  Further, at the direction of Hanratty, Wells assisted in improperly transferring assets among the Entity Members (defined herein) in order to hide the assets from clients and partners in order to enrich the Individual Members (defined herein).  Wells also acted as HR manager for Hanratty's various

companies and dealt with his frequent and explosive hiring and firing of his undocumented Philippine team, who had insecure access to financial information for Ebury Funds, investors, credit lines, and other financial information, as well as working with Dennisse Mendez to pay their compensation and health insurance via offshore shell companies.

94.     Dennisse Mendez is Ebury's Director of Operations, and at Hanratty's request and instruction, manages Ebury St.'s tax lien and real estate asset portfolios.  As set forth herein, at the direction of Hanratty, Mendez assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members. Further, Mendez worked with Wells to assist in paying the undocumented Philippine team' compensation and health insurance via offshore shell companies.  While a documented employee with BCMG, including the accompanying confidentiality, non-solicitation, and noncompetition, she facilitated the fraud with Hanratty pre and post exit.

95.     Shirley Vega is an employee working for Ebury. As set forth herein, Vega assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019.  Further, at the direction of Hanratty, Vega assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members.

96.     John Bronzo was an attorney working for Ebury St. who was eventually promoted to the position of Ebury St.'s General Counsel.  At Hanratty's instruction, Bronzo would initiate foreclosure procedures on certain tax lien certificates and process the necessary paperwork to obtain title to these acquired properties. There were several instances where Hanratty would instruct Bronzo to obtain title over a property in the benefit of a different entity than the original investor entity, thereby defrauding some investors to the benefit of others, while inflating asset

value to obtain bank loans and/or mortgages.  Further, at the direction of Hanratty, Bronzo assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members.

97.     Patrick  Seymour was Ebury's General Counsel who replaced Bronzo in this role. Seymour assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019.  Further, at the direction of Hanratty,  Seymour assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members

98.     Ping Xie is Ebury St.'s Chief Financial Officer and assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members, assisted in improperly moving assets into foreign entities located in the British Virgin Islands in order to hide the assets from clients, partners, and the United States Internal Revenue Service to enrich the Individual Members and defraud the United States Government. Xie knowingly falsified borrowing bases and redemption reports to present to Ebury St.'s servicers, lenders, potential lenders, investors, potential investors, and auditors.

99.     Hanratty, Wells, Mendez, Vega, Bronzo, Xie and   Seymour comprise the ("Individual Members").

100.     Ebury Street Capital, LLC is a fund controlled by Hanratty and acts as the General and Managerial Partner of Ebury Fund I, LP; Ebury Fund 2, LP; and Ebury RE, LLC.  The Hanratty Enterprise uses the seemingly legitimate company to lure investors and take their money.  For example, Hanratty made the decision to liquidate his Ebury St. fund and told his investors that they would receive their capital within 90 days. When they were not delivered their capital on time,

some of them, including an investor named Michael Salerno, sued Hanratty and filed a complaint with the New York police.

101.    EB LEVRE I, LLC, is a Delaware limited liability company that the Hanratty Enterprise uses to hold real estate assets and assist in the improper transfer of assets between entities.

102.    Ebury Fund I, LP, is a Delaware limited partnership that the Hanratty Enterprise uses to comingle and hide funds from investors and partners.  For example, Ebury St. distributed $3,793,679 to Ebury Fund 1, LP ("Fund 1") investors between July 1, 2018 and February 19, 2019, despite Fund 1 current assets being listed at $1,918,787.49 as of December 31, 2018.

103.    Ebury Fund II, LP, is a Delaware limited partnership that the Hanratty Enterprise uses to comingle and find funds from investors and partners.  For example,  McOsker pledged assets held by Carry Trade LLC and BFNH, LLC to BCLF Rev. I, LLC, where Hanratty and McOsker were partners.  Hanratty subsequently caused BCLF Rev. I LLC and/or its assets to be transferred to Ebury Fund 2, LP, solely owned by Hanratty and/or his affiliated companies. The assignment was made, as well as the assignment of Carry Trade LLC and BFNH, LLC, under the commitment that  Hanratty would grant to  McOsker a proprietary interest in Ebury Fund 2, LLP, of fifty percent (50%) which never occurred.

104.    EB 1EMIDC, LLC, is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners.

105.    Red Clover 1, LLC,  is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners.  For example,  McOsker pledged assets held by Carry Trade LLC and BFNH, LLC to BCLF Rev. I, LLC, where Hanratty and McOsker were partners.  Hanratty subsequently caused BCLF Rev. I LLC and/or its assets to

be transferred to Ebury Fund 2, LP, solely owned by Hanratty and/or his affiliated companies. Hanratty then assigned or transferred said assets to Red Clover 1, LLC to hide said assets from McOsker and affiliated entities as well as his own investors. The pledge was made, as well as the assignment of Carry Trade LLC and BFNH, LLC, under the commitment that Hanratty would grant to McOsker a proprietary interest in Ebury Fund 2, LLP, of fifty percent (50%) which never occurred.

106.    White Clover 1, LLC, is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners.

107.    Black Clover I, LLC, is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners.

108.    Ebury Fund IC1, LLC, is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners.

109.    Ebury RE, LLC is a New Jersey limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners.

110.    Ebury Fund 2CI, LLC is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners (collectively, Ebury Street Capital, LLC, with EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund II, LP, EB 1EMIDC, LLC, Red Clover 1, LLC White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC, Ebury RE, LLC, and Ebury Fund 2CI, LLC (the "Entity Members").

111.    The Individual Members and the Entity Members comprise the "Hanratty Enterprise" an association-in-fact that purports to manage and operate various investment funds.

112.    The Hanratty Enterprise is an organization that has existed for several years and functions as a continuing unit with an informal command structure that uses seemingly legitimate business and investment entities to conduct illegal activity.

113.    In reality, the Hanratty Enterprise preys on unsuspecting clients to take their money, which they then misappropriate and comingle funds across various entities to line their own pockets.  Further, the Hanratty Enterprise engages in outright theft of assets, including tax lien certificates, from its partners.  These activities are done to enrich the Hanratty Enterprise and its members.

114.    Through the years of individual acts of theft, misappropriation of money and other assets, and fraud to cover up that theft and misappropriation, the Hanratty Enterprise and its members stole money from Defendants/Counterclaimants/Third-Party Plaintiffs and other third parties.

115.    At all times relevant to these Counterclaims, the Individual Members engaged in the operation or management of the Hanratty Enterprise.

116.    While Hanratty acted as the head of the Hanratty Enterprise, Dennisse Méndez, Shirley Vega, Sarah Wells, John Bronzo, Patrick Seymour, and Ping Xie acted closely with him, knowing that they were engaging in illegal conduct and stealing from others.

117.    The Individual Members used the Entities Members to steal, transfer, and conceal assets, including client funds, partner money, and partner tax lien certificates in order to enrich themselves to the detriment of their clients and partners.

118.    At all relevant times, the Hanratty Enterprise's engaged in conduct affecting interstate commerce, including but not limited to, transmitting, assigning, or otherwise transferring

money and other assets among bank accounts in jurisdictions including but not limited to Puerto Rico, the British Virgin Islands, Delaware, New York, New Jersey, and/or Alabama.

119.    At all relevant times, the members of the Hanratty Enterprise acted with the common purpose of enriching themselves to the detriment of their clients and partners.

120.    At all relevant times, the members of the Hanratty Enterprise were employed or associated with the Hanratty Enterprise and participated in the conduct and affairs of the Hanratty Enterprise through a pattern of racketeering activity as described herein.

121.    The predicate acts described herein are related and pose a threat of continued activity as the Hanratty Enterprise has and continues to improperly steal, transfer, or otherwise dispose of its clients' and partners' money and other assets.

122.    The predicate acts described herein constitute a pattern of racketeering activities and are part of a common scheme to enrich the Hanratty Enterprise at the expense of Defendants/Counterclaimants/Third-Party Plaintiffs through acts constituting: (i) wire fraud, in violation of 18 U.S.C. § 1343; (ii) violations of the NSPA, 18 U.S.C. §§ 2314-15; and (iii) money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.

123.    The    Hanratty    Enterprise's    violations    of    §    1962(c)    injured Defendants/Counterclaimants/Third-Party Plaintiffs.

124.    Under the provisions of 18 U.S.C. § 1964(c), Defendants/Counterclaimants/Third-Party Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing this suit, prejudgment interest and attorneys' fees.

**Through a Ponzi-Like Scheme, The Hanratty Enterprise Defrauded and Stole Funds from Defendants/Counterclaimants/Third-Party Plaintiffs and Investors to Pay Off Previous Investors and Debts and to Procure New Investors**

125.    The Hanratty Enterprise had a practice of stealing, comingling, or otherwise misusing investor and partner funds and assets to pay off previously disgruntled investors and lure new unsuspecting investors.

126.    The Hanratty Enterprise would accept investor money into one fund or entity, use that money to produce leverage via a lender, then purchase assets in that fund. The Hanratty Enterprise would then take the redemptions from those assets and instead of paying that lender and investor, put the money in another fund to cover shortfalls. The Hanratty Enterprise did this hundreds of times, beginning in at least 2017 and is ongoing.

127.    By way of specific example, Hanratty made the decision to liquidate his Ebury St. fund and told his investors that they would receive their capital within 90 days. When they were not delivered their capital on time, because of shortfalls due to comingling and other improper transfers, some of them, including an investor named Michael Salerno, sued Hanratty and filed a complaint with the New York police.

128.    Hanratty then stole, comingled, or otherwise misused current investor and partner funds and assets to pay Mr. Salerno and other investors.

129.    The Hanratty Enterprise would routinely make improper transfers among the various entities and funds to pay off current debts, investors, and partners.

130.    Hanratty would also ask McOsker if he could "tap" $50,000.00 from funds as least partially owned by Defendants/Counterclaimants/Third-Party Plaintiffs in order to pay off current debts, investors, and partners.  Hanratty never repaid the $50,000 "tap."

**The Hanratty Enterprise's Frauds, Thefts, and Money Laundering Comprise Racketeering Activity in Violation of 18 U.S.C. § 1962**

**The Hanratty Enterprise Committed Wire Fraud in Violation of 18 U.S.C. § 1343**

131.   By the acts described herein, the members of the Hanratty Enterprise knowingly executed and/or intentionally participated in a scheme that defrauded, and that was intended to defraud, the Defendants/Counterclaimants/Third-Party Plaintiffs and other investors, and in furtherance of this scheme, the members of the Hanratty Enterprise transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures and/or sounds, but not limited to the following predicate acts:

    i.    numerous email and telephone communications between the parties and other investors beginning in 2017 and continuing through 2019 in furtherance of the scheme to fraudulently induce Defendants/Counterclaimants/Third-Party Plaintiffs and other investors to enter into agreements and remain in agreements so that the Hanratty Enterprise and its members could profit from their schemes;

    ii.    numerous emails and telephone calls throughout 2018 and 2019 between the parties regarding Hanratty and his funds' ability to obtain financing for the CRIM Proposal;

    iii.    numerous emails and telephone calls throughout 2018 and 2019 between the parties regarding the location and the purpose of Defendants/Counterclaimants/Third-Party Plaintiffs' money and other assets;

    iv.    Numerous fraudulent mailings of tax lien certificates over state lines regarding the Lepper Line Transactions, the Carry Trade Portfolio, and the Woods Cove Portfolio;

    v.    Hanratty's instruction via email and telephone communications for Wells to improperly notarize documents for Hanratty outside his presence when he was in a different territory;

    vi.    Hanratty's instruction to the Individual Members to improperly divert, comingle, steal, or otherwise improperly use Defendants/Counterclaimants/Third-Party Plaintiffs' and other investors money and assets are instances of wire communications in furtherance of the McOsker Enterprise that constitute violations of 18 U.S.C. 1343.

132.   The specific details of the Individual Members acts in improperly diverting, comingling, stealing, or otherwise improperly using Defendants/Counterclaimants/Third-Party

Plaintiffs' and other investors money and assets are exclusively within the knowledge and control of the members of the Hanratty Enterprise and will be identified in discovery and proven at trial.

**The Hanratty Enterprise Committed Theft in Violation of The National Stolen Property Act, 18 U.S.C. §§ 2314–2315**

133.    By the acts described herein, the members of the Hanratty Enterprise transmitted, transferred, stole, and received money or assets with a value of more than $5,000, knowing that the money or assets had been converted and/or taken by fraud.

134.    The money was transmitted or transferred in interstate commerce among bank accounts in New York, Puerto Rico, and other states and territories.

135.    By the acts described herein, the members of the Hanratty Enterprise devised or intended to devise a scheme or artifice to defraud, or for obtaining money or assets with a value of $5,000 or more by means of false or fraudulent pretenses, representations, or promises, transported or caused to be transported in interstate or foreign commerce in the execution or concealment of the scheme or artifice to defraud.

136.    On or about June 2019, Hanratty, Vega, Bronzo, and Seymour entered the BCMG offices over the weekend and took tax certificates belonging to companies controlled by McOsker, including certificates related to the Lepper Line Transactions, the Carry Trade Portfolio, and the Woods Cove Portfolio.

137.    The theft and transfers were made at the direction of Hanratty.

138.    The specific details of the Individual Members acts in stealing, Defendants/Counterclaimants/Third-Party Plaintiffs' and other investors money and assets are exclusively within the knowledge and control of the members of the Hanratty Enterprise and will be identified in discovery and proven at trial.

31

**The Hanratty Enterprise Committed Money Laundering in Violation of 18 U.S.C. §§ 2314–2315**

139.    The members of the Hanratty Enterprise committed, and aided and abetted, acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957 in connection with a scheme in which the members used the Hanratty Enterprise to divert, comingle, or otherwise improperly transfer Defendants/Counterclaimants/Third-Party Plaintiffs' and other investors money and assets for various reasons, including to enrich the members of the Hanratty Enterprise.

140.    The members of the Hanratty Enterprise violations of the other predicate acts (Wire Fraud and the NSPA) are specified unlawful activity within the meaning of 18 U.S.C. §§ 1956 and 1957.

141.    Through 2017 and continuing through the present, the members of the Hanratty Enterprise, through the Hanratty Enterprise routinely stole, comingled, or otherwise illegally transferred money and other assets from Defendants/Counterclaimants/Third-Party Plaintiffs' and other investors into other funds owned and controlled by Hanratty.

142.    The members of the Hanratty Enterprise would then use these seemingly legitimate funds to secure loans to pay off other outstanding debts and obligations incurred as a result of fraud and other unlawful acts.

143.    Hanratty directing the aforementioned wiring and transfers of the money and other assets stolen, comingled, or otherwise illegally transferred from Defendants/Counterclaimants/Third-Party Plaintiffs' and other investors constituted violations of (i) 18 U.S.C. § 1956 in that the Hanratty Enterprise members knew that the aforementioned financial transactions were intended to promote further predicate offenses, avoid tax reporting requirements, or otherwise conceal laundering funds; and (ii) 18 U.S.C. § 1957 in that the Hanratty Enterprise

members knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity.

144.   Further evidence in support, including whether Hanratty and the Hanratty Enterprise is continuing one or more of the predicate acts set forth above, is peculiarly within the knowledge and control of Plaintiffs/Counterclaim Defendants/Third-Party Defendants.

**The Hanratty Enterprise Committed Fraud**

145.   Ebury Fund 1 and Fund 2 had separate lenders to whom the Ebury enterprise owed certain contractual, fiduciary, and moral duties, which they routinely breached and hid from Hanratty's investors. In 2018, and believed to be continuing until present, Hanratty falsified the borrowing base submitted to his bank Emigrant Bank stating "Jack Grady has no idea what he's doing, and won't notice." Hanratty did this so that certain assets that were no longer eligible for financing purposes would not expire, so that he could gain more time to put additional assets on the borrowing base to cover these shortfalls, including those stolen form McOsker and those purchased together using the Leper Line.

146.   On multiple occasions over the course of 2018 and 2019 Hanratty, Ping, and Mendez represented to their current and prospective lenders and investors, that Ebury Fund 1 and Fund 2 owned the Carry Trade, BFNH, and Lepper Line assets, free and clear of all incumbrances, and represented that they were worth 100% of redemptive value.  This is despite never paying McOsker for the $5.3million in Carry Trade assets, and despite the fact that a portion of the Provisional Credit Line had been used to procure the $14 million in Lepper Line assets that Ebury Fund and Fund 2 purported to own and seek financing on.

147.   In a  Ponzi-like scheme he moved money from one fund to another to cover loses, falsified the borrowing bases, wired money directly to Ira Levinthol and other individual investors

without following his own fund documents and defrauding McOsker and the other fund investors in the process.

148.    In a text message from Hanratty to McOsker in 2018, Hanratty assured McOsker not to worry about his actions, because his investors were aware that he was "leapfrogging" i.e. that he was using money from one fund or transaction to pay off another fund or transaction.

149.    Hanratty received sales proceeds from sales brokered by BloxTrade, as well as redemptions received from MTAG and other servicers, and allocated them to inappropriate funds on many occasions throughout 2017, 2018, 2019, and believed to be continuing until the present.

150.    Hanratty stablished a real estate fund and transferred tax lien assets there under purported low bases, knowing that they were worth significantly more, and then sold, or worked with hard money lenders and other questionable third-parties to secure formal and informal financing on these assets, some of which he deposited in Ebury Fund 1 and Fund 2 accounts to cover the shortfalls that he created through his theft, gross mismanagement, and fraud.

151.    Further evidence in support, including whether Hanratty and the Hanratty Enterprise is continuing one or more of the predicate acts set forth above, is peculiarly within the knowledge and control of Plaintiffs/Counterclaim Defendants/Third-Party Defendants.

**The Hanratty Enterprise Committed Extortion in Violation of 18 U.S.C. §§ 871 et. seq.**

152.    In the Second Quarter of 2019, Hanratty emailed McOsker in relation to tax credits that Defendants/Counterclaimants/Third-Party Plaintiffs were to receive from the Puerto Rican Government.

153.    Hanratty stated, "either you have a tax credit problem or an IP [ownership] problem," implying that unless McOsker paid him a ransom, Hanratty would continue his baseless allegations to the Puerto Rican Government that McOsker and his affiliated entities were

committing tax fraud against Puerto Rico.  If McOsker paid Hanratty, Hanratty would drop his baseless allegations.

154.     Further evidence in support, including whether Hanratty and the Hanratty Enterprise is continuing one or more of the predicate acts set forth above, is peculiarly within the knowledge and control of Plaintiffs/Counterclaim Defendants/Third-Party Defendants.

**COUNT I – RICO UNDER 1962(d)**
**Against Ebury St.**

155.     Defendants/Counterclaimants/Third-Party Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

156.     At all relevant times, Ebury St. was a "person" within the meaning of 18 U.S.C. §§1961(3) and 1962(d).

157.     At all relevant times, each of the Defendants/Counterclaimants/Third-Party Plaintiffs was a "person" within the meeting of 18 U.S.C. §§ 1961(3) and 1962(d).

158.     At all relevant times, the Hanratty Enterprise (i) was and is an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that function as a continuing unit.

159.     Ebury St. and the Third-Party Defendants entered into a series of agreements between and among each other to knowingly and willfully engage in a conspiracy to violate 18 U.S.C. 1962(c). Ebury St. and the Third-Party Defendants entered into at least one agreement with at least Ebury St. and/or one of the Third-Party Defendants to join the conspiracy, took acts in furtherance of that conspiracy, and knowingly participated in that conspiracy.

160.     Ebury St. and the Third-Party Defendants agreed and conspired to violate 18 U.S.C. 1962(c) by participating, directly or indirectly, in the conduct of the affairs of the Hanratty Enterprise through a pattern of racketeering activity, including an agreement that the conspirators,

or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

161.    Ebury St. and the Third-Party Defendants agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d) to engage in illegal predicate acts that formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. §1962(c), as demonstrated by, among other things the following facts:

    a. John Hanratty acted as the head of the Hanratty Enterprise, directing his employees to inappropriately transfer investor assets, mismanage investor funds, falsifying notarized documents, defraud investors, and outright steal from his partner, McOsker.

    b. Sarah Wells is Hanratty' personal assistant and functioned as the office manager for Ebury St.'s New York office.  At Hanratty's instruction, Wells would notarize documents on Hanratty's behalf while Hanratty was neither present nor in the same state when said notarizations occurred.  Further, at the direction of Hanratty, Wells assisting in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners in order to enrich the Individual Members (defined herein).

    c. Dennisse Mendez is Ebury's Director of Operations, and at Hanratty's request and instruction, manages Ebury St.'s tax lien and real estate asset portfolios. As set forth herein, at the direction of Hanratty, Mendez assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members.

    d. Shirley Vega is an accountant working for Ebury St. As set forth herein, Vega assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019.  Further, at the direction of Hanratty, Vega assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members.

    e. John Bronzo was an attorney working for Ebury St. who was eventually promoted to the position of Ebury St.'s General Counsel.  At Hanratty's instruction, Bronzo would initiate foreclosure procedures on certain tax lien certificates and process the necessary paperwork to obtain title to these acquired properties. There were several instances where Hanratty would instruct Bronzo to obtain title over a property in the benefit of a different entity than the original investor entity, thereby defrauding some investors while inflating asset value to obtain bank loans and/or mortgages.  Further, at the direction of Hanratty, Bronzo assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members.

36

f.   Patrick  Seymour was Ebury's General Counsel who replaced Bronzo in this role.  Seymour assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019.  Further, at the direction of Hanratty,  Seymour assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members.

g.   Ping Xie is Ebury's Chief Financial Officer and, at the direction of Hanratty, assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members, assisted in improperly moving assets into foreign entities located in the British Virgin islands in order to hide the assets from clients, partners, and the United States Internal Revenue Service in order to enrich the Individual Members and defraud the United States Government.

h.   Ebury Street Capital, LLC is a fund controlled by Hanratty and acts as the General and Managerial Partner of Ebury Fund I, LP; Ebury Fund 2, LP; and Ebury RE, LLC.  Hanratty uses the seemingly legitimate company to lure investors and take their money.  For example, Hanratty made the decision to liquidate his Ebury St. fund and told his investors that they would receive their capital within 90 days. When they were not delivered their capital on time, some of them, including an investor named Michael Salerno, sued Hanratty and filed a complaint with the New York police.

i.   EB LEVRE I, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

j.   Ebury Fund I, LP, is a Delaware limited partnership that Hanratty uses to comingle and hide funds from investors and partners.  For example, Ebury St. distributed $3,793,679 to Ebury Fund 1, LP ("Fund 1") investors between July 1, 2018 and February 19, 2019, despite Fund 1 current assets being listed at $1,918,787.49 as of December 31, 2018

k.   Ebury Fund II, LP, is a Delaware limited partnership that Hanratty uses to comingle and hide funds from investors and partners.  For example,  McOsker pledged assets held by Carry Trade LLC and BFNH, LLC to BCLF Rev. I, LLC, where Hanratty and McOsker were partners.  Hanratty subsequently caused BCLF Rev. I LLC and/or its assets to be transferred to Ebury Fund 2, LP, solely owned by Hanratty and/or his affiliated companies. The assignment was made, as well as the assignment of Carry Trade LLC and BFNH, LLC, under the commitment that  Hanratty would grant to  McOsker a proprietary interest in Ebury Fund 2, LLP, of fifty percent (50%) which never occurred.

l.   EB 1EMIDC, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

m.  Red Clover 1, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.  For example, McOsker pledged assets held by Carry Trade LLC and BFNH, LLC to BCLF Rev. I, LLC, where  Hanratty and  McOsker were partners.  Hanratty subsequently caused BCLF Rev. I LLC and/or its assets to be transferred to Ebury Fund 2, LP, solely owned by Hanratty and/or his affiliated companies. Hanratty then assigned or transferred said assets to Red Clover 1, LLC to hide

said assets from McOsker and affiliated entities.  The pledge was made, as well as the assignment of Carry Trade LLC and BFNH, LLC, under the commitment that  Hanratty would grant to  McOsker a proprietary interest in Ebury Fund 2, LLP, of fifty percent (50%) which never occurred.

n.  White Clover 1, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

o.  Black Clover I, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

p.  Ebury Fund IC1, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

q.  Ebury Fund 2CI, LLC is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.  (Collectively, Ebury Street Capital, LLC, with EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund II, LP, EB 1EMIDC, LLC, Red Clover 1, LLC White Clover 1, LLC, Black Clover I, LLC, and Ebury Fund IC1, LLC, (the "Entity Members").

162.    As described above, the Individual Members were the principal co-conspirators and directly participated in multiple predicate acts to further the scheme.

163.    Further evidence of an agreement among Ebury St. and the Third-Party Defendants is peculiarly within the knowledge and control of Ebury St. and the Third-Party Defendants.

164.    Ebury St. and the Third-Party Defendants are each a member of the Hanratty Enterprise and as co-conspirators, Ebury St. and the Third-Party Defendants are liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by the Defendants/Counterclaimants/Third-Party Plaintiffs that were caused by any members of the conspiracy, regardless of whether Ebury St. and the Third-Party Defendants themselves were directly involved in a particular aspect of the Hanratty Enterprise.

165.    As a direct and proximate result of the violations set forth above, Defendants/Counterclaimants have been injured.  Ebury St. and the Third-Party Defendants' violations of 1962(d) are the proximate cause of this injury. Under the provisions of 18 U.S.C. § 1964(c), the Defendants/Counterclaimants/Third-Party Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing the suit, prejudgment interest and attorneys' fees.

## COUNT II – CONVERSION
### Against All Plaintiffs/Counterclaim Defendants

166.    Defendants/Counterclaimants/Third-Party Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

167.    At all relevant times, Defendants/Counterclaimants/Third-Party Plaintiffs had an immediate and superior right of possession to the Tax Liens held by Carry Trade, LLC and BFNH, LLC as well as ownership of said companies.

168.    McOsker pledged the aforementioned assets and ownership rights of said companies, at the suggestion of Hanratty, to companies jointly owned and controlled by McOsker and Hanratty for the limited and sole purpose of Hanratty obtaining the Formal Credit Line, and, alternatively, as a back up to secure the Provisional Credit Line.

169.    Defendants/Counterclaimants/Third-Party Plaintiffs held a property interest in the aforementioned assets and ownership rights with an immediate right to possession.

170.    Plaintiffs/Counterclaim Defendants/Third-Party Defendants then transferred the aforementioned assets and ownership rights without the consent or knowledge of McOsker.

171.    By the wrongful actions described herein, Plaintiffs/Counterclaim Defendants/Third-Party Defendants intentionally stole and converted the aforementioned assets and ownership rights to the exclusion and detriment of the Defendants/Counterclaimants/Third-Party Plaintiffs' rights.

172.    As a direct and proximate result of Plaintiffs/Counterclaim Defendants/Third-Party Defendants' actions, the Defendants/Counterclaimants/Third-Party Plaintiffs have been damaged and are entitled to compensatory damages in an amount to be determined at trial.

### COUNT III – BREACH OF CONTRACT
### Against Ebury St.

173.     Defendants/Counterclaimants/Third-Party Plaintiffs repeat and reallege each and every allegation if set forth herein.

174.     On or about September 2018 Messrs. Hanratty and McOsker entered into the Agreement related to the CRIM Proposal. The Agreement contained sufficiently definite terms and the parties manifested a mutual intention to be bound by the terms.

175.     Under the Agreement, and as more fully set forth herein, Hanratty and McOsker decided that for the CRIM Proposal to be successful, it was the obligation of Hanratty, first, to inject his own capital and that of his companies to cover 50% of the future obligations of the CRIM Proposal and, second, to procure the Formal Credit Line to make the necessary capital investments so that the CRIM Proposal would be successful.

176.     McOsker's obligations included, among the already $7 Million in capital investments he made: to cover 50% of the future obligations of the CRIM Proposal and, second, to supply the necessary intellectual property that would allow McOsker and Hanratty to process and administer the tax encumbrances in a more efficient manner and to locate the defaulting properties with greater precision.

177.     Hanratty and his companies did not comply with their obligations of injecting their own capital, because they had no capital of their own whatsoever. Further, they did not comply with their obligation to obtain the Formal Credit Line, since his promises with regard to the financing facilities never materialized. Nor did they comply with their obligation to successfully finance or build the syndicate to finance the $400 million nor the $800 million CRIM proposal.

178.     Defendants/Counterclaimants/Third-Party   Plaintiffs   relied   on   Hanratty's assurances that he would obtain financing and inject capital contributions to cover 50% of the future obligations of the CRIM Proposal to their detriment.

40

179.    Hanratty and his companies' breaches cost the joint venture, and McOsker personally, lost profits, because even if the CRIM Proposal had not been successfully obtained, McOsker and his companies allowed business opportunities to pass based on the expectation that Hanratty would obtain financing and make capital contributions.

180.    Had he had another more diligent partner, or had he done it on his own, McOsker would have been able to obtain the necessary financing to continue pursuing the CRIM Proposal. In the alternative, McOsker would have invested the capital that he invested into the CRIM Proposal in a different manner had he known that the line of financing was not going to materialize.

181.    Defendants/Counterclaimants/Third-Party Plaintiffs have performed all conditions, covenants, and promises required by them in accordance with the terms and conditions of the contract except insofar as performance thereof has been excused by the failure of Ebury St. to perform and their breaches thereof.

182.    The lost profit by McOsker as a result of Hanratty's breaches is in excess of, at a minimum, $150 million. The CRIM Proposal had an initial objective to purchase the portfolio of tax encumbrances of the CRIM, valued at $400 million in 2017 and $800 million in 2018, for purchase of $2.4 billion in assets, as well as a 15-year servicing contract for 10% of net collected revenue, expected to be $2 billion a year, or $20 million per year for 15 years.

WHEREFORE, Defendants/Counterclaimants/Third-Party Plaintiffs pray for entry of a judgment in favor of Defendants/Counterclaimants/Third-Party Plaintiffs against Ebury St., in an amount to be proven at trial, including an award of:

A.  actual, compensatory, and consequential damages;

B.  trebled actual damages;

C.  restitution and a constructive trust over Ebury St.'s assets;

D.  costs and expenses of this action, including reasonable attorneys' fees;

E.  Punitive damages;

F.  Pre- and post-judgment interest at the maximum legal rate; and

G.  Other and further relief as the Court deems just and proper.

## THIRD- PARTY COMPLAINT

### THE PARTIES

1.      Defendant/Counterclaimant/Third-Party Plaintiff Thomas McOsker is a resident of Puerto Rico.

2.      Defendant/Counterclaimant/Third-Party Plaintiff Badel Hernandez is a resident of Puerto Rico.

3.      Defendant/Counterclaimant/Third-Party Plaintiff Andrew Kernan is a resident of the State of New York.

4.      Defendant/Counterclaimant/Third-Party Plaintiff LienClear, LLC is a Puerto Rico limited liability company.

5.      Defendant/Counterclaimant/Third-Party Plaintiff LienClear 0001, LLC is a Delaware limited liability company.

6.      Defendant/Counterclaimant/Third-Party Plaintiff LienClear 0002, LLC is a Delaware limited liability company.

7.      Defendant/Counterclaimant/Third-Party Plaintiff BloxTrade, LLC is a Puerto Rico limited liability company.

8.      Defendant/Counterclaimant/Third-Party Plaintiff BCMG Services, LLC is a Puerto Rico limited liability company.

9.      Defendant/Counterclaimant/Third-Party Plaintiff BCMG International, LLC is a Puerto Rico limited liability company.

10.     Defendant/Counterclaimant/Third-Party Plaintiff Sitona Ventures LLC is a Delaware limited liability company.

11.     Third-Party Defendant John Hanratty  is a resident of Puerto Rico.

1

12.     Third-Party Defendant Dennisse Méndez is a resident of Puerto Rico.

13.     Third-Party Defendant Shirley Vega is a resident of Puerto Rico.

14.     Third-Party Defendant Sarah Wells is a resident of New York.

15.     Third-Party Defendant John Bronzo is a resident of New York.

16.     Third-Party Defendant Ping Xie is a resident of New York.

17.     Third-Party Defendant Patrick Seymour is a resident of Pennsylvania.

18.     Third-Party Defendant Ebury Fund I, LP, is a limited partnership of Delaware whose principal place of business is at 41 Purdy Ave., #278, Rye, NY, 10580.

19.     Third-Party Defendant Ebury Fund 2, LP is a limited partnership of Delaware whose principal place of business is at 41 Purdy Ave. #278, Rye, NY, 10580.

20.     Third-Party Defendant EB 1EMIDC, LLC is a limited liability company of Delaware whose principal place of business is at 41 Purdy Ave. #278, Rye, NY, 10580.

21.     Third-Party Defendant Red Clover 1, LLC, is a limited liability company of Delaware whose principal place of business is at 1357 Ashford Ave., Ste. 2, PMB 451, San Juan, PR 00927.

22.     Third-Party Defendant White Clover 1, LLC, is a limited liability company of Delaware whose principal place of business is at 1357 Ashford Ave., Ste. 2, PMB 451, San Juan, PR 00927.

23.     Third-Party Defendant Black Clover I, LLC, is a limited liability company of Delaware whose principal place of business is at 1357 Ashford Ave., Ste. 2, PMB 451, San Juan, PR 00927.

24.     Third-Party Defendant Ebury Fund IC1, LLC is a limited liability company of Delaware whose principal place of business is at 41 Purdy Ave. #278, Rye, NY, 10580.

25.     Third-Party Defendant Ebury Fund 2CI, LLC is a limited liability company of Delaware whose principal place of business is at 41 Purdy Ave. #278, Rye, NY, 10580.

26.     Third-Party Defendant Ebury RE, LLC is a limited liability company of New Jersey whose principal place of business is 644 Fernandez Juncos Ave., San Juan, PR, 00907.

## JURISDICTION AND VENUE

27.     Pursuant to 28 U.S.C. § 1331, this Court has subject-matter jurisdiction because Defendant/Counterclaimant/Third-Party Plaintiffs allege RICO violations in violation of 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. § 1964(c).

28.     Pursuant to 28 U.S.C. § 1367, the Court may exercise supplemental jurisdiction over Defendant/Counterclaimant/Third-Party Plaintiffs' state law claims.

29.     This Court has personal jurisdiction over Third-Party Defendants EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund 2, LP, EB 1EMIDC, LLC, Red Clover 1, LLC, White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC, Ebury Fund 2CI, LLC each of which is a Delaware entity and may be served by serving its registered agent in Delaware.

30.     The Court has personal jurisdiction over Ebury Street Capital, LLC because it entered into agreements with Defendant/Counterclaimant/Third-Party Plaintiffs in which it consented to the jurisdiction of Delaware Courts.

31.     The Court has personal jurisdiction over the Individual Members because they are citizens of the United States, reside in Puerto Rico and New York, and upon information and belief, manage Delaware entities EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund 2, LP, EB 1EMIDC, LLC, Red Clover 1, LLC, White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC,

Ebury Fund 2CI, LLC and thus have consented to personal jurisdiction in Delaware pursuant to 6 *Del. C.* § 18-109(a); 6 *Del. C.* § 15-114.

32.     The Court has personal jurisdiction over all of the Plaintiffs/Counterclaim Defendants/Third-Party Plaintiffs pursuant to 18 U.S.C.§ 1965 because this action may be brought in this jurisdiction against parties EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund 2, LP, EB 1EMIDC, LLC, Red Clover 1, LLC, White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC, Ebury Fund 2CI, LLC.

33.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because Plaintiffs EB LEVRE I, LLC, Ebury Fund I, LP, Ebury Fund 2, LP, EB 1EMIDC, LLC, Red Clover 1, LLC, White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC, Ebury Fund 2CI, LLC are Delaware entities and Ebury Street Capital, LLC executed agreements with Defendant/Counterclaimant/Third-Party Plaintiffs in which the parties consented to Delaware as the venue for any and all disputes that arise out of the agreements.

## FACTUAL BACKGROUND

34.     Defendants/Counterclaimants/Third-Party Plaintiffs incorporate and reallege Paragraphs 21 through 182 of the Counterclaims as though fully set forth herein.

## COUNT I – RICO UNDER 1962(c)
### Against John Hanratty

35.     Defendants/Counterclaimants/Third-Party Plaintiffs incorporate and reallege the previous paragraphs as though fully set forth herein.

36.     At all relevant times, Defendants/Counterclaimants/Third-Party Plaintiffs were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

37.     At all relevant times, all Third-Party Defendants and Ebury St. were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

38.     At all relevant times, the Hanratty Enterprise (i) has been an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) has had associated members with a common purpose that function as a continuing unit, including all Plaintiffs.

39.     At all relevant times, the Hanratty Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

40.     At all relevant times, all Third-Party Defendants and Ebury St. were employed by, or associated with, the Hanratty Enterprise and conducted and participated in the conduct of the Hanratty Enterprise through a pattern of racketeering activity described in this Complaint.

41.     The Third-Party Defendants' and Ebury St.'s violations of 18 U.S.C. § 1962(c) have directly and proximately caused Defendants/Counterclaimants/Third-Party Plaintiffs' injuries. Pursuant to 18 U.S.C. § 1964(c), the Defendants/Counterclaimants/Third-Party Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing the suit, prejudgment interest, and attorneys' fees.

## COUNT II – RICO UNDER 1962(d)
### Against all Third-Party Defendants

42.     Defendants/Counterclaimants/Third-Party Plaintiffs incorporate and reallege the foregoing paragraphs as though fully set forth herein.

43.     At all relevant times, Defendants/Counterclaimants/Third-Party Plaintiffs were "persons" within the meaning of 18 U.S.C. §§1961(3) and 1962(d).

44.     At all relevant times, each of the Third-Party Defendants and Ebury St. were "persons" within the meeting of 18 U.S.C. §§ 1961(3) and 1962(d).

5

45.     At all relevant times, the Hanratty Enterprise (i) was and is an ongoing association-in-fact with a decision-making framework or mechanism for controlling the association; and (ii) had associated members with a common purpose that function as a continuing unit.

46.     The Third-Party Defendants and Ebury St. entered into a series of agreements between and among each other to knowingly and willfully engage in a conspiracy to violate 18 U.S.C. 1962(c). Each Third-Party Defendant and Ebury St. entered into at least one agreement with at least one other Third-Party Defendant and Ebury St. to join the conspiracy, took acts in furtherance of that conspiracy, and knowingly participated in that conspiracy.

47.     The Third-Party Defendants and Ebury St. agreed and conspired to violate 18 U.S.C. 1962(c) by participating, directly or indirectly, in the conduct of the affairs of the Hanratty Enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

48.     Each Third-Party Defendant and Ebury St. agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d) to engage in illegal predicate acts that formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. §1962(c), as demonstrated by, among other things the following facts:

   a. John Hanratty, as more fully alleged herein, acted as the head of the Hanratty Enterprise, directing his employees to inappropriately transfer investor assets, mismanage investor funds, falsifying notarized documents, defraud investors, and outright steal from his partner, McOsker.
   b. Sarah Wells is Hanratty' personal assistant and functioned as the office manager for Ebury St.'s New York office. At Hanratty's instruction, Wells would notarize documents on Hanratty's behalf while Hanratty was neither present nor in the same state when said notarizations occurred. Further, at the direction of Hanratty, Wells assisting in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners in order to enrich the Individual Members (defined herein).

c. Dennisse Mendez is Ebury's Director of Operations, and at Hanratty's request and instruction, manages Ebury St.'s tax lien and real estate asset portfolios. As set forth herein, at the direction of Hanratty, Mendez assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members.

d. Shirley Vega is an accountant working for Ebury St. As set forth herein, Vega assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019.  Further, at the direction of Hanratty, Vega assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members.

e. John Bronzo was an attorney working for Ebury St. who was eventually promoted to the position of Ebury St.'s General Counsel.  At Hanratty's instruction, Bronzo would initiate foreclosure procedures on certain tax lien certificates and process the necessary paperwork to obtain title to these acquired properties. There were several instances where Hanratty would instruct Bronzo to obtain title over a property in the benefit of a different entity than the original investor entity, thereby defrauding some investors while inflating asset value to obtain bank loans and/or mortgages.  Further, at the direction of Hanratty, Bronzo assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members.

f. Patrick  Seymour was Ebury's General Counsel who replaced Bronzo in this role.  Seymour assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019.  Further, at the direction of Hanratty,  Seymour assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members

g. Ping Xie is Ebury's Chief Financial Officer and, at the direction of Hanratty, assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members, assisted in improperly moving assets into foreign entities located in the British Virgin islands in order to hide the assets from clients, partners, and the United States Internal Revenue Service in order to enrich the Individual Members and defraud the United States Government.

h. Hanratty, Wells, Mendez, Vega, Bronzo, Xie and  Seymour comprise the ("Individual Members").

i. Ebury Street Capital, LLC is a fund controlled by Hanratty and acts as the General and Managerial Partner of Ebury Fund I, LP; Ebury Fund 2, LP; and Ebury RE, LLC.  Hanratty uses the seemingly legitimate company to lure investors and take their money.  For example, Hanratty made the decision to liquidate his Ebury St. fund and told his investors that they would receive their capital within 90 days. When they were not delivered their capital on time, some of them, including an investor named Michael Salerno, sued Hanratty and filed a complaint with the New York police.

j.  EB LEVRE I, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

k.  EB 1EMIDC, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

l.  Ebury Fund I, LP, is a Delaware limited partnership that Hanratty uses to comingle and hide funds from investors and partners.  For example, Ebury St. distributed $3,793,679 to Ebury Fund 1, LP ("Fund 1") investors between July 1, 2018 and February 19, 2019, despite Fund 1 current assets being listed at $1,918,787.49 as of December 31, 2018

m.  Ebury Fund II, LP, is a Delaware limited partnership that Hanratty uses to comingle and hide funds from investors and partners.  For example,  McOsker pledged assets held by Carry Trade LLC and BFNH, LLC to BCLF Rev. I, LLC, where Hanratty and McOsker were partners.  Hanratty subsequently caused BCLF Rev. I LLC and/or its assets to be transferred to Ebury Fund 2, LP, solely owned by Hanratty and/or his affiliated companies.  The assignment was made, as well as the assignment of Carry Trade LLC and BFNH, LLC, under the commitment that  Hanratty would grant to  McOsker a proprietary interest in Ebury Fund 2, LLP, of fifty percent (50%) which never occurred.

n.  Red Clover 1, LLC,  is a Delaware limited liability company that Hanratty uses to  comingle and hide funds from investors and partners.  For example, McOsker pledged assets held by Carry Trade LLC and BFNH, LLC to BCLF Rev. I, LLC, where Hanratty and McOsker were partners.  Hanratty subsequently caused BCLF Rev. I LLC and/or its assets to be transferred to Ebury Fund 2, LP, solely owned by Hanratty and/or his affiliated companies. Hanratty then assigned or transferred said assets to Red Clover 1, LLC to hide said assets from McOsker and affiliated entities.  The pledge was made, as well as the assignment of Carry Trade LLC and BFNH, LLC, under the commitment that  Hanratty would grant to  McOsker a proprietary interest in Ebury Fund 2, LLP, of fifty percent (50%) which never occurred.

o.  White Clover 1, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

p.  Black Clover I, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

q.  Ebury Fund IC1, LLC, is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

r.  Ebury RE, LLC is a New Jersey limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

s.  Ebury Fund 2CI, LLC is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners.

49.  As described above, Individual Members and the Entity Members were the principal co-conspirators and directly participated in multiple predicate acts to further the scheme.

50.     Further evidence of an agreement among Third-Party Defendants and Ebury St. is peculiarly within the knowledge and control of Third-Party Defendants and Ebury St.

51.     Each Third-Party Defendant and Ebury St. is a member of the Hanratty Enterprise and as co-conspirators, the Third-Party Defendant and Ebury St. are liable for all of the actions committed by all of the co-conspirators within the conspiracy and are liable for all of the damages sustained by the Defendants/Counterclaimants/Third-Party Plaintiffs that were caused by any members of the conspiracy, regardless of whether the Third-Party Defendants and Ebury St. themselves were directly involved in a particular aspect of the Hanratty Enterprise.

52.     As a direct and proximate result of the violations set forth above, Defendants/Counterclaimants/Third-Party Plaintiffs have been injured.   the Third-Party Defendants and Ebury St.'s violations of 1962(d) are the proximate cause of this injury. Under the provisions of 18 U.S.C. § 1964(c), the Defendants/Counterclaimants/Third-Party Plaintiffs are entitled to bring this action and recover treble damages, the cost of bringing the suit, prejudgment interest and attorneys' fees.

### COUNT III– FRAUD/FRAUDULENT INDUCEMENT
### Against John Hanratty

53.     Defendants/Counterclaimants/Third-Party Plaintiffs repeat and reallege each and every allegation if set forth herein.

54.     Hanratty made numerous materially false statements and representations as described herein including, but not limited to, the following:

a.  Falsely representing to McOsker that Hanratty and Ebury St. were in a liquid financial position and able to fulfill their obligations under the CRIM Proposal; and
b.  Falsely representing to McOsker that Hanratty and Ebury St. that were very close to obtaining the necessary financing.

55.     Hanratty knew the statements were false when made.

9

56.     Hanratty made the statements identified in paragraphs 70 to induce McOsker to enter into the CRIM Proposal and remain partners with Hanratty related to the CRIM Proposal.

57.     McOsker acted in justifiable reliance on Hanratty's false statements and remained partners with Hanratty related to the CRIM Proposal to his detriment.

58.     As outlined above, Defendants/Counterclaimants/Third-Party Plaintiffs have been damaged by Hanratty's false statements.  Had Hanratty not impermissibly induced McOsker to remain partners related to the CRIM Proposal, McOsker and his companies could have successfully maintained the CRIM Proposal through other means, or McOsker and his companies would have engagement in other business opportunities that they let pass by because of Hanratty's assurances that financing would be obtained and Hanratty's and McOsker's efforts under the CRIM Proposal could continue.

## COUNT IV – TORTIOUS INTERFERENCE
## WITH PROSPECTIVE ECONOMIC ADVANTAGE/BUSINESS RELATIONS
### Against John Hanratty

59.     Defendants/Counterclaimants/Third-Party Plaintiffs repeat and reallege each and every allegation if set forth herein.

60.     Defendants/Counterclaimants/Third-Party Plaintiffs had a reasonable probability of a business opportunity.  Specifically, BCMG Technologies and BCMG Services had a contract with the Puerto Rican Industrial Development Company ("PRIDCO") to be granted a tax credit in excess of $4 million to which they were creditors pursuant to Law 73-2008.

61.     Defendants complied with all their obligations under the contract with PRIDCO to receive the tax credits.

62.     Hanratty intentionally interfered with McOsker and his companies' tax credit by, among other things as set forth herein, falsely reporting to the PRIDCO authorities, Department

of Economic Development and Commerce ("DDEC")authorities, and Hacienda that McOsker and his companies were defrauding the Puerto Rican government through the Law 73-20088 tax credits.

63.     Hanratty's false reports were without justification as its only motive and purpose was to disrupt McOsker and his companies' business activities and cost them money through various costs and expense and the potential loss of the Law 73-20088 tax credits.

64.     Hanratty's false reports has caused McOsker and his companies to go through detailed laborious audits.  The audits have cost Defendants considerable time, money, and resources to comply with and have disrupted business activities. **To date the audits have disproven all Hanratty's false accusations.** Defendants are confident that will remain through the audits' completion.

65.     As a result of Hanratty's false accusations, Defendants have been damaged through the loss of time, resources, money, and legal expenses to comply with the audits, a disruption to business activity, harm to business reputation, and the unrealized $4 million plus tax credit.

### COUNT V – TORTIOUS INTERFERENCE  WITH CONTRACTUAL RELATIONS
### Against John Hanratty

66.     Defendants repeat and reallege each and every allegation if set forth herein.

67.     BCMG Technologies and BCMG Services had a contract with the Puerto Rican Industrial Development Company ("PRIDCO") to be granted a tax credit in excess of $4 million to which they were creditors pursuant to Law 73-20088.

68.     Hanratty was aware that BCMG Technologies and BCMG Services had a contract with PRIDCO for Law 73-20088 tax credits.

11

69.     Hanratty intentionally interfered with McOsker and his companies' tax credit by falsely reporting to the PRIDCO authorities, DDEC authorities, and Hacienda that McOsker and his companies were defrauding the Puerto Rican government through the Law 73-20088 tax credits.

70.     Hanratty's false report was without justification as its only motive and purpose was to disrupt McOsker and his companies' business activities and cost them money through various costs and expense and the potential loss of the Law 73-20088 tax credits.

71.     Hanratty's false report has caused McOsker and his companies to go through detailed laborious audits.  The audits have cost Defendants considerable time, money, and resources to comply with and have disrupted business activities. **To date the audits have disproven all Hanratty's false accusations.**  Defendants are confident that will remain through the audits' completion.

72.     As a result of Hanratty's false accusations, Defendants have been damaged through the loss of time, resources, money, and legal expenses to comply with the audits, a disruption to business activity, harm to business reputation, and the unrealized $4 million plus tax credit.

### COUNT VI – CONVERSION
### Against All Third-Party Defendants

73.     Defendants incorporate and reallege the previous paragraphs as though fully set forth herein.

74.     At all relevant times, Defendants had an immediate and superior right of possession to the Tax Liens held by Carry Trade, LLC and BFNH, LLC as well as ownership of said companies.

75.     McOsker pledged the aforementioned assets and ownership rights of said companies, at the suggestion of Hanratty, to companies jointly owned and controlled by McOsker

and Hanratty for the limited and sole purpose of Hanratty obtaining the Formal Credit Line, and, alternatively, as a back up to secure the Provisional Credit Line.

76.     Defendants held a property interest in the aforementioned assets and ownership rights with an immediate right to possession.

77.     Hanratty then transferred the aforementioned assets and ownership rights without the consent or knowledge of McOsker.

78.     By the wrongful actions described herein, Plaintiffs intentionally stole and converted the aforementioned assets and ownership rights to the exclusion and detriment of the Defendants' rights.

79.     As a direct and proximate result of Plaintiffs' actions, the Defendants have been damaged and are entitled to compensatory damages in an amount to be determined at trial.

## COUNT VII – CIVIL CONSPIRACY
### Against All Third-Party Defendants

80.     Defendants incorporate and reallege the previous paragraphs as though fully set forth herein.

81.     Plaintiffs are a combination of two or more persons.

82.     As set forth herein, each Plaintiff engaged in at least one unlawful act in furtherance of a conspiracy against Plaintiffs.

83.     Plaintiffs' conspiracy is the direct and proximate cause of the damage to Defendants in an amount to be determined at trial.

84.     Each Plaintiff is jointly and severally liable for the acts of its co-conspirators committed in furtherance of the conspiracy.

## COUNT VIII - UNJUST ENRICHMENT
### Against All Third-Party Defendants

85.     Defendants incorporate and reallege the previous paragraphs as though fully set forth herein.

86.     Defendants plead the eighth claim in the alternative to its claim for breach of contract and conversion as to those Plaintiffs.

87.     By their wrongful conduct as described herein, Plaintiffs have been unjustly enriched at Defendants' expense.

88.     It is against equity and good conscience to permit Plaintiffs to retain the benefits of their wrongful conduct.

89.     Plaintiffs' wrongful conduct was the direct and proximate cause of damage to the Defendants in an amount to be determined at trial.

## COUNT IX – DEFAMATION (Slander/Slander per se)
### Against John Hanratty

90.     Defendants incorporate and reallege the previous paragraphs as though fully set forth herein.

91.     From 2019 through present Hanratty disseminated false accusations and claims that McOsker had committed criminal acts, as well as statements directly maligning to McOsker in his trade, business, and profession. Hanratty made these oral statements to various Puerto Rican government officials and individuals in the tax lien industry

92.     Hanratty made false and defamatory statements of fact concerning McOsker, including but not limited to:

        a.    Falsely reporting to the Puerto Rican government that McOsker was defrauding the Puerto Rican Government related to tax credits;

    b. Falsely reporting to the Puerto Rican Office of Industrial Tax Exemption that BCMG International was engaged in fraudulent acts;

    c. Falsely reporting to the Puerto Rican Department of Economic Development that McOsker was defrauding the Puerto Rican Government related to tax credits;

    d. Falsely reporting to the Puerto Rican Industrial Development Company that McOsker was defrauding the Puerto Rican Government related to tax credits;

    e. Falsely reporting to the Puerto Rican Treasury Department (Hacienda) that McOsker was defrauding the Puerto Rican Government related to tax credits;

    f. Falsely reporting to certain banking institutions in Puerto Rico that McOsker was defrauding the Puerto Rican Government related to tax credits;

    g. In 2019 accusing McOsker of stealing from his friend and colleague Robert Sanchez in a building partnership;

    h. In 2019, approaching former members of the MapPlus team in order to falsely accuse McOsker of some of the allegations in this complaint; and

    i. Falsely informing multiple fund managers in the tax lien industry over the course of 2019-2021, and possibly ongoing, that McOsker stole his funds related to the four trades at issue.

93. Hanratty made the false and defamatory statements to third parties in an unprivileged publication.

94. Hanratty's defamatory statements are slander per se because the statements were made to malign McOsker in his trade, business, or profession.

95. As a direct and proximate result of Hanratty's defamatory statements McOsker has suffered harm, including but not limited to, economic damages and harm to McOsker's reputation and goodwill in an amount to be determined at trial.

### COUNT X – DEFAMATION (Libel)
### Against John Hanratty

96. Defendants incorporate and reallege the previous paragraphs as though fully set forth herein.

97. From 2019 to the present, Hanratty disseminated false accusations and claims that McOsker had committed criminal acts, as well as statements directly maligning to McOsker in his

trade, business  and profession. Hanratty made these written statements to the Puerto Rican government and individuals in the tax lien industry.

98.     Hanratty made false and defamatory statements of fact concerning McOsker, including but not limited to:

a. Falsely reporting to the Puerto Rican government that McOsker was defrauding the Puerto Rican Government related to tax credits;

b. Falsely reporting to the Puerto Rican Office of Industrial Tax Exemption that BCMG International was engaged in fraudulent acts;

c. Falsely reporting to the Puerto Rican Department of Economic Development that McOsker was defrauding the Puerto Rican Government related to tax credits;

d. Falsely reporting to the Puerto Rican Industrial Development Company that McOsker was defrauding the Puerto Rican Government related to tax credits;

e. Falsely reporting to the Puerto Rican Treasury Department (Hacienda) that McOsker was defrauding the Puerto Rican Government related to tax credits;

f. Falsely reporting to certain banking institutions in Puerto Rico that McOsker was defrauding the Puerto Rican Government related to tax credits;

g. In 2019 directing Dudley at Lavaleer Capital via text message as to how to attempt to bully BCMG employees via email to create a false paper trail he would later attempt to use to have OITE cancel the decree of BCMG International;

h. In 2019 accusing McOsker of stealing from his friend and colleague Robert Sanchez in a building partnership;

i. In 2019, approaching former members of the MapPlus team in order to falsely accuse McOsker of some of the allegations in this complaint; and

j. Falsely informing multiple fund managers in the tax lien industry over the course of 2019-2021, and possibly ongoing, that McOsker stole his funds related to the four trades at issue.

99.     Hanratty made the false and defamatory statements to third parties in an unprivileged publication.

100.    Hanratty's defamatory statements are slander per se because the statements were made to malign McOsker in his trade, business, or profession.

101.    As a direct and proximate result of Hanratty's defamatory statements McOsker has suffered harm, including but not limited to, economic damages and harm to McOsker's reputation and goodwill in an amount to be determined at trial.

WHEREFORE, Defendants/Counterclaimants/Third-Party Plaintiffs pray for entry of a judgment in favor of Defendants/Counterclaimants/Third-Party Plaintiffs against Plaintiffs/Counterclaimants/Third-Party Defendants, jointly and severally, in an amount to be proven at trial, including an award of:

A.  actual, compensatory, and consequential damages;

B.  trebled actual damages;

C.  restitution and a constructive trust over Plaintiffs/Counterclaimants/Third-Party Defendants' assets;

D.  costs and expenses of this action, including reasonable attorneys' fees;

E.  Punitive damages;

F.  Pre- and post-judgment interest at the maximum legal rate; and

G.  Other and further relief as the Court deems just and proper.


**COOCH AND TAYLOR, P.A.**

/s/ *Dean R. Roland*
Blake A. Bennett (#5133)
Dean R. Roland (#6459)
The Nemours Building
1007 N. Orange St., Suite 1120
Wilmington, DE 19801
(302) 984-3800

*Attorneys for Defendants/*
*Counterclaimants/Third-Party*
*Plaintiffs*

17