**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EBURY STREET CAPITAL, LLC, EB 1EMIALA, LLC, EB 2EMIALA, LLC, EBURY FUND 1 NJ LLC, and EBURY FUND 2 NJ, LLC, | |
| Plaintiffs–Counterclaim Plaintiffs, | |
| v. | C.A.  No. 21-cv-00203-MN |
| THOMAS R. MCOSKER, ANDREW KERNAN, BADEL HERNANDEZ, LIENCLEAR – 0001, LLC, LIENCLEAR – 0002, LLC, LIENCLEAR, LLC, BLOXTRADE, LLC, BCMG SERVICES, LLC, BCMG INTERNATIONAL, LLC, and SITONA VENTURES LLC, | |
| Defendants–Counterclaim Plaintiffs–Third-Party Plaintiffs, | |
| v. | |
| JOHN HANRATTY, PING XIE, SARAH WELLS, DENNISSE MÉNDEZ, SHIRLEY VEGA, JOHN BRONZO, PATRICK SEYMOUR, EB LEVRE I, LLC, EBURY FUND I, LP, EBURY FUND 2, LP, EB 1EMIDC, LLC, RED CLOVER 1, LLC, WHITE CLOVER 1, LLC, BLACK CLOVER I, LLC, EBURY FUND IC1, LLC, EBURY FUND 2CI, LLC, and EBURY RE, LLC, | |
| Third-Party Defendants. | |

**THE EBURY PARTIES' OPENING BRIEF IN SUPPORT OF**
**MOTION TO DISMISS COUNTERCLAIMS AND THIRD-PARTY COMPLAINT**

GUSRAE KAPLAN NUSBAUM PLLC
Kari Parks (*pro hac vice*)
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com

SMITH KATZENSTEIN & JENKINS LLP
Kathleen M. Miller (No. 2898)
Julie M. O'Dell (No. 6191)
1000 N. West Street, Suite 1501
Wilmington Delaware 19801
(302) 652-8400
kmiller@skjlaw.com
jodell@skjlaw.com

*Attorneys for The Ebury Parties*

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................... i

TABLE OF AUTHORITIES ..................................................................................................... iv

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ......................................................................................................................... 2

    I.  Plaintiffs Allege that the McOsker Parties Have Run a Multi-Year Ponzi Scheme to Trick Their Clients—Including Plaintiffs—Into Giving Up Millions of Dollars' Worth of Tax Lien Certificates ............................................................................................................................... 2

    II.  In July 2022, Judge Dawson Denied the McOsker Parties' Motion to Dismiss the Ebury Plaintiffs' RICO and Civil Conspiracy Claims ............................................................................ 5

    III.  In September 2022, the McOsker Parties Filed 13 Counter- and Third-Party Claims, Adding 17 Ebury Entities and Employees as Third-Party Defendants .................................................... 6

        A.     The McOsker Parties Claim that Mr. McOsker—With Zero Help or Funding—Created the CRIM Proposal Sometime Between 2014 and 2017 ...................................................... 6

        B.     The McOsker Parties Claim that They Contracted with Unidentified Ebury Parties Sometime Between 2017 and 2019 ................................................................................................. 7

    IV.  Defendant BCMG Services and Non-Party Lesser Flaming LLC Executed the BCMG Capital Contract ............................................................................................................................ 8

    V.  The McOsker Parties Allege that Mr. Hanratty Did Not Finance the CRIM Proposal, and Attempt to Defend Against Plaintiffs' Amended Complaint .................................................... 8

    VI.  The McOsker Parties Claim that Mr. Hanratty Did Not Give Them Full Access to the Ebury Parties, and "Slandered" Them When He Sued ........................................................................ 10

    VII.  The McOsker Parties Allege Nearly No Facts About the Ebury Employees' or Entities' Conduct ................................................................................................................................... 12

        A.    The Ebury Employees ............................................................................................ 12

            1.     Sarah Wells ........................................................................................................ 12

            2.     Dennisse Méndez .............................................................................................. 13

            3.     Shirley Vega ...................................................................................................... 13

            4.     John Bronzo ...................................................................................................... 14

            5.     Patrick Seymour ............................................................................................... 14

            6.     Ping Xie ............................................................................................................. 15

B.      The Ebury Entities ...................................................................................... 15

        1.      Ebury Street Capital, LLC ..................................................................... 16

        2.      EB 1EMIALA, LLC ................................................................................ 16

        3.      EB 2EMIALA, LLC ................................................................................ 16

        4.      Ebury Fund 1 NJ LLC ............................................................................ 16

        5.      Ebury Fund 2 NJ, LLC ............................................................................ 17

        6.      EB Levre I, LLC ...................................................................................... 17

        7.      Ebury Fund I, LP .................................................................................... 17

        8.      Ebury Fund 2, LP .................................................................................... 18

        9.      EB 1EMIDC, LLC .................................................................................. 18

        10.     Red Clover 1, LLC .................................................................................. 18

        11.     White Clover 1, LLC ............................................................................... 19

        12.     Black Clover I, LLC ................................................................................ 19

        13.     Ebury Fund IC1, LLC ............................................................................ 19

        14.     Ebury Fund 2CI, LLC ............................................................................ 19

        15.     Ebury RE, LLC ....................................................................................... 19

LEGAL STANDARD ................................................................................................... 20

ARGUMENT ................................................................................................................ 21

I.  Puerto Rico Law Governs the McOsker Parties' Common Law Claims ............................ 21

    A.      The BCMG Capital Contract Includes Two Puerto Rico "Governing Law" Clauses .. 22

    B.      The McOsker Parties' Tort Claims Arise out of Puerto Rico Contacts Between Puerto Rico Residents ................................................................................................ 23

II.  The McOsker Parties Fail to Plead the Existence of Any Contract Enforceable Against Any Ebury Parties, Let Alone Breach-of-Contract's Other Elements ............................ 24

    A.      The McOsker Parties Do Not Explain Who Should Defend Themselves Against the Breach-of-Contract Claim ................................................................................. 24

    B.      The McOsker Parties Cannot Enforce the BCMG Operating Agreement Against Any Ebury Party .......................................................................................... 25

III.  The McOsker Parties' Torts are Time-Barred .................................................... 25

IV.  Tardiness Aside, the McOsker Parties Fail to Plead Their Torts' Elements ................... 26

    A.      Conversion ........................................................................................... 26

B.   Tortious Interference ................................................................................ 27

C.   Defamation ............................................................................................... 28

D.   Unjust Enrichment ................................................................................... 29

V. The McOsker Parties Fail to Plead the Existence of Any RICO Enterprise, Let Alone Racketeering Activity that Injured them ................................................................... 30

VI.  The McOsker Parties Fail to Plead RICO or Civil Conspiracy .......................................... 33

VII.  The Court Cannot Exercise Personal Jurisdiction Over the Third-Party Defendants ...... 34

CONCLUSION ............................................................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

Cases

A.M. Capen's Co. v. Am. Trading & Prod. Corp.,
  200 F. Supp. 2d 34 (D.P.R. 2002)............................................................................................ 27

Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg,
  660 F. Supp. 1362 (D. Conn. 1987)......................................................................................... 34

Annulli v. Panikkar,
  200 F.3d 189 (3d Cir. 1999).................................................................................................... 31

Ashcroft v. Iqbal,
  556 U.S. 662 (2009)......................................................................................................... 20, 24

Associated Gen. Contractors of Cal., Inc. v. Cal. State Council,
  459 U.S. 519 (1983)................................................................................................................ 21

A-Valey Engineers, Inc. v. Bd. of Chosen Freeholders,
  106 F. Supp. 2d 711 (D.N.J. 2000) ......................................................................................... 34

Barreto Peat, Inc. v. Luis A. Ayala Colon Sucrs., Inc.,
  709 F. Supp. 321 (D.P.R. 1989)............................................................................................... 26

Bell Atl. Corp. v. Twombly,
  550 U.S. 544 (2007)......................................................................................................... 20, 24

Berg Chilling Sys., Inc. v. Hull Corp.,
  435 F.3d 455 (3d Cir. 2006).................................................................................................... 21

Black & Yates, Inc. v. Mahogany Ass'n, Inc.,
  129 F.2d 227 (3d Cir.)............................................................................................................. 33

Blount Fin. Serv. Inc. v. Walter E. Heller & Co.,
  819 F.2d 151 (6th Cir. 1987) .................................................................................................. 31

Certain Underwriters at Lloyds, London v. Chemtura Corp.,
  160 A.3d 457 (Del. 2017) ....................................................................................................... 22

Chin v. Chrysler LLC,
    538 F.3d 272 (3d Cir. 2008)........................................................................ 21

Colon v. Bladés,
    914 F. Supp. 23  (D.P.R. 2012).................................................................. 28

Fed. Ins. Co. v. Banco de Ponce,
    582 F. Supp. 1388 (D.P.R. 1984).............................................................. 26

Flip Mortgage Corp. v. McElhone,
    841 F.2d 531 (4th Cir. 1988) .................................................................... 31

Flovac, Inc. v. Airvac, Inc.,
    84 F. Supp. 3d 95 (D.P.R. 2015)............................................................... 25

Fowler v. UPMC Shadyside,
    578 F.3d 203 (3d Cir. 2009).............................................................. 20, 35

Gen. Office Prods. Corp. v. A.M. Capen's Sons, Inc.,
    115 P.R. Dec. 553, 1984 WL 270915 (P.R. 1984) .................................. 27

General Office,
    115 P.R. Offic. Trans. .............................................................................. 27

Gierbolini Rosa v. Banco Popular de Puerto Rico,
    930 F. Supp. 712 (D.P.R. 1996)............................................................... 28

Gov't of Puerto Rico v. Carpenter Co.,
    442 F. Supp. 3d 4647 (D.P.R. 2020 .......................................................... 29

H.J. Inc. v. Northwestern Bell Tel. Co.,
    492 U.S. 229 (1989).......................................................................... 30, 31

Harris v. Goderick,
    No. 05-22039-CIV, 2012 WL 12542429 (S.D. Fla. Oct. 5, 2012) ........... 20

Heirs of Sorbá v. Viñas,
    49 P.R.R. 31 (1935) ................................................................................. 26

Hughes v. Consol-Penn. Coal Co.,
    945 F.2d 594 (3d Cir. 2011)..................................................................... 30

Hull Dobbs Co. v. Superior Court,
    81 P.R.R. 214 (P.R. 1959) ....................................................................... 26

In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,
578 F. Supp. 3d 2676 (D.P.R. 2021 ........................................................................... 29

In re Garrido Jimenez,
455 B.R. 51 (D.P.R. 2011) ......................................................................................... 25

In re OSC 1 Liquidating Corp.,
529 B.R. 825 (Bankr. D. Del. 2015) .......................................................................... 22

Island Airlines, LLC v. Bohlke,
No. SX-2016-CV-00404, 2022 WL 474132 n.7 (D.V.I. Feb. 14, 2022) .................... 21

Jane Voe #2 v. Archdiocese of Milwaukee,
700 F. Supp. 2d 653 (D. Del. 2010) .......................................................................... 34

Kolar v. Preferred Real Est. Invs., Inc.,
361 F. App'x 354 (3d Cir. 2010) ..................................................................... 30, 31, 32

Lum v. Bank of Am.,
361 F.3d 217 (3d Cir. 2004) ............................................................................... 30, 32

Marshall-Silver Constr. Co. v. Mendel,
894 F.2d 593 (3d Cir. 1990) ...................................................................................... 31

Martinez Colon v. Santander Nat'l Bank,
4 F. Supp. 2d 53 (D.P.R. 1998) ................................................................................. 25

Menasco, Inc. v. Wasserman,
886 F.2d 681 (4th Cir. 1989) .................................................................................... 31

MirTech v. AgroFresh Inc.,
561 F. Supp. 3d 447 (D. Del. 2021) .......................................................................... 26

Montalban v. Centro Com. Plaza Carolina,
132 D.P.R. 785 (1993) ............................................................................................... 27

New Comm. Wireless Servs., Inc. v. SprintCom, Inc.,
287 F.3d 1 (1st Cir. 2002) ......................................................................................... 27

Ocaso, S.A. Compañia de Seguros y Reaseguros v. Puerto Rico Maritime Shipping Authority,
915 F. Supp. 1244 (D.P.R. 1996) .............................................................................. 25

Odesser v. Continental Bank,
676 F. Supp. 1305 (E.D. Pa. 1987) ........................................................................... 33

Penn. Emp. Benefit Tr. Fund v. Zeneca, Inc.,
    710 F .Supp.2d 458 (D. Del. 2010) .......................................................................... 23

Phillips v. Cnty. of Allegheny,
    515 F.3d 224 (3d Cir. 2008) ............................................................................. 20, 35

R.R. Isla Verde Hotel Corp. v. Howard Johnson Int'l, Inc.,
    121 Fed. App'x. 870 (1st Cir. 2005) ..................................................................... 27

Rolon v. Rafael Rosario & Assocs., Inc.,
    450 F. Supp. 2d 153 (D.P.R. 2006) ....................................................................... 33

Rose v. Bartle,
    871 F.2d 331 (3d Cir. 1989) .................................................................................. 33

Shoemaker v. McConnell,
    556 F. Supp. 2d 351 (D. Del. 2008) ...................................................................... 35

Swierkiewicz v. Sorema N.A.,
    534 U.S. 506 (2002) ............................................................................................... 24

Time Share Vacation Club v. Atlantic Resorts, Ltd.,
    735 F.2d 61 (3d Cir. 1984) ............................................................................. 34, 35

Travelers Indem. Co. v. Lake,
    594 A.2d 38 (Del. 1991) ........................................................................................ 22

Triangle Cayman Asset Co. v. LG & AC, Corp.,
    Civ. No. 16-2863 (FAB), 2018 WL 10581534 (D.P.R. Aug. 3, 2018) .................... 28

United States v. Falcone,
    311 U.S. 205 (1940) ............................................................................................... 33

United States v. Kreimer,
    609 F.2d 126 (5th Cir. 1980) .......................................................................... 31, 32

United States v. Viola,
    35 F.3d 37 (2d Cir. 1994) ...................................................................................... 33

Western Assocs. Ltd v. Market Square Assocs.,
    235 F.3d 629 (D.C. Cir. 2001) ............................................................................... 30

Westernbank Puerto Rico v. Kachkar,
    Civ. No. 07-1606 (ADC/BJM), 2009 WL 6337949 (D.P.R. Dec. 10, 2009) .......... 29

Whitwell v. Archmere Acad., Inc.,
   463 F. Supp. 2d 482 (D. Del. 2006) ......................................................................... 21

Statutes

10 Del. C. § 3104 ........................................................................................................ 35
18 U.S.C. §§ 1341, 1343 .............................................................................................. 30
31 L.P.R.A. § 3374 ...................................................................................................... 25
31 L.P.R.A. § 5298 ...................................................................................................... 26

Rules

Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) ............................................... 1

Other Authorities

Restatement (Second) of Conflicts § 6 ......................................................................... 22
Restatement (Second) of Conflicts § 145 ..................................................................... 23
Restatement (Second) of Conflicts § 148 ..................................................................... 23
Restatement (Second) of Conflicts § 188 ..................................................................... 22

This is the "**Ebury Parties**"[1] Opening Brief in support of their Motion to Dismiss Defendants–Counterclaim Plaintiffs–Third-Party Plaintiffs' (together, the "**McOsker Parties**[2]") Counterclaims and Third-Party Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). <u>See</u> Counterclaims and Third-Party Complaint (Sep. 1, 2022) [D.I. 39].

## PRELIMINARY STATEMENT

In 2019, the Ebury Parties learned that they were victims of the McOsker Parties' multi-year Ponzi Scheme, moved out of the Puerto Rico office that they shared with the McOsker Parties, and sued in the federal district court for the District of Puerto Rico. Because the McOsker Parties argued that their dispute belonged in local Puerto Rico court, the Ebury Parties voluntarily dismissed their first federal case and refiled in the local court—where the McOsker Parties argued that this dispute actually belonged here in Delaware.

At the McOsker Parties' urging, and as the Puerto Rico case continued, the Ebury Plaintiffs sued in this Court in February 2021, alleging that the McOsker Parties perpetrated a racketeering conspiracy and breached numerous contracts governed by Delaware law. In July 2021, Judge Dawson rejected the McOsker Parties' motion to dismiss the Amended Complaint, preserving the Ebury Plaintiffs' RICO and contract claims.

---

[1] The "**Ebury Parties**" are Plaintiffs–Counterclaim Defendants (together, the "**Ebury Plaintiffs**") Ebury Street Capital, LLC ("**ESC**"), EB 1EMIALA, LLC, EB 2EMIALA, LLC, Ebury Fund 1 NJ LLC, and Ebury Fund 2 NJ, LLC and "**Third-Party Defendants**" John Hanratty, Ping Xie, Sarah Wells, Dennisse Méndez, Shirley Vega, John Bronzo, Patrick Seymour, EB Levre I, LLC, Ebury Fund I, LP, Ebury Fund 2, LP, EB 1EMIDC, LLC, Red Clover 1, LLC, White Clover 1, LLC, Black Clover I, LLC, Ebury Fund IC1, LLC, Ebury Fund 2CI, LLC, and Ebury RE, LLC.

[2] The "**McOsker Parties**" are Defendants–Counterclaim Plaintiffs–Third-Party Plaintiffs Thomas R. McOsker, Andrew Kernan, Badel Hernandez, Lienclear – 0001 ("**LC Purchaser**"), LLC, Lienclear – 0002, LLC ("**LC Escrow**"), Lienclear, LLC ("**LC Servicer**"), "**Bloxtrade**," LLC, "**BCMG Services**," LLC, "**BCMG International**," LLC, and "**Sitona**" Ventures LLC.

Now, the McOsker Parties have filed their Counterclaim and Third-Party Complaint (the "**Counterclaim**") accusing the Ebury Parties of mirror-image racketeering and contract misconduct, plus more torts for good measure. But in plagiarizing the Ebury Plaintiffs' solid RICO structure, the McOsker Parties fail to actually plead RICO facts; instead of mirroring Plaintiffs' well-pleaded Amended Complaint, the McOsker Parties offer a house of mirrors filled with nothing but adjectives, adverbs, innuendo, and legal conclusions.

Because the McOsker Parties' melodrama fails to plead facts alleging that a single one of the 22 Ebury Parties is liable for even one of the 13 Counter- or Third-Party Claims—or that even one of the Third-Party Ebury Defendants has a single contact with Delaware—the Ebury Parties respectfully request that the Court grant this Motion.

## BACKGROUND

### I.   Plaintiffs Allege that the McOsker Parties Have Run a Multi-Year Ponzi Scheme to Trick Their Clients—Including Plaintiffs—Into Giving Up Millions of Dollars' Worth of Tax Lien Certificates

Defendant Thomas R. McOsker owns and manages a panoply of Delaware and Puerto Rico LLCs, including Defendants LC Purchaser, LC Escrow, LC Servicer, BCMG Services, BCMG International, and Sitona. Amended Complaint ¶¶ 6, 31–37 (June 25, 2021) ("**Am. Compl.**" or "**Amended Complaint**") [D.I. 16]. Mr. McOsker also owned non-party "**Cactus**" Ventures LLC, which was a Delaware LLC established in 2014 and canceled in 2018. Id. ¶¶ 40–43. Defendant Andrew Kernan is the Chief Financial Officer of LC Purchaser, LC Escrow, LC Servicer (together, the "**Tax Lien Defendants**") and BCMG Services, while Defendant Badel Hernandez is in-house counsel and business manager of Defendants LC Servicer, BloxTrade, and BCMG Services. Id. ¶¶ 45–46.

Plaintiffs, meanwhile, are investors in tax lien certificates, which give their holders the right to collect unpaid taxes and interest from property owners. Id. ¶¶ 2, 64–68. Because there is no exchange or other centralized mechanism for secondary trading, investors like Plaintiffs often engage brokers and market-makers when it comes time to sell their certificates. Id. ¶ 70. The Tax Lien Defendants purport to be such brokers, advertising that they (1) purchase Certificates and then sell them at a mark-up (2) after providing escrow, clearing, and transfer services. Id. ¶¶ 4, 5.

Plaintiffs eventually hired the Tax Lien Defendants to facilitate eight separate "**Transactions**" governed by a functionally-identical set of three contracts, which required the Tax Lien Defendants to make to make two payments to Plaintiffs per Transaction: (1) 60% of the Transaction price when Plaintiffs provided satisfactory assignment forms, and (2) the remaining 40% one LC Servicer transferred the Certificates to third-party purchasers. Am. Compl. ¶¶ 72–73, 77, 86, 91–111.

But in four of the eight Transactions, the Tax Lien Defendants dragged their feet for months after selling Plaintiffs' Certificates, continually manufacturing new excuses for their failure to pay Plaintiffs. Id. ¶ 89. And in the last four Transactions—in which Plaintiffs transferred title to 932 Certificates, for which Defendants promised they would pay Plaintiffs $3.5 million—the Tax Lien Defendants never paid Plaintiffs at all (the "**Unpaid Transactions**"). Id. ¶¶ 90–111.

After the Tax Lien Defendants failed to pay Plaintiffs for their Certificates, Plaintiffs learned, inter alia, that (1) LC Escrow repeatedly used the exact same "**Scotia Bank Screenshot**" to trick Plaintiffs and other clients, including non-party Laveer Management, LLC ("**Laveer**"), into believing that the Tax Lien Defendants would pay for their Certificates; (2) the Tax Lien Defendants never really escrow client funds at all, but instead deposit client money into a New York checking account held by LC Escrow, then transfer the funds to Puerto Rico accounts held

by BCMG Services and LC Servicer; and (3) used client money to attempt to defraud Puerto Rican taxpayers of over $6.5 million, engaging in a three-year scheme in which BCMG Services purported to purchase millions of dollars of intellectual property in arm's-length transactions—but actually just arranged and executed circular payments among BCMG Services, Sitona, and Cactus, all owned by Mr. McOsker and operated by Messrs. McOsker, Kernan, and Hernandez, purchasing the "**LienLog IP**" for $160,000 in 2014, sold it to BCMG Services for $2,044,250 in 2017, and sold it again to Sitona for $13,189,500 in 2018, despite the fact that LienLog's website no longer existed and its trademarks had been canceled. Id. ¶¶ 115, 149, 160–62, 164–99.

Plaintiffs also learned that from 2016 through at least 2019, the "**McOsker Enterprise**" had defrauded other Tax Lien Defendant clients—including non-parties Tang Capital Management LLC, INA Group LLC, Millennium Trust Company, LLC, HGM Holdings LLC, Kite Capital Partners, and Laveer—in the exact same manner and for the exact same reasons that the Enterprise stole Plaintiffs' money and Certificates, including by using the exact same Scotia Bank Screenshot. Id. ¶¶ 151, 153, 162.

Plaintiffs first sought justice in Puerto Rico, suing Mr. McOsker, BCMG Services, BCMG International, and several other McOsker entities in the federal District of Puerto Rico. See generally Declaration of McOsker Counsel Blake A. Bennett ("**Bennett Decl.**") Exs. 1, 4, 5 (Aug. 27, 2021) [D.I. 22-1, 22-4, 22-5]. After Mr. McOsker, BCMG Services, and BCMG International claimed that diversity jurisdiction did not exist, Plaintiffs refiled their claims in Puerto Rico state court—where Mr. McOsker, BCMG Services, and BCMG International argued that the dispute really belonged in Delaware. See id. at 1 (arguing that the Ebury Parties "are contractually impeded from objecting to the jurisdiction of the Delaware courts."); id. at 15 ("[T]his factor alone tilts the scale unequivocally in favor of a transfer to the U.S. District Court for the District of Delaware.").

## II.     In July 2022, Judge Dawson Denied the McOsker Parties' Motion to Dismiss the Ebury Plaintiffs' RICO and Civil Conspiracy Claims

Accordingly, on February 12, 2021, Plaintiffs initiated this "**Delaware Litigation**" against the McOsker Parties. See Order Partially Granting and Partially Denying McOsker Parties' Motion to Dismiss at 1 (July 7, 2022) [D.I. 28] (the "**Order**") (citations omitted). After the McOsker Parties moved to dismiss, Plaintiffs filed an Amended Complaint, alleging one RICO § 1962(c) Control claim against Mr. McOsker; one RICO § 1962(d) Conspiracy claim against all of the McOsker Parties; Fraudulent Inducement against Mr. McOsker, LC Purchaser, and LC Escrow; Breach of Contract against Lienclear 002, LLC; and, in the alternative, Conversion, Civil Conspiracy, and Unjust Enrichment against all of the McOsker Parties. Id.; see also Am. Compl. ¶¶ 224–70.

The McOsker Parties moved to dismiss yet again, arguing that Plaintiffs had failed to state any claim but breach of contract; the federal Court should also dismiss the state-law contract claim; the Court could not exercise personal jurisdiction over Messrs. Kernan or Hernandez; and, alternatively, the Court should stay this Delaware litigation pursuant to Colorado River. See generally Memorandum in Support of Motion to Dismiss or Stay (Aug. 27, 2021) [D.I. 23]. Plaintiffs opposed the McOsker Parties' dismissal motion, and the McOsker Parties countered with a reply brief. See Plaintiffs' Opposition (Oct. 12, 2021) [D.I. 24]; McOsker Parties' Reply (Nov. 12, 2021) [D.I. 27].

On July 7, 2022, Judge Dawson issued an order preserving the Ebury Plaintiffs' RICO, breach of contract, and civil conspiracy claims, dismissing their fraudulent inducement, conversion, and unjust enrichment claims as duplicative. Order at 4–9.

Judge Dawson rejected the McOsker Parties' RICO § 1962(c) arguments, holding that the Ebury Plaintiffs had properly alleged (1) enterprise, by pleading facts explaining that "the common

purpose of the [McOsker E]nterprise was to expand its clients in order to get them to convey title of their Certificates to Defendants," (2) pattern, by pleading facts explaining "the time period of the [allegedly-fraudulent] communications, the fraudulent misconduct that Plaintiffs accuse [the McOsker Parties] of, and even between whom the communications occurred," and (3) open-ended racketeering continuity, by pleading facts showing how the McOsker Parties had perpetrated the same racketeering acts against other third parties, specifically named by Plaintiffs, "even after the four transactions at issue in this case occurred." Id. at 4–8 (citations omitted).

### III.   In September 2022, the McOsker Parties Filed 13 Counter- and Third-Party Claims, Adding 17 Ebury Entities and Employees as Third-Party Defendants

#### A. The McOsker Parties Claim that Mr. McOsker—With Zero Help or Funding—Created the CRIM Proposal Sometime Between 2014 and 2017

The September 2022 Counterclaim alleges that sometime before 2011, Mr. McOsker began working at non-party GFI Group "to open a new division focused on creating a secondary market for property tax encumbrances, commonly known as 'Tax Liens,'" and that in 2011, he was its "Head of Tax Receivables Brokerage Division. Countercl. ¶¶ 21–23. At some point, Mr. McOsker "left GFI Group to commence his own tax encumbrance brokerage firm, [Defendant] BloxTrade." Id. ¶ 27. In 2014, Mr. McOsker moved from New York City to San Juan to take advantage of "preferential tax rates" for "bona fide residents of Puerto Rico." Id. ¶¶ 28–29.

Once in Puerto Rico, Mr. McOsker's "specialized knowledge" allowed him to "identif[y] a business opportunity in the portfolio of tax encumbrances of the Center for the Collection of Municipal Taxes ('**CRIM**')." Id. ¶¶ 31–33.

**B. The McOsker Parties Claim that They Contracted with Unidentified Ebury Parties Sometime Between 2017 and 2019**

The Counterclaim alleges that "[i]n mid-2017," Messrs. McOsker and Hanratty "met in New York to discuss several matters," and "began to form an understanding that they desired to become partners in the CRIM Proposal." Id. ¶ 37. However, "[Mr.] McOsker did not require" Mr. Hanratty to "make an initial capital contribution under the Initial Agreement," nor did Mr. McOsker "request what is known as a shared services allocation." Id. ¶ 37. While the Counterclaim capitalizes the phrase "Initial Agreement," that phrase is not defined anywhere in the pleading; indeed, this is the only time that phrase appears in the entire document. See generally id.

The McOsker Parties go on to claim:

> [T]he Agreement between the parties at that time was that [Mr.] Hanratty would be a capital partner and his financing obligations would be for future obligations incurred by the common venture. As discussed below, the parties' obligations related to the CRIM Proposal were clarified and further memorialized through various subsequent writings including various documents circulated in 2017 and 2018, emails in 2017, 2018, and 2019, and instant messages through various messaging services throughout 2017–2019.

Id. ¶¶ 37–38. The Counterclaim does not identify or annex the "various subsequent writings" that "clarified and further memorialized" "the parties' obligations," nor does it identify who "the parties" are. See generally id.

While this paragraph again capitalizes "Agreement," the Counterclaim does not define that term for another five paragraphs, when it alleges that "they"—whose antecedent is unclear— "formalize[d] the Agreement through the "**BCMG Capital**," LLC operating agreement, which was signed by both parties on February 19, 2019" (the "**BCMG Capital Contract**"). Id. ¶ 43. The BCMG Contract "provided that Lesser Flamingo, LLC, a Puerto Rico limited liability company wholly owned by [Mr.] Hanratty" would be "a 49% partner–owner" of BCMG Capital, while Defendant BCMG Services, owned by Mr. McOsker, would be "a 51% partner–owner." See id.

IV.     **Defendant BCMG Services and Non-Party Lesser Flaming LLC Executed the BCMG Capital Contract**

Because the Counterclaim neither annexes nor quotes the BCMG Contract, the Ebury Parties attach it to this Opening Brief as an exhibit. <u>Compare generally</u> <u>id.</u> <u>and</u> Declaration of Kari Parks Exhibit A, BCMG Capital Contract. The only parties to the BCMG Capital Contract are Defendant BCMG Services and non-party Lesser "**Flamingo**" LLC. <u>See</u> <u>id.</u> at 1, 4, 30.

The Contract has two "Governing Law" clauses, which both invoke Puerto Rico law. <u>Id.</u> at 1–2, 5, 28. The Contract states that BCMG Capital's "principal place of business and registered office" shall be in San Juan, Puerto Rico. <u>Id.</u> at 5. The Contract also includes an arbitration clause, which requires all dispute between the Members to be resolved by arbitration, in Spanish, in San Juan, Puerto Rico. <u>Id.</u> at 25–26. Finally, the Contract includes "Integration" and "No Third Party Beneficiary Clauses." <u>Id.</u> at 28.

V.     **The McOsker Parties Allege that Mr. Hanratty Did Not Finance the CRIM Proposal, and Attempt to Defend Against Plaintiffs' Amended Complaint**

The Counterclaim devotes several dozen paragraphs to claim that (1) "[Mr.] Hanratty and [ESC] were unable to provide their own funds to finance the day-to-day operations of the CRIM Proposal" and therefore "employed alternate means to attempt to obtain the necessary financing," purporting to give examples of Mr. Hanratty's attempts to find "a financing line" and the "alternate means," including a bridge loan; and (2) push back against Plaintiffs' well-pleaded RICO, breach of contract, and conspiracy allegations. <u>Id.</u> ¶¶ 45–81; <u>see also generally</u> Order.

For example, the Counterclaim alleges that "[Mr.] Hanratty notified [Messrs.] Kernan, Vasquez, McOsker, and several companies of McOsker, that there was only one week left to achieve the financing facility and that they make the corresponding preparations," and that "[Mr.]

Hanratty knew these statements were false when made," but does not explain what harm Mr. Hanratty's urgency caused. Id. ¶ 68.

Similarly, the Counterclaim alleges that [Mr.] Hanratty moved his cousin, attorney [and Third-Party Defendant] Patrick Seymour, to the [shared] BCMG office to document and craft a legal case against [Mr.] McOsker and other individuals and entities while rifling through secure documents and assets under the cover of night." Id. ¶ 69. However, it does not explain why Messrs. Hanratty and Seymour could not look through their own files, in their own office, after dark—let alone explain how that activity, lawful or not, hurt the McOsker Parties, other than claiming that "[Mr.] Hanratty and his companies" eventually filed "a string of meritless and slanderous lawsuits" against the McOsker Parties. Compare generally id. and id. ¶ 83; but see Order at 10 (refusing to dismiss Plaintiffs' RICO, breach of contract, or conspiracy claims against the McOsker Parties); Parks Decl. ¶ 3 (discovery has begun in the Puerto Rico case).

Then, "[s]uddenly, [Mr.] Hanratty decided to leave the BCMG offices." Id. ¶ 82. Again, the McOsker Parties neither specify the time frame, nor explain what was "sudden" or why this "suddenness" matters, though they do claim that Mr. Hanratty and his employees, Mr. Seymour and Ms. Vega, "stole[] or took digital copies" "certain certificates of tax encumbrances" that belong to "Carry Trade"—an entity in which Messrs. Hanratty and McOsker were "equal partners." Id. ¶¶ 82–83. The McOsker Parties further claim that Messrs. Hanratty and Seymour and Ms. Vega "stole[] or took digital copies" of "other items," yet admit that they have no idea whether this is true. Id. ¶ 83 ("It is unclear what other items [Mr.] Hanratty, [Ms.] Vega, and [Mr.] Seymour stole, or took digital copies of [ . . . ]").

9

## VI.    The McOsker Parties Claim that Mr. Hanratty Did Not Give Them Full Access to the Ebury Parties, and "Slandered" Them When He Sued

"The very next day," "[Mr.] McOsker was served with" a copy of Plaintiffs' first federal complaint, filed in the District of Puerto Rico, "begin[ning] a string of meritless and scandalous lawsuits filed by [Mr.] Hanratty and his companies against [Mr.] McOsker and his companies:"

> Not only did [Mr.] Hanratty file the scandalous and deceitful complaints in Puerto Rico and the Federal District Court for the District of Delaware, he also dedicated himself to spread this false information among relevant persons in the market of tax encumbrances of the United States, which caused damages to the reputation of [Mr.] McOsker and to the goodwill of BCMG, LLC and affiliated entities of subsidiaries. [Mr.] Hanratty's false and slanderous statements include, but are not limited to:
>
> a.  Falsely reporting to the Puerto Rican government that [Mr.] McOsker was defrauding the Puerto Rican Government related to tax credits;
> b.  Falsely reporting to the Puerto Rican Office of Industrial Tax Exemption that BCMG International was engaged in fraudulent acts;
> c.  Falsely reporting to the Puerto Rican Department of Economic Development that [Mr.] McOsker was defrauding the Puerto Rican Government related to tax credits;
> d.  Falsely reporting to the Puerto Rican Industrial Development Company that McOsker was defrauding the Puerto Rican Government related to tax credits;
> e.  Falsely reporting to the Puerto Rican Treasury Department (Hacienda) that McOsker was defrauding the Puerto Rican Government related to tax credits;
> f.  Falsely reporting to certain banking institutions in Puerto Rico that [Mr.] McOsker was defrauding the Puerto Rican Government related to tax credits;
> g.  In 2019[,] falsifying statements and directing Dudley at Laveer Capital to create a false paper trail he would later attempt to use to have OITE cancel the decree of BCMG International;
> h.  In 2019[,] falsely accusing [Mr.] McOsker of stealing from his friend and colleague Robert Sanchez in a building partnership;[]
> i.  In 2019, approaching former members of the MapPlus team in order to falsely accuse [Mr.] McOsker of some of the allegations in this Amended Complaint[; and]
> j.  Falsely informing multiple fund managers in the tax lien industry over the course of 2019–2021, and possibly ongoing, that [Mr.] McOsker stole his funds related to the four trades at issue.

Id. ¶¶ 84–86. To support their Libel claim, the McOsker Parties also claim that "[i]n 2019," Mr. Hanratty "direct[ed] Dudley at [Laveer] Capital via text message as to how to attempt to bully BCMG employees via email." Id. ¶ 98(g).

The McOsker Parties provide no further detail regarding these "false and statements" statements—no identification of when Mr. Hanratty made these statements, no explanation of what, exactly, Mr. Hanratty actually said, and no explanation of why any of these statements were "false report[s]." See generally id.

The McOsker Parties also claim that Mr. Hanratty "attempted to use the dispute between the parties and the filing of his complaint to prevent BCMG Technologies and BCMG Services to be granted a tax credit," which "delay[ed] the tax credit." Id. ¶ 87. Again, the McOsker Parties do not identify when, exactly, Mr. Hanratty "attempted to use the dispute;" why they believe that he did so in order "to prevent BCMG Technologies and BCMG Services" from being granted tax credits; or what, exactly, Mr. Hanratty actually did. See generally id.

Finally, the McOsker Parties claim that "Plaintiffs / Counterclaim Defendants / Third-Party Defendants" engaged in various "acts of concealment," such as "insist[ing]" that the McOsker Parties not speak directly with Mr. Xie, "insist[ing]" that Messrs. Hanratty and McOsker speak verbally instead of in writing," "bull[ied]" and "used intimidated to dissuade individuals from questioning his requests and behavior," "concealed" and "refused to confirm" assorted financial information of the Ebury Entities, and "[f]rom fall 2018 to Winter 2019," "played a 'wait and see' game." See Countercl. ¶ 90.

The McOsker Parties claim that Mr. Hanratty is liable for violating RICO §§ 1962(c) and (d), and also sue him for "Fraud / Fraudulent Inducement," "Tortious Interference with Prospective Economic Advantage / Business Relations," "Tortious Interference with Contractual Relations,"

Conversion, Civil Conspiracy, Unjust Enrichment, "Defamation (Slander / Slander per se)," and "Defamation (Libel)." See generally id.

## VII. The McOsker Parties Allege Nearly No Facts About the Ebury Employees' or Entities' Conduct

Besides their 10 claims against Mr. Hanratty, the McOsker Parties also sue the Ebury employees and entities for Unjust Enrichment, Conversion, Civil Conspiracy, and RICO § 1962(d) conspiracy. See generally id.

### A. The Ebury Employees

The McOsker Parties claim that the employees "acted closely with [Mr. Hanratty], knowing that they were engaging in illegal conduct and stealing from others," including "to steal, transfer, and conceal assets, including client funds, partner money, and partner tax lien certificates in order to enrich themselves to the detriment of their clients and partners." Countercl. ¶¶ 116–17. The McOsker Parties' allegations against each individual employee begin and end with:

#### 1. Sarah Wells

Sarah Wells is Hanratty's personal assistant and functioned as the office manager for Ebury St.'s New York office. From at least the formation of the partnership in 2017 to the present, at Hanratty's instruction, Wells would notarize documents on Hanratty's behalf while Hanratty was neither present nor in the same state when said notarizations occurred. Further, at the direction of Hanratty, Wells assisted in improperly transferring assets among the Entity Members (defined herein) in order to hide the assets from clients and partners in order to enrich the Individual Members (defined herein). Wells also acted as HR manager for Hanratty's various companies and dealt with his frequent and explosive hiring and firing of his undocumented Philippine team, who had insecure access to financial information for Ebury Funds, investors, credit lines, and other financial information, as well as working with Dennisse Méndez to pay their compensation and health insurance via offshore shell companies.

Countercl. ¶ 93; see also id. ¶ 131(v) (alleging that Ms. Wells "improperly notarize[d] documents"); id. ¶ 161(a) (repeating most of ¶ 93 verbatim); 3PC ¶ 48(b) (same).

### 2.     Dennisse Méndez

Dennisse Méndez is Ebury's Director of Operations, and at Hanratty's request and instruction, manages Ebury St.'s tax lien and real estate asset portfolios. As set forth herein, at the direction of Hanratty, Méndez assisted in improperly transferring assets among the Entity Members in order to hide the assets from clients and partners to enrich the Individual Members. Further, Méndez worked with Wells to assist in paying the undocumented Philippine team' compensation and health insurance via offshore shell companies. While a documented employee with BCMG, including the accompanying confidentiality, non-solicitation, and noncompetition, she facilitated the fraud with Hanratty pre and post exit.

Countercl. ¶ 94; see also id. ¶ 161(c) (repeating much of id. ¶ 94 verbatim, with no additional information); id. ¶ 90 3PC ¶ 48(c) (same); Countercl. ¶ 56 ("On information and belief," Ms. Méndez "marked these $5.3 million in assets on the books of the fund without paying for them, and it is unclear what cost basis they falsified to this effect"); id. ¶ 82 (alleging that Ms. Méndez helped manage ESC employees and independent contractors and "had to talk to the office manager of the Philippines team[], who later resigned").

### 3.     Shirley Vega

Shirley Vega is an employee working for Ebury. As set forth herein, Vega assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019. Further, at the direction of Hanratty, Vega assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members.

Countercl. ¶ 95; accord id. ¶ 161(d) (repeating ¶ 95 verbatim); 3PC ¶ 48(d) (same).

The McOsker Parties further allege that "[o]n or about June 2019," "over a weekend," Ms. Vega and Messrs. Hanratty and Seymour "stole, or took digital copies of" "documents and assets" "over a weekend when they vacated the office." Countercl. ¶¶ 69, 82–83, 136; but see ¶ 83 ("It is unclear what other items [Mr.] Hanratty, [Ms.] Vega, and [Mr.] Seymour stole, or took digital copies of, over the weekend between when [Mr.] Hanratty informed [Mr.] McOsker that he was moving offices and the first complaint was filed, or any time beforehand for that matter.").

### 4.     John Bronzo

John Bronzo was an attorney working for Ebury St. who was eventually promoted to the position of Ebury St.'s General Counsel. At Hanratty's instruction, Bronzo would initiate foreclosure procedures on certain tax lien certificates and process the necessary paperwork to obtain title to these acquired properties. There were several instances where Hanratty would instruct Bronzo to obtain title over a property in the benefit of a different entity than the original investor entity, thereby defrauding some investors to the benefit of others, while inflating asset value to obtain bank loans and/or mortgages. Further, at the direction of Hanratty, Bronzo assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members.

Countercl. ¶ 96; accord id. ¶ 161(e) (repeating ¶ 96 verbatim); 3PC ¶ 48(e) (same). The McOsker

Parties also accuse Mr. Bronzo of the same "theft" that occurred "[o]n or about June 2019." Id. ¶¶

136–37

### 5.     Patrick Seymour

Patrick Seymour was Ebury's General Counsel who replaced Bronzo in this role. Seymour assisted Hanratty and others in actively stealing tax certification and other valuable information from BCMG offices in June 2019. Further, at the direction of Hanratty, Seymour assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members.

Countercl. ¶ 97; accord id. ¶ 161(f) (repeating ¶ 97 verbatim); Third-Party Complaint ("**TPC**") ¶

48(f) (same). The McOsker Parties claim that Mr. Seymour worked out of the BCMG office "to

document and craft a legal case against [Mr.] McOsker and other individuals and entities while

rifling through secure documents and assets under the cover of night." Id. ¶ 69; see also id. ¶ 90(t)

("Under the guise of 'helping with the CRIM portfolio,' [Mr.] Hanratty concealed his cousin

Seymour's actions, undertaken in BCMG offices day and night"). They also accuse Mr. Seymour

of the "theft" that occurred "[o]n or about June 2019." Id. ¶¶ 69, 83, 136–37.

**6.    Ping Xie**

Ping Xie is Ebury St.'s Chief Financial Officer and assisted in improperly transferring assets among the Entity Members to hide the assets from clients and partners to enrich the Individual Members, assisted in improperly moving assets into foreign entities located in the British Virgin Islands in order to hide the assets from clients, partners, and the United States Internal Revenue Service to enrich the Individual Members and defraud the United States Government. Xie knowingly falsified borrowing bases and redemption reports to present to Ebury St.'s servicers, lenders, potential lenders, investors, potential investors, and auditors.

Countercl. ¶ 98; accord id. ¶ 161(g) (repeating most of ¶ 98 verbatim, without adding additional information); TPC ¶ 48(g) (same). "On multiple occasions over the course of 2018 and 2019 Hanratty, Ping, and Méndez [falsely] represented to their current and prospective lenders and investors that Ebury Fund 1 and Fund 2 owned the Carry Trade, BFNH, and Lepper Line assets, free and clear of all incumbrances, and represented that they were worth 100% of redemptive value." Countercl. ¶ 146.

The McOsker Parties also allege, "[o]n information and belief," that Messrs. Hanratty, Xie, and Ms. Méndez "marked[] $5.3 million in assets on the books of the fund without paying for them, and it is unclear what cost basis they falsified to this effect." Id. ¶ 56. The McOsker Parties do not provide any facts explaining this "information and belief." See generally Countercl.; TPC.

**B.  The Ebury Entities**

The McOsker Parties again plead legal conclusions that the Court may exercise personal jurisdiction over the Ebury Entities and that this District is an appropriate venue for this dispute. See Countercl. ¶ 19 (personal jurisdiction); id. ¶ 20 (venue); TPC ¶ 29 (personal jurisdiction); id. ¶ 32 (personal jurisdiction); id. ¶ 33 (venue).

1.      **Ebury Street Capital, LLC**

The only facts that the McOsker Parties plead regarding ESC's alleged acts or omissions are that ESC (1) "is a fund controlled by [Mr.] Hanratty and acts as the General and Managerial Partner of Ebury Fund I, LP; Ebury Fund 2, LP; and Ebury RE, LLC," (2) "conducted a series of transactions with the firm GFI Group where [Mr.] McOsker worked" and met Mr. Hanratty, (3) "distributed $3,793,679 to Ebury Fund I, LP ("**Fund 1**") investors between July 1, 2018 and February 19, 2018, despite [sic] Fund 1 current assets being listed at $1,918,787.49 as of December 31, 2018," and (4) "were unable to provide [its] own funds to finance the day-to-day operations of the CRIM Proposal" and "employed alternate means to obtain the necessary financing." Countercl. ¶¶ 26, 45, 51–52, 100; TPC ¶ 48(l).

2.      **EB 1EMIALA, LLC**

The McOsker Parties' only factual allegation regarding this Entity is: "EB 1EMIALA, LLC is an Alabama limited liability company with a principal place of business at 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907." Countercl. ¶ 2.

3.      **EB 2EMIALA, LLC**

The McOsker Parties' only factual allegation regarding this Entity is: "EB 2EMIALA, LLC is an Alabama limited liability company with a principal place of business at 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907." Countercl. ¶ 3.

4.      **Ebury Fund 1 NJ LLC**

The McOsker Parties' only factual allegation regarding this Entity is: "Ebury Fund 1 NJ, LLC is a New Jersey limited liability company with a principal place of business at 644 Avenida

Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907." Countercl. ¶ 4.

**5.      Ebury Fund 2 NJ, LLC**

The McOsker Parties' only factual allegation regarding this Entity is: "Ebury Fund 2 NJ, LLC is a New Jersey limited liability company with a principal place of business at 644 Avenida Fernandez Juncos, District View Office Center, Suite 203, San Juan, Puerto Rico 00907." Countercl. ¶ 5.

**6.      EB Levre I, LLC**

The McOsker Parties' only factual allegation regarding this Entity is: "EB LVERE I, LLC is a Delaware limited liability company that the Hanratty Enterprise uses to hold real estate assets and assist in the improper transfer of assets between entities." Countercl. ¶ 101; accord id. ¶ 161(i) ("EB LEVRE I, LLC is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners."); TPC ¶ 48(j) (repeating ¶ 161(i) verbatim).

**7.      Ebury Fund I, LP**

The McOsker Parties' only factual allegation regarding this Entity is: "Ebury Fund I, LP, is a Delaware limited partnership that the Hanratty Enterprise uses to comingle and hide funds from investors and partners. For example, [ESC] distributed $3,793,679 to Ebury Fund 1, LP ("Fund 1") investors between July 1, 2018 and February 19, 2019, despite [sic] Fund 1 current assets being listed at $1,918,787.49 as of December 31, 2018." Countercl. ¶ 102; accord id. ¶ 161(j) (repeating ¶ 102 verbatim); TPC ¶ 48(l) (same). It is not clear whether the McOsker Parties are alleging that "Ebury Fund I, LP" and "Ebury Fund 1, LP" are the same Entity. See generally Countercl.

### 8.    Ebury Fund 2, LP

The McOsker Parties' only factual allegation regarding this Entity is:

> Ebury Fund II, LP, is a Delaware limited partnership that the Hanratty Enterprise
> uses to comingle and find funds from investors and partners. For example, McOsker
> pledged assets held by Carry Trade LLC and BFNH, LLC to BCLF Rev. I, LLC,
> where Hanratty and McOsker were partners. Hanratty subsequently caused BCLF
> Rev. I LLC and/or its assets to be transferred to Ebury Fund 2, LP, solely owned
> by Hanratty and/or his affiliated companies.

Countercl. ¶ 103; <u>accord</u> <u>id.</u> ¶ 161(k) (repeating ¶ 103 verbatim); <u>id.</u> ¶ 48(m) (same). It is not clear

whether the McOsker Parties are alleging that "Ebury Fund 2, LP" and "Ebury Fund II, LP" are

the same Entity. <u>See generally</u> Countercl.

### 9.    EB 1EMIDC, LLC

The McOsker Parties' only factual allegation regarding this Entity is: "EB 1EMIDC, LLC,

is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide

funds from investors and partners." Countercl. ¶ 104; <u>accord</u> <u>id.</u> ¶ 161(l) (repeating ¶ 104

verbatim); TPC ¶ 48(k) (same).

### 10.    Red Clover 1, LLC

The McOsker Parties' only factual allegation regarding this Entity is:

> Red Clover 1, LLC, is a Delaware limited liability company that the Hanratty
> Enterprise uses to comingle and hide funds from investors and partners. For
> example, McOsker pledged assets held by Carry Trade LLC and BFNH, LLC to
> BCLF Rev. I, LLC, where Hanratty and McOsker were partners. Hanratty
> subsequently caused BCLF Rev. I LLC and/or its assets to be transferred to Ebury
> Fund 2, LP, solely owned by Hanratty and/or his affiliated companies. Hanratty
> then assigned or transferred said assets to Red Clover 1, LLC to hide said assets
> from McOsker and affiliated entities as well as his own investors.

Countercl. ¶ 105; <u>accord</u> <u>id.</u> ¶ 161(m) (repeating ¶ 105 verbatim); TPC ¶ 48(n) (same).

### 11.   White Clover 1, LLC

The McOsker Parties' only factual allegation regarding this Entity is: "White Clover 1, LLC, is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners." Countercl. ¶ 106; accord id. ¶ 161(n) (repeating ¶ 106 verbatim); TPC ¶ 48(o) (same).

### 12.   Black Clover I, LLC

The McOsker Parties' only factual allegation regarding this Entity is: "Black Clover I, LLC is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners." Countercl. ¶ 107; accord id. ¶ 161(o) (repeating ¶ 107 verbatim); TPC ¶ 48(p) (same).

### 13.   Ebury Fund IC1, LLC

The McOsker Parties' only factual allegation regarding this Entity is: "Ebury Fund IC1, LLC, is a Delaware limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners." Countercl. ¶ 108; accord ¶ 161(p) (repeating ¶ 108 verbatim); TPC ¶ 48(q) (same).

### 14.   Ebury Fund 2CI, LLC

The McOsker Parties' only factual allegation regarding this Entity is: "Ebury Fund 2CI, LLC is a Delaware limited liability company that Hanratty uses to comingle and hide funds from investors and partners." Countercl. ¶ 161(q); accord TPC ¶ 48(s) (repeating id. verbatim).

### 15.   Ebury RE, LLC

The McOsker Parties' only factual allegation regarding this Entity is: "Ebury RE, LLC is a New Jersey limited liability company that the Hanratty Enterprise uses to comingle and hide funds from investors and partners." Countercl. ¶ 109; TPC ¶ 48(r) (repeating id. verbatim).

## LEGAL STANDARD

"A plaintiff cannot convert a fact-free, inadequate claim into a viable cause of action by merely adding meaningless adjectives or adverbs." Harris v. Goderick, No. 05-22039-CIV, 2012 WL 12542429, at *6 (S.D. Fla. Oct. 5, 2012), R&R adopted sub nom., No. 05-22039-CIV, 2013 WL 11319432 (S.D. Fla. May 6, 2015), aff'd sub nom., 608 F. App'x 760 (11th Cir. 2015) (citations omitted) ("Regardless of whether Plaintiff uses words like 'clearly,' 'obviously,' or 'indisputably,' the [Court's] focus is on the substance of the factual allegations, not the adverbs or adjectives a litigant uses.").

"[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (citation omitted). If "the factual detail in a complaint is so undeveloped that it does not provide a defendant the type of notice of claim which is contemplated by Rule 8," the Court must dismiss the pleading. Id. at 232.

Therefore, to survive this Motion, the McOsker Parties' Counterclaim must plead "facts to state a claim that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). While the Court should "assume the[] veracity" of the Counterclaim's "well-pleaded factual allegations," its conclusory allegations "are not entitled to [this] assumption." Ashcroft v. Iqbal, 556 U.S. 662, 680 (2009); see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (citing Phillips, 515 F.3d at 232–33) (Iqbal "provides the final nail-in-the-coffin for [Conley v. Gibson's] 'no set of facts' standard").

While the Court must assume that the McOsker Parties "can prove the **facts**" they allege, it cannot assume that they "can prove facts that [they have] not alleged," or that the Ebury Parties

"have violated the [] laws in ways that [the McOsker Parties] have not[] alleged." Associated Gen. Contractors of Cal., Inc. v. Cal. State Council, 459 U.S. 519, 526 (1983) (emphasis added). Accordingly, "[w]here a pleading party elects to inundate other litigants with copious factual and legal allegations," it should "provide reference in each count as to which factual allegations it alleges support that count." Island Airlines, LLC v. Bohlke, No. SX-2016-CV-00404, 2022 WL 474132, at *10 n.7 (D.V.I. Feb. 14, 2022).

## ARGUMENT

### I.        Puerto Rico Law Governs the McOsker Parties' Common Law Claims

The McOsker Parties invoke this Court's supplemental jurisdiction to hear their common law claims Countercl. ¶¶ 155–82 (RICO § 1962(d), Conversion, Breach of Contract); TPC ¶¶ 35–101 (RICO § 1962(c), RICO § 1962(d), "Fraud / Fraudulent Inducement," "Tortious Interference with Prospective Business Advantage / Business Relations," "Tortious Interference with Contractual Relations," Conversion, Civil Conspiracy, Unjust Enrichment, "Defamation (Slander / Slander per se)," "Defamation (Libel")). While they do not specify which jurisdiction's law controls any of these claims, they do allege that all of this wrongful conduct occurred when Messrs. Hanratty and McOsker both lived and worked in San Juan, Puerto Rico, including when they shared office space. See generally id.

Where, as here, more than one state's law could apply, this Court must apply Delaware's choice-of-law standards to determine which law controls. See Chin v. Chrysler LLC, 538 F.3d 272, 278 (3d Cir. 2008) (federal court applies choice-of-law principles of forum state). The Court must decide choice of law on an issue-by-issue basis, i.e. apply dépeçage. Whitwell v. Archmere Acad., Inc., 463 F. Supp. 2d 482, 485 (D. Del. 2006) (citing Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006)).

Since 1991, Delaware has resolved choice of law questions pursuant to a "most significant relationship" test derived from the Restatement (Second) of Conflict of Laws (the **Second Restatement**"). Certain Underwriters at Lloyds, London v. Chemtura Corp., 160 A.3d 457, 464–65 (Del. 2017) (citing Travelers Indem. Co. v. Lake, 594 A.2d 38, 46–47 (Del. 1991)).

Seven considerations are generally applicable to all "most significant relationship" questions: (1) interstate and international systems' needs, (2) the forum's relevant policies, (3) other interested states' relevant policies, as well as those other states' relative interests in determining the issue; (4) protecting the parties' justified expectations, (5) that field of law's basic underlying policies, (6) certain, predictable, and uniform results, and (7) the ease of determining and applying the applicable law. Lake, 594 A.2d at 47 (quoting Restatement (Second) of Conflicts § 6).

### A. The BCMG Capital Contract Includes Two Puerto Rico "Governing Law" Clauses

If a written contract includes a choice-of-law clause, the Court must apply the specified law so long as it has a "material relationship to the transaction." In re OSC 1 Liquidating Corp., 529 B.R. 825, 831–32 (Bankr. D. Del. 2015) (citation omitted). If a contract is oral or otherwise lacks a choice-of-law clause, the Court considers Second Restatement § 188's five factors to determine which state has the "most significant relationship:" (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties. Chemtura, 160 A.3d at 465 (citing Restatement (Second) of Conflicts § 188).

Here, the only pleaded agreement—the BCMG Capital Contract—includes not one, but two "Governing Law" clauses, which both state that Puerto Rico law governs the Contract. See BCMG Capital Contract §§ 2.1, 13.12. Accordingly, Puerto Rico law governs the Contract Claim.

### B. The McOsker Parties' Tort Claims Arise out of Puerto Rico Contacts Between Puerto Rico Residents

To determine which law controls a tort claim, Delaware considers (a) "the place where the injury occurred," (b) "the place where the conduct causing the injury occurred," (c) "the domicil, residence, nationality, place of incorporation and place of business for the parties," and (d) "the place where the relationship, if any, between the parties is centered." Penn. Emp. Benefit Tr. Fund v. Zeneca, Inc., 710 F .Supp. 2d 458, 468 (D. Del. 2010) (citing Restatement (Second) of Conflicts § 145). Delaware applies a "more specific" version of this test "where fraud or misrepresentation is at issue:" if "the plaintiff's action in reliance occurred in the same state where the false representation was made, that state's law controls." Id. (citing Restatement (Second) of Conflicts § 148).

Therefore, Puerto Rico law governs the tort claims: all of the allegedly-tortious activity (1) occurred in Puerto Rico, (2) by Ebury Parties living and working in Puerto Rico, (3) against McOsker Parties living and working in Puerto Rico. See generally Countercl.; TPC.

## II.   The McOsker Parties Fail to Plead the Existence of Any Contract Enforceable Against Any Ebury Parties, Let Alone Breach-of-Contract's Other Elements

### A.   The McOsker Parties Do Not Explain Who Should Defend Themselves Against the Breach-of-Contract Claim

As a threshold matter, Counterclaim Count III's failure to identify who, exactly, was a party to—let alone breached—a contract with any McOsker Party is reason enough for this Court to dismiss the contract claim. Accord Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (citation omitted) (a complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.").

While the Counterclaim titles the cause of action as "Against Ebury St.," its explanatory allegations suggest that the McOsker Parties might be trying to allege breach of contract against Mr. Hanratty personally, or perhaps Mr. Hanratty and specified entities. See Countercl. ¶ 174 ("On or about September 2018 Messrs. Hanratty and McOsker entered into the Agreement related to the CRIM Proposal [ . . . ]"); id. ¶ 177 ("Hanratty and his companies did not comply with **their** obligations [ . . . ]") (emphasis added); id. ¶ 179 ("Hanratty and his companies' breaches [ . . . ]"); id. ¶ 182 ("Hanratty's breaches [ . . . ]").

Because the claim's nine explanatory paragraphs do not even decide which "defendant is liable for the misconduct alleged," the Court should dismiss Count III. Accord Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570) (the facts alleged must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

24

### B. The McOsker Parties Cannot Enforce the BCMG Operating Agreement Against Any Ebury Party

The BCMG Capital Contract is the only agreement that the McOsker Parties attempt to enforce against any Ebury Party. See Countercl. ¶ 43. However, no Ebury Party is a party to the BCMG Capital Contract: its only parties are (1) Defendant BCMG Capital, LLC and (2) non-party Flamingo. See BCMG Capital Contract at 1, 4, 30.

Moreover, the Counterclaim does not even attempt to plead facts explaining why any Ebury Party could be bound by Flamingo's promises; it mentions Flamingo just once, pleading that it is a "Puerto Rico limited liability company wholly owned by [Mr.] Hanratty in his personal capacity [and] is a 49% partner–owner of BCMG Capital LLC." Id. ¶ 44. That single allegation falls far short of pleading any theory that could justify holding any Ebury Party to Flamingo's promises. Accord In re Garrido Jimenez, 455 B.R. 51, 57 (D.P.R. 2011) (citing 31 L.P.R.A. § 3374) (Under Puerto Rico law, a "contract shall only be valid between the parties who execute them and their heirs").

Finally, not a single one of the Ebury Parties' allegedly-wrongful acts breaches any BCMG Capital Contract term. Compare generally BCMG Capital Contract and Countercl. The McOsker Parties fail to plead their Contract Claim.

### III. The McOsker Parties' Torts are Time-Barred

Puerto Rico's one-year statute of limitations bars all of the McOsker Parties' tort claims. See, e.g., Flovac, Inc. v. Airvac, Inc., 84 F. Supp. 3d 95, 105–06 (D.P.R. 2015) (tortious interference); Martinez Colon v. Santander Nat'l Bank, 4 F. Supp. 2d 53, 57 (D.P.R. 1998) (defamation and libel); Ocaso, S.A. Compañia de Seguros y Reaseguros v. Puerto Rico Maritime Shipping Authority, 915 F. Supp. 1244, 1261 (D.P.R. 1996) (fraud, fraudulent misrepresentation,

and civil conspiracy); <u>Barreto Peat, Inc. v. Luis A. Ayala Colon Sucrs., Inc.</u>, 709 F. Supp. 321, 323 (D.P.R. 1989) (citing 31 L.P.R.A. § 5298) (conversion).

To the extent that the Counterclaim gives the reader any temporal context, it appears that the McOsker Parties' conversion, unjust enrichment, fraud, and civil conspiracy claims arise out of commercial activity that occurred no later than 2019, when the McOsker and Ebury Parties stopped working together. <u>See generally</u> Countercl. The Counterclaim provides no temporal information at all to explain when Mr. Hanratty allegedly defamed the McOsker Parties. <u>See generally</u> <u>id.</u>

Because not one of the McOsker Parties' tort claims remained viable on February 12, 2021—when Plaintiffs initiated this Delaware Litigation—the Court must dismiss all of them as time-barred. <u>Cf.</u> <u>MirTech v. AgroFresh Inc.</u>, 561 F. Supp. 3d 447, 458 (D. Del. 2021) (citation omitted) (observing that the filing of a complaint tolls the statute of limitations governing a compulsory counterclaim, but does not toll the time to file an affirmative counterclaim).

## IV.    **Tardiness Aside, the McOsker Parties Fail to Plead Their Torts' Elements**

### A.  **Conversion**

In Puerto Rico, conversion is not just "the simple acquisition of another's property," but instead "the malicious and wrongful privation of the ownership rights, the illegal exercise, or the assumption of authority over another's property, use and enjoyment." <u>Fed. Ins. Co. v. Banco de Ponce</u>, 582 F. Supp. 1388, 1393 (D.P.R. 1984), <u>aff'd</u>, 751 F.2d 38 (1st Cir. 1984) (citing <u>Hull Dobbs Co. v. Superior Court</u>, 81 P.R.R. 214, 222 (P.R. 1959); <u>Heirs of Sorbá v. Viñas</u>, 49 P.R.R. 31 (1935)). Accordingly, the McOsker Parties must plead that (1) each defendant's "malicious and wrongful privation" of (2) the McOsker Parties' ownership rights (2) actually and proximately

caused (3) the McOsker Parties' damages. <u>Montalban v. Centro Com. Plaza Carolina</u>, 132 D.P.R. 785, 795–96 (1993); <u>Banco de Ponce</u>, 751 F.2d at 42.

Because the McOsker Parties fail to plead facts showing each and every Party "maliciously" and "wrongfully privat[ed]" the McOsker Parties' "ownership rights," the Court should dismiss the conversion claims—Counterclaim Count II and Third-Party Complaint Count VI. <u>See generally</u> Countercl.

### B. Tortious Interference

As a threshold matter, there is no such thing as a "tortious interference with prospective economic advantage / business relations" claim in Puerto Rico. <u>A.M. Capen's Co. v. Am. Trading & Prod. Corp.</u>, 200 F. Supp. 2d 34, 48–49 (D.P.R. 2002); <u>see also</u> <u>Gen. Office Prods. Corp. v. A.M. Capen's Sons, Inc.</u>, 115 P.R. Dec. 553, 558–59, 1984 WL 270915 (P.R. 1984) (holding that because a fixed-term contract is "indispensable," there is no tortious interference claim "[i]f what is affected is [ . . . ] a profitable financial relationship where there is no contract").

Instead, Puerto Rico only recognizes tortious interference with contract, and only if the claimant pleads (1) the existence of a contract (2) that has a fixed length of time, (3) the defendant had prior knowledge of that contract, (3) the defendant maliciously caused (4) the third party to break the contract, and (5) the plaintiff suffered resulting damages. <u>See, e.g.</u>, <u>New Comm. Wireless Servs., Inc. v. SprintCom, Inc.</u>, 287 F.3d 1, 9–10 (1st Cir. 2002) (citing <u>General Office</u>, 115 P.R. Offic. Trans. at 734); <u>R.R. Isla Verde Hotel Corp. v. Howard Johnson Int'l, Inc.</u>, 121 Fed. App'x. 870, 871 (1st Cir. 2005).

By failing to allege the relevant facts, including (1) the PRIDCO contract had a fixed time, (2) the PRIDCO contract's terms, (3) the PRIDCO contract's counterparty breached the contract, or (4) Mr. Hanratty caused the counterparty to breach the contract, the McOsker Parties fail to

plead tortious interference. <u>Accord</u> <u>Triangle Cayman Asset Co. v. LG & AC, Corp.</u>, Civ. No. 16-2863 (FAB), 2018 WL 10581534, at *1 (D.P.R. Aug. 3, 2018), <u>aff'd</u>, 52 F.4th 24 (1st Cir. 2022) (dismissing tortious interference claim where, <u>inter alia</u>, claimant failed to cite to contract's fixed terms). Accordingly, the Court should dismiss Third-Party Complaint Counts IV and V.

### C.  Defamation

"Puerto Rico has codified the basic features of the Anglo-Saxon common law governing defamation" and recognizes "the traditional defense of privilege," including "the absolute privilege to report judicial proceedings." <u>Gierbolini Rosa v. Banco Popular de Puerto Rico</u>, 930 F. Supp. 712, 716–17 (D.P.R. 1996), <u>aff'd</u>, 121 F.3d 695 (1st Cir. 1997); <u>see also, e.g.</u>, <u>Colon v. Bladés</u>, 914 F. Supp. 23 193, 197–98 (D.P.R. 2012) (Puerto Rico defamation's elements are (1) negligently false statement of fact (2) about the plaintiff (3) published to a third party; "merely hyperbolic" statements "are not defamatory").

Therefore, a communication is privileged *per se* if, <u>inter alia</u>, it is made "[i]n a fair and true report of a judicial legislative, official or other proceedings, or of anything said in the course thereof," or to a Puerto Rico "official upon probable cause with the intention of serving the public interest or of securing the redress of a private wrong." <u>Gierbolini</u>, 930 F. Supp. at 717 n.1 (quoting 32 L.P.R.A. § 3144).

All ten allegedly-wrongful statements are so vague that it is highly questionable whether they meet Rule 8's low notice pleading standard. <u>See</u> TPC ¶¶ 92, 98.

Regardless, six of Mr. Hanratty's alleged ten "false and defamatory statements of fact" were *per se* privileged: "false[] report[s] to the Puerto Rican government" of the McOsker Parties' unlawful activity. <u>Id.</u> ¶¶ 92(a)–(f); <u>id.</u> ¶¶ 98(a)–(f). The remaining four all are "report[s]" of the Ebury Parties' various litigations against the McOsker Parties. <u>See</u> <u>id.</u> ¶¶ 92(g)–(i); <u>id.</u> ¶¶ 98(g)–

(j). And at least two could never have been defamatory at all: "directing Dudley at Laveer Capital" is not a "false statement of fact," and "accusing McOsker of stealing" is not a publication to a third party. See id. ¶ 92(g); id. ¶¶ 98(g)–(h). Therefore, the Court should dismiss Third-Party Complaint Counts IX and X.

### D.  Unjust Enrichment

In Puerto Rico, plaintiffs can **only** invoke unjust enrichment if the allegedly-wrongful behavior is not prohibited by any other law. Gov't of Puerto Rico v. Carpenter Co., 442 F. Supp. 3d 464, 476–77 (D.P.R. 2020). The claim is "unavailable if the plaintiff may seek other forms of relief," even if the plaintiff "fail[s] to sufficiently allege that claim." In re Fin. Oversight & Mgmt. Bd. for Puerto Rico, 578 F. Supp. 3d 267, 296 (D.P.R. 2021).

In claiming that the Ebury Parties' allegedly-wrongful behavior is prohibited by a panoply of other laws, the McOsker Parties plead themselves out of any unjust enrichment claim. Accord, e.g., Westernbank Puerto Rico v. Kachkar, Civ. No. 07-1606 (ADC/BJM), 2009 WL 6337949, at *29 (D.P.R. Dec. 10, 2009), report and recommendation adopted, 2010 WL 14165421, at *1 (D.P.R. Mar. 31, 2010) (inter alia, dismissing unjust enrichment claim; "That the defendants have failed to plead [their breach of contract, fraudulent inducement, and conversion] claims adequately to survive the motion to dismiss, or that [plaintiff's] affirmative defenses have defeated them, does not render the underlying tort and contract laws inapplicable to the situation."). The Court should dismiss Third-Party Complaint Count VIII.

**V.      The McOsker Parties Fail to Plead the Existence of Any RICO Enterprise, Let Alone Racketeering Activity that Injured them**

To plead a RICO § 1962(c) "Control" violation, the McOsker Parties must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, i.e. two predicate acts defined by statute, including indictable offenses under the mail and wire fraud statutes. Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004); 18 U.S.C. §§ 1341, 1343.

RICO claims rooted in fraud must be "pleaded with particularity" sufficient to satisfy Rule 9(b). Kolar v. Preferred Real Est. Invs., Inc., 361 F. App'x 354, 363 (3d Cir. 2010) (citing Lum, 361 F.3d at 224). Indeed, such claims "must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." Kolar, 361 F. App'x at 363 (quoting Western Assocs. Ltd v. Market Square Assocs., 235 F.3d 629, 637 (D.C. Cir. 2001)).

To plead a racketeering "pattern," the Counterclaim must allege that the racketeering acts are related and continuous—that they "amount to or pose a threat of criminal activity." Kolar, 361 F. App'x at 362–63 (citing H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989)). To plead continuity, a claimant must allege "a closed period of repeated conduct" that lasted "a substantial period of time," or "past conduct that by its nature projects into the future with a threat of repetition;" in other words, that the enterprise is a "long-term association that exists **for** criminal purposes." H.J. Inc., 492 U.S. at 241–42. While two predicate acts across ten years may state a RICO claim, predicate acts that occurred over a twelve-month period do not. Hughes v. Consol-Penn. Coal Co., 945 F.2d 594, 610–11 (3d Cir. 2011).

An isolated allegedly-fraudulent transaction "cannot by itself underpin a pattern of racketeering activity." Kolar, 361 F. App'x at 365 (citations omitted). Similarly, unlawful schemes that target just one or one class of victims do not "pose [a] future threat," and therefore also cannot

trigger RICO liability. Marshall-Silver Constr. Co. v. Mendel, 894 F.2d 593, 596–98 (3d Cir. 1990); see also id. at 598 (quoting H.J. Inc., 492 U.S. at 239) ("Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy the continuity requirement: Congress was concerned in RICO with long-term criminal conduct."). Moreover, "if the pattern requirement has any force whatsoever, it is to prevent [ . . . ] ordinary commercial fraud from being transformed into a federal RICO claim." Kolar, 361 F. App'x at 365 (quoting Menasco, Inc. v. Wasserman, 886 F.2d 681, 684 (4th Cir. 1989)).

Therefore, federal courts often dismiss RICO claims that arise out of disputed contractual obligations. See, e.g., Annulli v. Panikkar, 200 F.3d 189, 200 (3d Cir. 1999) ("[T]heft by deception, like a simple breach of contract or intentional interference with contract, is not a predicate act of racketeering activity enumerated in § 1961(1) [ . . . ] We will not read language into § 1962 to federalize every state tort, contract, and criminal law action."); Flip Mortgage Corp. v. McElhone, 841 F.2d 531, 538 (4th Cir. 1988) ("[T]his circuit will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims"); Blount Fin. Serv. Inc. v. Walter E. Heller & Co., 819 F.2d 151, 152 (6th Cir. 1987) (dismissing RICO claim in part because "[t]he fact that the parties take different positions under the contract [ . . . and defendant] thereby concealed or refused to disclose what the plaintiff considers the true prime rate called for under the contract, does not give a valid rise to a claim for fraud."); United States v. Kreimer, 609 F.2d 126, 128 (5th Cir. 1980) ("[T]he mail fraud act does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract.").

For example, in Kolar, the Third Circuit held that a plaintiff failed to plead its § 1962(c) claim where "the balance of the complaint" alleged very little "activity containing any 'deceptive elements,'" aside from one supposedly-fraudulent transaction. 361 F. Appp'x at 363. Instead, the

"essence" of the complaint was that the defendants had "'diverted and / or misappropriated monies due and payable' to him under purported claims of contractual right." Id. While the plaintiff tried to "characterize these contract-based claims of right as 'false' and 'fraudulent,'" "defendants' alleged conduct—even if wrongful as a matter of contract or other state law—was not fraudulent." Id.

And in Lum, the Third Circuit rejected a § 1962(c) claim rooted in allegations that "[e]ach month during the Class Period, Defendants mailed thousands of bank statements, advertisements for credit cards, contracts and promotional materials containing the fraudulent stated and artificially inflated interest rates to Plaintiffs and the Class in furtherance of their fraudulent scheme," and made "interstate phone calls and / or facsimile transmissions" promoting their alleged frauds. 361 F.3d at 224. By failing to "indicate the date, time, or place of any misrepresentation" or "provide an alternative means of injecting precision and some measure of substantiation into the fraud allegations," the plaintiffs fell short of Rule 9(b)'s particularity requirements. Id. at 225.

As in Lum, the McOsker Parties fail to plead any § 1962(c) violation "because their general allegations of fraud do not comply with Rule 9(b) and their specific allegations regarding particular transactions do not amount to fraud." Lum, 361 F.3d at 224. And as in Kolar, the "essence" of the McOsker Parties' allegations is that the Ebury Parties failed to live up to their contractual promises. See Kolar, 361 F. App'x at 363. Because the McOsker Parties' only alleged damages flow out of non-fraudulent, but failed, business endeavors, they state no RICO claim; and for the same reasons, the McOsker Parties' "Fraud / Fraudulent Inducement" claim fails; the Court should dismiss Counterclaim Count I and Third-Party Complaint Counts I, II, and III.

**VI.    The McOsker Parties Fail to Plead RICO or Civil Conspiracy**

Conspiracy's threshold element is affirmative agreement; therefore, a person cannot be convicted of agreeing to participate in a conspiracy if she does not know that the conspiracy even exists. United States v. Falcone, 311 U.S. 205, 210–11 (1940). Courts require proof of the defendant's actual knowledge in order to prevent liability based on merely tenuous or incidental connections with the enterprise. United States v. Viola, 35 F.3d 37, 45 (2d Cir. 1994) (citations omitted).

Therefore, to plead RICO § 1962(d) conspiracy, the Counterclaim must allege that each defendant (1) "agree[d] to commit the predicate acts" and (2) "[knew] that those acts were part of a pattern of racketeering activity conducted in such a way as to violate Section 1962(a), (b), or (c)." Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989) (quoting Odesser v. Continental Bank, 676 F. Supp. 1305, 1312 (E.D. Pa. 1987)).

Similarly, to plead civil conspiracy, the Counterclaim must allege specific "facts showing particularly what a defendant[] did to carry the conspiracy into effect, whether such acts within the framework of the conspiracy alleged,[] whether such acts, in the ordinary course of events, would proximately cause injury to the plaintiff," and that the defendant affirmatively agreed to perform those acts "in furtherance of the objects of the conspiracy." Rolon v. Rafael Rosario & Assocs., Inc., 450 F. Supp. 2d 153, 160–61 (D.P.R. 2006) (citation omitted).

Here, the Counterclaim pleads zero facts demonstrating any Ebury Entity or Employees' knowledge of the alleged RICO enterprise—let alone facts showing that any of those Ebury Parties affirmatively agreed to facilitate the conspiracy, or performed any acts that, "in the ordinary course of events, would proximately cause injury to the plaintiff." See Rolon, 450 F. Supp. 2d at 161; accord Rose, 871 F.2d at 336 (citing Black & Yates, Inc. v. Mahogany Ass'n, Inc., 129 F.2d 227,

231–32 (3d Cir.), <u>cert. denied</u>, 317 U.S. 672 (1942)) ("A conspiracy claim must[] contain supportive **factual** allegations") (emphasis added).

Because the Counterclaim fails to plead facts showing each and every Ebury Entity's or Employee's own knowledge of, role in, or agreement to violate RICO or commit any alleged tort against the McOsker Parties, the Court should dismiss both the RICO Conspiracy and Civil Conspiracy claims: Third-Party Complaint Counts II and VII. <u>Accord, e.g.</u>, <u>A-Valey Engineers, Inc. v. Bd. of Chosen Freeholders</u>, 106 F. Supp. 2d 711, 715 (D.N.J. 2000) (alterations omitted) (plaintiffs failed to state a claim against "'defendant corporations' [who] supplied the misrepresentations in issue;" "Pleadings containing collectivized allegations against 'defendants' do not satisfy Rule 9(b)."); <u>Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg</u>, 660 F. Supp. 1362, 1369 (D. Conn. 1987) (dismissing RICO complaint that "[did] not specify which defendants used mail or wire services, what was transmitted, or to whom it was sent").

## VII.    The Court Cannot Exercise Personal Jurisdiction Over the Third-Party Defendants

Finally, by failing to state any claim against any Third-Party Defendant, the Counterclaim also fails to allege this Court's jurisdiction over all of those Parties.

To survive this 12(b)(2) Motion, the McOsker Parties bear the burden of proving, by a preponderance of the evidence, that (1) there is a statutory basis for jurisdiction and (2) exercising jurisdiction comports with due process. <u>Jane Voe #2 v. Archdiocese of Milwaukee</u>, 700 F. Supp. 2d 653, 655 (D. Del. 2010) (citations omitted). To prove the defendant's minimum contacts, the McOsker Parties must produce "sworn affidavits or other competent evidence." <u>Id.</u> (quoting <u>Time Share Vacation Club v. Atlantic Resorts, Ltd.</u>, 735 F.2d 61, 67 n.9 (3d Cir. 1984)).

While the RICO statute authorizes federal service of process, the Counterclaim fails to plead the Third-Party Defendants' knowing agreement to and participation in any RICO

conspiracy. See id. And assuming that this Court would exercise supplemental jurisdiction even if the RICO claims failed, it could not exercise personal jurisdiction over the Third-Party Defendants because the Counterclaim fails to plead facts suggesting that even one of those Ebury Parties has a single contact with Delaware, let alone the minimum contacts necessary to satisfy due process. Accord Shoemaker v. McConnell, 556 F. Supp. 2d 351, 354–55 (D. Del. 2008) (citing 10 Del. C. § 3104)) (granting 12(b)(2) dismissal where Delaware resident sued Ohio residents for car crash that occurred in Ohio).

## CONCLUSION

The Counterclaim's failure to prove their "entitlement" to relief "with its facts" dooms each and every one of the McOsker Parties' claims. See Fowler, 578 F.3d at 211 (citing Phillips, 515 F.3d at 234–35). The Ebury Parties respectfully request that the Court dismiss the Counterclaim and Third-Party Complaint with prejudice.

Dated: November 14, 2022

|  | SMITH KATZENSTEIN & JENKINS LLP |
|---|---|
| Of Counsel: | /s/ Kathleen M. Miller |
|  | Kathleen M. Miller (No. 2898) |
| GUSRAE KAPLAN NUSBAUM PLLC | Julie M. O'Dell (No. 6191) |
|  | Brandywine Building |
| Kari Parks (pro hac vice) | 1000 N. West Street, Suite 1591 |
| 120 Wall Street, 25th Floor | Wilmington, Delaware 19801 |
| New York, New York 10005 | (302) 652-8400 |
| (212) 269-1400 | kmiller@skjlaw.com |
| kparks@gusraekaplan.com | jodell@skjlaw.com |
|  |  |
|  | Attorneys for The Ebury Parties |